**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SUZANNE BOELTER, individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br> v.<br><br>ADVANCE MAGAZINE PUBLISHERS INC., d/b/a CONDÉ NAST,<br><br>       Defendant. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

    Plaintiff Suzanne Boelter ("Plaintiff"), individually and on behalf of herself and all others similarly situated, by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## NATURE OF THE CASE

    1.  Advance Magazine Publishers Inc., d/b/a Condé Nast ("Condé Nast"), is an international media company that publishes some of the most widely circulated magazines in the United States, including *GQ*, *The New Yorker*, *Vanity Fair*, *Vogue*, *Glamour*, *Allure*, and *Lucky*.

    2.  To supplement its sales and advertising revenues, Condé Nast sells its subscribers' personal information—including their full names, titles of magazines subscribed to, and home addresses (collectively "Personal Reading Information"), as well as myriad other personal, lifestyle, and demographic information such as gender, age, ethnicity, income, religion, parental status, and political affiliation—to data miners and other third parties without the written consent of its customers.

3.      Condé Nast's disclosure of Personal Reading Information, and other personal, demographic, and lifestyle information is not only unlawful, but also dangerous because it allows for the targeting of particularly vulnerable members of society.  In fact, anyone can buy a customer list from Condé Nast that contains a number of categories of detailed subscriber information.  For example, a purchase could buy a list with the names and addresses of all *Bon Appétit* subscribers who are Jewish, Republican, single, over the age of 80, with a net worth of greater than $500,000, no children in the household, and a history of charitable donations. Condé Nast would sell such a list for approximately $180 per thousand subscribers listed.

4.      While Condé Nast profits handsomely from the unauthorized sale and disclosure of its customers' Personal Reading Information and other personal information, it does so at the expense of its subscribers' privacy rights because Condé Nast does not obtain its customers' written consent prior to selling their Personal Reading Information.

5.      By selling its customers' Personal Reading Information without their written consent, Condé Nast violates Michigan's Video Rental Privacy Act, M.C.L. § 445.1712 ("VRPA"), which prohibits companies from disclosing without permission any record or information concerning a Michigan customer's purchase of written materials, if the record identifies the customer.

6.      Accordingly, Plaintiff brings this Class Action Complaint against Condé Nast for its intentional and unlawful disclosure of its customers' Personal Reading Information in violation of the VRPA, and for unjust enrichment.

## **PARTIES**

7.      Plaintiff Suzanne Boelter is a natural person and citizen of the State of Michigan. Plaintiff Boelter is a subscriber to *Bon Appétit* and *Self* magazines, which are published by

Condé Nast.  Prior to and at the time she subscribed to *Bon Appétit* and *Self*, Condé Nast did not

notify Plaintiff Boelter that it discloses the Personal Reading Information of its customers, and

Plaintiff Boelter has never authorized Condé Nast to do so.  Furthermore, Plaintiff Boelter was

never provided any written notice that Condé Nast sells its customers' Personal Reading

Information, or any means of opting out.  Since subscribing to *Bon Appétit* and *Self*, and

continuing to present, Condé Nast has disclosed, and continues to disclose, without consent or

prior notice, Plaintiff Boelter's Personal Reading Information to data mining companies

including Insource and others, who then supplement that information with data from their own

files.  Moreover, during that same period, Condé Nast has sold – and continues to sell and offer

for sale – mailing lists containing Plaintiff Boelter's Personal Reading Information to third

parties seeking to contact Condé Nast subscribers, without first obtaining Plaintiff Boelter's

written consent or even giving her prior notice of the disclosure and sales.  Because Condé Nast

sold and disclosed her Personal Reading Information, Plaintiff Boelter now receives junk mail

and telephone solicitations offering discounted magazine subscriptions, among other things.

These unwarranted offers waste Plaintiff Boelter's time, money, and resources.  These harassing

junk mail offerings and phone call solicitations received by Plaintiff Boelter are attributable to

Condé Nast's unauthorized sale and disclosure of her Personal Reading Information.  Because

Plaintiff Boelter is entitled by law to privacy in her Personal Reading Information, and because

she paid money for her subscription, Condé Nast's sale of her Personal Reading Information

deprived Plaintiff Boelter of the full set of benefits to which she was entitled as a part of her *Bon

Appétit* and *Self* subscriptions, thereby causing economic harm.  Accordingly, what Plaintiff

Boelter received (a subscription without statutory privacy protections) was less valuable than

what she paid for (a subscription with accompanying statutory privacy protections), and she would

not have been willing to pay as much, if at all, for her *Bon Appétit* and *Self* subscriptions had she known that Condé Nast would disclose her Personal Reading Information.

8.      Defendant Advance Magazine Publishers Inc., d/b/a Condé Nast is a New York corporation with its principal place of business at 1 World Trade Center, New York, New York 10007.  Condé Nast does business throughout Michigan, New York, and the entire United States.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendants.  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

10.      This Court has personal jurisdiction over Condé Nast because Condé Nast conducts substantial business within New York, such that Condé Nast has significant, continuous, and pervasive contacts with the State of New York.  Additionally, Condé Nast is a New York corporation, with its principal place of business is in New York, New York.

11.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Condé Nast does substantial business in this District, a substantial part of the events giving rise to Plaintiff's claims took place within this judicial District, and Condé Nast's principal place of business is in this District.

## FACTUAL BACKGROUND

### Michigan's Video Rental Privacy Act

12.      In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and written materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now

4

recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance."  S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

13.     Recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the VRPA "to preserve personal privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information.  H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

14.     Section 2 of the VRPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

M.C.L. § 445.1712 (emphasis added).

15.     Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought.  The whole process of intellectual growth is one of privacy—of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye."  S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

16.     As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes.  And it protects the selection of books that we choose to read."  134 Cong. Rec. S5399 (May 10, 1988).

5

17.     Senator Leahy also explained why choices in movies and reading materials are so private: "These activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

18.     Michigan's passage of the VRPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit A**).

19.     Despite the fact that thousands of Michigan residents subscribe to Condé Nast publications, Condé Nast disregards its legal responsibility by systematically violating the VRPA.

### *The Personal Information Market: Consumers' Personal Information Has Real Value*

20.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[1]

21.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[2]

---

[1] The Information Marketplace: Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited July 15, 2015).

[2] *See* Web's Hot New Commodity: Privacy, WSJ.com (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274

22.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[3]

23.     In fact, an entire industry exists where companies known as data miners purchase, trade, and collect massive databases of information about consumers.  Data miners then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[4]

24.     The scope of data miners' knowledge about consumers is immense:  "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[5]

25.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers

---

.html (last visited July 15, 2015).

[3] Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2,  *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf  (last visited July 15, 2015) (emphasis added).

[4] *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited July 15, 2013).

[5] Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited May 12, 2015).

that are now available."[6]

26.    Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi- Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[7]

27.    In their letter, the co-Chairmen recognized that:

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[8]

28.    Data mining is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[9] including fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like Condé Nast share information with data miners and direct-mail advertisers, they contribute to the "[v]ast databases of names and personal information" that are often "sold to thieves by large publicly

---

[6] Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited July 15, 2015).

[7] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited July 15, 2015).

[8] *Id.*

[9] *See Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited July 15, 2015).

traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[10]

29.    Information disclosures like Condé Nast's are particularly dangerous to the elderly.  "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[11]  The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[12]

30.    Indeed, an entire black market exists where the personal information of vulnerable elderly Americans is exchanged.  Thus, information disclosures like Condé Nast's are particularly troublesome because of their cascading nature:  "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[13]

31.    Condé Nast is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue:  disclosing subscriber information to data miners, direct marketers, and other third parties is a widespread practice in the publishing industry.

---

[10] Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times,  May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html?pagewanted=all&_r=0 (last visited July15, 2015).

[11] *Id.*

[12] *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited July 15, 2015).

[13] *See id.*

32.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth.  Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases

33.     As the data mining industry has grown, so too have consumer concerns regarding the privacy of their personal information.

34.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[14]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[15]

35.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy- protective competitors.

36.     In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[16]

37.     These companies' business models capitalize on a fundamental tenet underlying

---

[14] *See 2013 TRUSTe US Consumer Confidence Index*, TRUSTe, http://www.truste.com/us-consumer-confidence-index-2013/ (last visited July 15, 2015).

[15] *Id.*

[16] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited July 15, 2015).

the personal information marketplace:  consumers recognize the economic value of their private

data.  Research shows that consumers are willing to pay a premium to purchase services from

companies that adhere to more stringent policies of protecting their personal data.[17]

38.     Thus, in today's economy, individuals and businesses alike place a real,

quantifiable value on consumer data and corresponding privacy rights.[18]  As such, where a

business offers customers a service that includes statutorily guaranteed privacy protections, yet

fails to honor these guarantees, the customer receives a service of less value than the service paid

for.

### *Condé Nast Unlawfully Sells its Subscribers' Personal Reading Information*

39.     Condé Nast maintains a vast digital database comprised of its subscribers'

Personal Reading Information.  Condé Nast discloses its subscribers' Personal Reading

Information to data mining companies including Insource and others, who then supplement that

information with additional sensitive personal information about each Condé Nast subscriber,

including gender, purchasing habits, political affiliation, religious practice, charitable donations,

and (when applicable) number, age, and gender of the subscriber's children.  (*See, e.g.*, **Exhibits**

**B-D**).

40.     Condé Nast then sells its mailing lists—which include subscribers' Personal

---

[17] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited July 15, 2015).

[18] *See* Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited July 15, 2015) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.")

Reading Information identifying which individuals purchased which magazines, and can include the sensitive information obtained from data miners—to data miners, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibits B–D**).

41.     As a result of Condé Nast's data compiling and sharing practices, companies can purchase mailing lists from Condé Nast that identify Condé Nast subscribers by their most intimate details:  income, political affiliation, religious practice, and charitable donations. Condé Nast's disclosure of such sensitive and personal information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.  For example, Condé Nast will sell—to anyone willing to pay for it—a list with the names and addresses of all *Bon Appétit* subscribers who are Jewish, Republican, single, over the age of 80, with a net worth of greater than $500,000, no children in the household, and a history of charitable donations.

42.     Condé Nast does not seek its subscribers' prior written consent to any of these disclosures and its subscribers remain unaware that their Personal Reading Information and other sensitive personal information is being bought and sold on the open market.

43.     Consumers can sign up for Condé Nast subscriptions through numerous media outlets, including the Internet, telephone, or traditional mail.  Regardless of how the consumer subscribes, Condé Nast never requires the individual to read or agree to any terms of service, privacy policy, or information-sharing policy.  Consequently, Condé Nast uniformly fails to obtain any form of consent from – or even provide effective notice to – its subscribers before disclosing their Personal Reading Information.

44.     As a result, Condé Nast disclosed and continues to disclose its customers' Personal Reading Information – including their reading habits and preferences that can "reveal

12

intimate facts about our lives, from our political and religious beliefs to our health concerns"[19] –
to anybody willing to pay for it.

45.     By and through these actions, Condé Nast has intentionally disclosed to third
parties its Michigan subscribers' Personal Reading Information without consent, in direct
violation of the VRPA with Plaintiff and other members of the Class.

### CLASS ACTION ALLEGATIONS

46.     Plaintiff seeks to represent a class defined as all Michigan residents who had their
Personal Reading Information disclosed to third parties by Condé Nast without consent (the
"Class").  Excluded from the Class is any entity in which Defendant has a controlling interest,
and officers or directors of Defendant.

47.     Members of the Class are so numerous that their individual joinder herein is
impracticable.  On information and belief, members of the Class number in the thousands.  The
precise number of Class members and their identities are unknown to Plaintiff at this time but
may be determined through discovery.  Class members may be notified of the pendency of this
action by mail and/or publication through the distribution records of Defendant.

48.     Common questions of law and fact exist as to all Class members and predominate
over questions affecting only individual Class members.  Common legal and factual questions
include, but are not limited to:  (a) whether Condé Nast is "engaged in the business of selling at
retail" books or other written materials (*i.e.*, magazines); (b) whether Condé Nast obtained
consent before disclosing to third parties Plaintiff's and the Class's Personal Reading
Information; (c) whether Condé Nast's disclosure of Plaintiff's and the Class's Personal Reading

---

[19] *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3,
2011), https://www.eff.org/press/archives/2011/10/03 (last visited July 15, 2015).

Information violated the Video Rental Privacy Act, M.C.L. § 445.1712; and (d) whether Condé Nast's sale of Plaintiff's and the Class's Personal reading Information constitutes unjust enrichment.

49.    The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiff's and the Class's Personal Reading Information.

50.    Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and her counsel.

51.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I
### Violation of the Video Rental Privacy Act
### (M.C.L. § 445.1712)

52.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

53.     Plaintiff brings this claim individually and on behalf of members of the Class against Defendant Condé Nast.

54.     As a magazine publisher that sells subscriptions to consumers, Condé Nast is engaged in the business of selling written materials at retail.  *See* M.C.L. § 445.1712.

55.     By subscribing to *Bon Appétit* and *Self*, Plaintiff purchased written materials directly from Condé Nast.  *See* M.C.L. § 445.1712.

56.     Because Plaintiff purchased written materials directly from Condé Nast, she is a "customer" within the meaning of the VRPA.  *See* M.C.L. § 445.1711(a).

57.     At all times relevant, and beginning on the dates Plaintiff initiated her *Bon Appétit* and *Self* subscriptions, Condé Nast disclosed Plaintiff's Personal Reading Information, which identified her as a *Bon Appétit* and *Self* subscriber, in at least two ways.

58.     First, Condé Nast disclosed mailing lists containing Plaintiff's Personal Reading Information to data mining companies including Insource, and others, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to Condé Nast.

59.     Second, Condé Nast sold its mailing lists containing Plaintiff's Personal Reading Information—enhanced with additional information from data miners—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

60.     Because the mailing lists included the additional information from the data miners, the lists were more valuable, and Condé Nast was able to increase its profits gained from the mailing list sales.

61.     By selling or otherwise disclosing its subscriber lists, Condé Nast disclosed to persons other than Plaintiff records or information concerning her purchase of written materials from Condé Nast.  *See* M.C.L. § 445.1712.

62.     The information Condé Nast disclosed indicates Plaintiff's name and address, as well as the fact that she subscribed to *Bon Appétit* and *Self*.  Accordingly, the records or information disclosed by Condé Nast indicate Plaintiff's identity.  *See* M.C.L.§ 445.1712.

63.     Plaintiff and the members of the Class never consented to Condé Nast disclosing their Personal Reading Information to anyone.

64.     Worse yet, Plaintiff and the members of the Class did not receive notice before Condé Nast disclosed their Personal Reading Information to third parties.

65.     On information and belief, Condé Nast's disclosures of Plaintiff's and the Class's Personal Reading Information were not made pursuant to a court order, search warrant, or grand jury subpoena.

66.     Condé Nast's disclosures of Plaintiff's and the Class's Personal Reading Information were not made to collect payment for their subscriptions.

67.     Condé Nast's disclosures of Plaintiff's Personal Reading Information were made to data miners, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase Condé Nast's revenue.  Accordingly, Condé Nast's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiff and the members of the Class.

16

68.     By disclosing Plaintiff's Personal Reading Information, Condé Nast violated Plaintiff's and the Class's statutorily-protected right to privacy in their reading habits.  *See* M.C.L. § 445.1712.

69.     Additionally, because Plaintiff and the members of the Class paid for their Condé Nast subscriptions, and Condé Nast was obligated to comply with the VRPA, Condé Nast's unlawful disclosure of Plaintiff's and the other Class members' Personal Reading Information deprived Plaintiff and the Class members of the full value of their paid-for subscriptions. Because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, Condé Nast's unlawful sale and disclosure of their Personal Reading Information caused her to receive less value than she paid for, thereby causing her economic harm.

70.     Likewise, because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, a magazine subscription that keeps their Personal Reading Information private is more valuable than one that does not.

71.     Accordingly, had Plaintiff been adequately informed of Condé Nast's disclosure practices, she would not have been willing to purchase her *Bon Appétit* and *Self* subscriptions at the price charged, if at all.  Thus, Condé Nast's unlawful disclosures caused Plaintiff economic harm.

72.     Condé Nast's disclosure of Plaintiff's Personal Reading Information to third parties has also caused an influx of third party print advertisements and marketing calls to her cellular phone.

73.     As a result of Condé Nast's unlawful and continued disclosure of their Personal Reading Information, Plaintiff and the members of the Class have suffered privacy and economic

injuries.  On behalf of herself and the Class, Plaintiff seeks:  (1) an injunction requiring

Defendant Condé Nast to obtain consent from Michigan subscribers prior to the disclosure of

their Personal Reading Information as required by the VRPA; (2) actual damages, including

disgorgement, or $5,000.00, whichever is greater, per Class member pursuant to M.C.L. §

445.1715(a); and (3) costs and reasonable attorneys' fees pursuant to M.C.L. § 445.1715(b).

**COUNT II**

**Unjust Enrichment**

74.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set

forth herein.

75.     Plaintiff brings this claim individually and on behalf of the members of the Class

against Defendant.

76.     Plaintiff and the Class members conferred benefits on Condé Nast by providing

Condé Nast with their Personal Reading Information and paying Condé Nast for their magazine

subscriptions.  Condé Nast received and retained the information and money belonging to

Plaintiff and the Class when Plaintiff and the Class subscribed to Condé Nast publications.

77.     Because Condé Nast received and processed Plaintiff's and the Class's

subscription payments and Personal Reading Information, and because Condé Nast has

employees handling customer accounts and billing as well as customer data, Condé Nast

appreciates or has knowledge of such benefits.

78.     Under the VRPA, Plaintiff and the Class members were entitled to confidentiality

in their Personal Reading Information as part of their subscriptions.

79.     Under principles of equity and good conscience, because Condé Nast failed to

comply with the VRPA, Condé Nast should not be allowed to retain the full amount of money

Plaintiff and the Class paid for their subscriptions or the money it received by selling Plaintiff's

18

and the Class's Personal Reading Information.

80.     Plaintiff and the other Class members have suffered actual damages as a result of Condé Nast's unlawful conduct in the form of the value Plaintiff and the other Class members paid for and ascribed to the confidentiality of their Personal Reading Information.  This amount is tangible and will be calculated at trial.

81.     Additionally, Plaintiff and the Class members have suffered actual damages inasmuch as Condé Nast's failure to inform them that it would disclose their Personal Reading Information caused them to purchase magazine subscriptions when they otherwise would not have.

82.     Further, a portion of the purchase price of each Condé Nast magazine subscription sold to Plaintiff and the other Class members was intended to ensure the confidentiality of Plaintiff's and the other Class members' Personal Reading Information, as required by the VRPA.  Because Plaintiff and the other Class members were denied services that they paid for and were entitled to receive—i.e., confidentiality of their Personal Reading Information—and because Plaintiff and the Class would have commanded a discount to voluntarily forego those benefits, they incurred actual monetary damages.

83.     To prevent inequity, Condé Nast should return to Plaintiff and the Class the value they ascribe to confidentiality of their Personal Reading Information and all money derived from Condé Nast's sale and disclosure of Plaintiff's and the Class's Personal Reading Information.

84.     Accordingly, Plaintiff and the Class members seek an order declaring that Condé Nast's conduct constitutes unjust enrichment, and awarding Plaintiff and the Class restitution in an amount to be calculated at trial equal to the amount of  money obtained by Condé Nast through its sale and disclosure of Plaintiff's and the Class's Personal Reading Information.

## PRAYER FOR RELIEF

85.     WHEREFORE, Plaintiff, individually and on behalf of all others similarly

situated, seeks a judgment against Defendant as follows:

A.     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class.

B.     For an order declaring that Defendant's conduct as described herein violates the Video Rental Privacy Act, M.C.L. § 445.1712;

C.     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

D.     For an award of actual damages, including disgorgement and restitution, or $5,000, whichever is greater, to Plaintiff and each Class member, as provided by the Video Rental Privacy Act, M.C.L. § 445.1715(a);

E.     For prejudgment interest on all amounts awarded;

F.     For an order of restitution and all other forms of equitable monetary relief;

G.     For injunctive relief as pleaded or as the Court may deem proper; and;

H.     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: July 20, 2015

Respectfully submitted,

**BURSOR & FISHER, P.A.**


By: ___*/s/ Joseph I. Marchese*_____
       Joseph I. Marchese

Scott A. Bursor
Joseph I. Marchese
Philip L. Fraietta
888 Seventh Avenue
New York, NY  10019
Telephone: (212) 989-9113
Facsimile:  (212) 989-9163
Email:  scott@bursor.com
       jmarchese@bursor.com
       pfraietta@bursor.com

*Attorneys for Plaintiff*

**EXHIBIT A**



**House
Legislative
Analysis
Section**

Washington Square Building, Suite 1025
Lansing, Michigan 48909
Phone: 517/373-6466

PRIVACY: SALES, RENTALS OF VIDEOS, ETC.

**House Bill 5331** as enrolled
Second Analysis (1-20-89)

**Sponsor: Rep. David Honigman
House Committee: Judiciary
Senate Committee: Judiciary**

## THE APPARENT PROBLEM:

During the period when Congressional confirmation hearings were being held on the nomination of Robert Bork to the Supreme Court, a Washington weekly obtained and published a list of videotapes rented under Bork's wife's account. Many found this to be an unwarranted invasion of privacy, and the incident prompted the introduction in Congress of a bill to protect the privacy of those who rent or buy videotapes. Many in Michigan also believe that one's choice in videos, records, and books is nobody's business but one's own, and suggest the enactment of a statute to explicitly protect a consumer's privacy in buying and borrowing such items.

## THE CONTENT OF THE BILL:

The bill would create a new public act to preserve personal privacy with respect to the purchase, rental, or borrowing of written materials, sound recordings, and video recordings. Except as otherwise provided by law, a retailer, lender, or renter of such items could not disclose information — such as selections made — on a particular customer to any person other than that customer. Such information could be disclosed with the customer's written permission, under a court order, to the extent reasonably necessary to collect past-due payment, for the exclusive purpose of marketing goods and services directly to the consumer, or under a search warrant. Violation of the bill would be a misdemeanor.

## FISCAL IMPLICATIONS:

The House Fiscal Agency says that the bill would have no fiscal implications. (1-18-89)

## ARGUMENTS:

### For:

The bill would recognize that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else, for that matter. The bill would complement the Library Privacy Act, which exempts library records on a person from disclosure under the Freedom of Information Act and prohibits disclosure absent a court order or the individual's consent.

**Response:** The bill, while laudable in its aims, may be unnecessary for libraries, which already are subject to civil penalties for violating the Library Privacy Act.

### Against:

The bill could offer more in the way of recourse for injured parties if it provided for civil damages as well as criminal misdemeanor penalties. Civil remedies not only offer a person recompense for harm done: they free a person from having to rely on a prosecutor's office to pursue a case.

H.B. 5331 (1-20-89)

**EXHIBIT B**



# Conde Nast - Enhanced Database Mailing List

The Conde Nast Enhanced Database is overlaid with E-Tech and InfoBase Lifestyle data and includes subscribers to Vogue, W, Glamour, Allure, Self, Teen Vogue, GQ, Details, Architectural Digest, Brides, Lucky, Golf Digest, Golf World, Vanity Fair, Bon Appetit, Conde Nast Traveler, Wired, The New Yorker.

**Get Count**   **Get Pricing**   **Get More Information**

| SEGMENTS | | *COUNTS THROUGH 05/31/2015* |
|---|---|---|
| 6,588,000 | TOTAL UNIVERSE / BASE RATE | $110.00/M |
| 6,588,000 | ACTIVE SUBSCRIBERS | $110.00/M |
| 628,000 | 30 DAY HOTLINE SUBSCRIBERS | + $17.00/M |
| 1,643,000 | 3 MONTH HOTLINE SUBSCRIBERS | + $14.00/M |
| 3,248,000 | 12 MONTH FORMER SUBSCRIBERS | $70.00/M |
| 73,000 | LAST 30 DAY CHANGE OF ADDRESS | + $14.00/M |
| | CATALOG RATE | $80.00/M |
| | FUNDRAISING | $70.00/M |
| | NONPROFIT | $80.00/M |

| POPULARITY: | ▪▪▪▪▪ 100 |
|---|---|
| MARKET: | CONSUMER |
| CHANNELS: | |
| SOURCE: | 98% PAID 61% DTP |
| PRIVACY: | UNKNOWN |
| DMA?: | YES - MEMBER |
| STATUS: | PREFERRED PROVIDER |
| GEO: | USA |
| GENDER: | 58% FEMALE 36% MALE |

## DESCRIPTION

The Conde Nast Enhanced Database is overlaid with E-Tech and InfoBase Lifestyle data and includes subscribers to  Vogue, W, Glamour, Allure, Self, Teen Vogue, GQ, Details, Architectural Digest, Brides, Lucky, Golf Digest, Golf World, Vanity Fair, Bon Appetit, Conde Nast Traveler, Wired, The New Yorker.


Active subscribers selectable by the following income ranges:

Under $15,000

$15,000 - $19,000

$20,000 - $29,000

$30,000 - $39,000

$40,000 - $49,000

$50,000 - $74,000

$75,000 - $99,999

$100,000 - $124,999

| SELECTS | |
|---|---|
| 3 MONTH HOTLINE | $14.00/M |
| 30 DAY HOTLINE | $17.00/M |
| 3RD PARTY BLOW-IN | $10.00/M |
| 6 MONTH HOTLINE | $9.00/M |
| ACTIVE SUBSCRIBERS | |
| AGE/INCOME | $14.00/M |
| CATALOG/PRODUCT BUYERS | $14.00/M |
| CHANGE OF ADDRESS | $14.00/M |
| ETHNIC/ETHNICITY | $14.00/M |
| GENDER/PAID | $9.00/M |
| GIFT GIVERS | $14.00/M |
| HOME ADDRESS / BUSINESS ADDRESS | $14.00/M |
| INCOME RANGES | |
| LIFESTYLE INTEREST ENHHANCEMENTS | $14.00/M |
| MARITAL STATUS | $14.00/M |
| NET WORTH | |
| NEW TO FILE | $14.00/M |
| NIELSEN COUNTY | $9.00/M |
| PRESENCE OF CHILDREN | $14.00/M |
| PUBLICATION TITLE | |
| RELIGION/RELIGIOUS | $14.00/M |
| RUNNING CHARGE | $8.00/M |
| SOURCE / NEW TO FILE / RENEWALS | $14.00/M |
| STATE/SCF/ZIP | $9.00/M |
| VOTER PARTY | $14.00/M |
| ADDRESSING | |
| KEY CODING | $2.00/M |
| EMAIL | $59.00/F |
| FTP | $59.00/F |

$125,000+

Adult Age Ranges (Active subscriber counts)

18-24 = 220,658

25-34 = 867,846

35-44 = 978,871

45-54 = 1,156,504

55-64 = 1,178,913

65-74 = 720,538

75+ = 443,222

Note: A signed list rental agreement from mailer is required on an annual basis.  List owner will not rent to sweepstakes, surveys, contests or telemarketing offers.  Email Addresses are not available.

3,000 Minimum will apply on all reuse orders.

**ORDERING INSTRUCTIONS**
- To order this list, contact your List Broker and ask for NextMark List ID #299643 or click here to place your request.
- 10,000 NAME MINIMUM ORDER $0.00 MINIMUM PAYMENT
- 85% NET NAME AVAILABLE ON ORDERS OF 50,000 OR MORE ($15.00/M RUN CHARGE)
- EXCHANGE IS AVAILABLE
- REUSE IS AVAILABLE ON ORDERS OF 3,000
- CANCELLATION FEE AT $100.00/F

**RELATED LISTS**
- HEARST MASTERFILE
- CONSUMER REPORTS
- SMITHSONIAN MAGAZINE
- BONNIER CORPORATION ENHANCED MASTERFILE
- I-BEHAVIOR DATABASE
- TIME INC. AFFLUENT MEDIA GROUP ENHANCED MASTERFILE
- MEREDITH DATABASE - ENHANCED MASTERFILE
- NATIONAL GEOGRAPHIC SOCIETY ENHANCED MASTERFILE
- AMERICAN LUNG ASSOCIATION DONOR MASTERFILE
- TIME INC. MAGAZINES GROUP ENHANCED MASTERFILE

**Get Count**   **Get Pricing**   **Get More Information**

**EXHIBIT C**



# Conde Nast - Woman's Group Enhanced Database Mailing List

The Conde Nast Women's Group Enhanced Database is comprised of the female subscribers to the Conde Nast titles. This database is overlaid with E-Tech and InfoBase Lifestyle data and includes female subscribers to Vogue, W, Glamour, Allure, Self, Teen Vogue, GQ, Details, Architectural Digest, Brides, Lucky, Golf Digest, Golf World, Vanity Fair, Bon Appetit, Conde Nast Traveler, Wired, The New Yorker.

**Get Count**   **Get Pricing**   **Get More Information**

| SEGMENTS | | COUNTS THROUGH 05/31/2015 |
|---|---|---|
| 3,646,774 | TOTAL UNIVERSE / BASE RATE | $110.00/M |
| 3,646,774 | ACTIVE FEMALE SUBSCRIBERS | + $14.00/M |
| 414,503 | 30 DAY HOTLINE FEMALE SUBSCRIBERS | + $31.00/M |
| 1,028,630 | 3 MONTH HOTLINE FEMALE SUBSCRIBERS | + $28.00/M |
| | CATALOG RATE | $80.00/M |
| | FUNDRAISING | $70.00/M |
| | NONPROFIT | $80.00/M |

| | |
|---|---|
| POPULARITY: | ▬▬▬▬▬ 96 |
| MARKET: | CONSUMER |
| CHANNELS: | |
| SOURCE: | 98% PAID 61% DTP |
| PRIVACY: | UNKNOWN |
| DMA?: | YES - MEMBER |
| STATUS: | PREFERRED PROVIDER |
| GEO: | USA |
| GENDER: | 100% FEMALE |

## DESCRIPTION

The Conde Nast Women's Group Enhanced Database is comprised of the female subscribers to the Conde Nast titles. This database is overlaid with E-Tech and InfoBase Lifestyle data and includes female subscribers to Vogue, W, Glamour, Allure, Self, Teen Vogue, GQ, Details, Architectural Digest, Brides, Lucky, Golf Digest, Golf World, Vanity Fair, Bon Appetit, Conde Nast Traveler, Wired, The New Yorker.

Note: A signed list rental agreement from mailer is required on an annual basis. List owner will not rent to sweepstakes, surveys, contests or telemarketing offers. Email Addresses are not available.

3,000 Minimum will apply on all reuse orders.

## ORDERING INSTRUCTIONS

- To order this list, contact your List Broker and ask for NextMark List ID #299838 or click here to place your request.
- 10,000 NAME MINIMUM ORDER $0.00 MINIMUM PAYMENT
- 85% NET NAME AVAILABLE ON ORDERS OF 50,000 OR MORE ($8.00/M RUN CHARGE)

| SELECTS | |
|---|---|
| 3 MONTH HOTLINE | $14.00/M |
| 30 DAY HOTLINE | $17.00/M |
| 3RD PARTY BLOW-IN | $10.00/M |
| 6 MONTH HOTLINE | $9.00/M |
| AGE/INCOME | $14.00/M |
| CATALOG/PRODUCT BUYERS | $14.00/M |
| CHANGE OF ADDRESS | $14.00/M |
| ETHNIC/ETHNICITY | $14.00/M |
| GENDER/PAID | $9.00/M |
| GIFT GIVERS | $14.00/M |
| HOME ADDRESS / BUSINESS ADDRESS | $14.00/M |
| HUNTING / FISHING INTEREST | $14.00/M |
| LIFESTYLE INTEREST ENHHANCEMENTS | $14.00/M |
| MARITAL STATUS | $14.00/M |
| NEW TO FILE | $14.00/M |
| NIELSEN COUNTY | $9.00/M |
| PRESENCE OF CHILDREN | $14.00/M |
| PRODUCT | $14.00/M |
| RELIGION/RELIGIOUS | $14.00/M |
| RUNNING CHARGE | $8.00/M |
| SOURCE / NEW TO FILE / RENEWALS | $14.00/M |
| STATE/SCF/ZIP | $9.00/M |
| VOTER PARTY | $14.00/M |

| ADDRESSING | |
|---|---|
| KEY CODING | $2.00/M |
| EMAIL | $59.00/F |

- EXCHANGE IS AVAILABLE
- REUSE IS AVAILABLE ON ORDERS OF 3,000
- CANCELLATION FEE AT $100.00/F

FTP                                          $59.00/F

**RELATED LISTS**

- TIME INC. CORPORATE DATABASE
- BOARDROOM MASTERFILE
- HEARST MASTERFILE - LIFESTYLE
- MEREDITH DATABASE - ENHANCED MASTERFILE
- HIGHLIGHTS FOR CHILDREN ENHANCED MASTERFILE
- ALLURE MAGAZINE
- GLAMOUR MAGAZINE
- CONDE NAST - MEN'S GROUP ENHANCED DATABASE
- GUTHY-RENKER MASTERFILE
- HEARST MASTERFILE

**Get Count**   **Get Pricing**   **Get More Information**

**EXHIBIT D**



**① Start ② Results ③ Data Card ④ Request ⑤ Finished**

# Conde Nast - Religious Subscribers Mailing List

Now Enhanced with E-Tech Data! This masterfile is comprised of subscribers to upscale publications by Condé Nast. Titles include: Vogue, W, Glamour, Allure, Self, Teen Vogue, GQ, Details, Architectural Digest, Brides, Lucky, Golf Digest, Golf World, Vanity Fair, Bon Appetit, Conde Nast Traveler, Wired, The New Yorker.

**Get Count** **Get Pricing** **Get More Information**

| SEGMENTS | *COUNTS THROUGH 05/31/2015* | |
|---|---|---|
| 4,117,384 | TOTAL UNIVERSE / BASE RATE | $110.00/M |
| 151,512 | ACTIVE BUDDHIST SUBSCRIBERS | + $14.00/M |
| 2,061,720 | ACTIVE CATHOLIC SUBSCRIBERS | + $14.00/M |
| 84,791 | ACTIVE EASTERN ORTHODOX SUBSCRIBERS | + $14.00/M |
| 50,419 | ACTIVE HINDU SUBSCRIBERS | + $14.00/M |
| 71,887 | ACTIVE ISLAMIC SUBSCRIBERS | + $14.00/M |
| 287,213 | ACTIVE JEWISH SUBSCRIBERS | + $14.00/M |
| 6,281 | ACTIVE LUTHERAN SUBSCRIBERS | + $14.00/M |
| 25,178 | ACTIVE MORMON SUBSCRIBERS | + $14.00/M |
| 4,117,384 | ACTIVE PROTESTANT SUBSCRIBERS | + $14.00/M |
| 32,630 | ACTIVE SHINTO SUBSCRIBERS | + $14.00/M |
| | CATALOG RATE | $80.00/M |
| | FUNDRAISING | $70.00/M |
| | NONPROFIT | $80.00/M |

| | |
|---|---|
| POPULARITY: | ▪▪▪▪▪ 93 |
| MARKET: | CONSUMER |
| CHANNELS: | |
| SOURCE: | 98% PAID 61% DTP |
| PRIVACY: | UNKNOWN |
| DMA?: | YES - MEMBER |
| STATUS: | PREFERRED PROVIDER |
| GEO: | USA |

| SELECTS | |
|---|---|
| 3 MONTH HOTLINE | $14.00/M |
| 30 DAY HOTLINE | $17.00/M |
| 3RD PARTY BLOW-IN | $10.00/M |
| 6 MONTH HOTLINE | $9.00/M |
| AGE/INCOME | $14.00/M |
| CATALOG/PRODUCT BUYERS | $14.00/M |
| CHANGE OF ADDRESS | $14.00/M |
| ETHNIC/ETHNICITY | $14.00/M |
| GENDER/PAID | $9.00/M |
| GIFT GIVERS | $14.00/M |
| HOME ADDRESS / BUSINESS ADDRESS | $14.00/M |
| LIFESTYLE INTEREST ENHHANCEMENTS | $14.00/M |
| MARITAL STATUS | $14.00/M |
| NEW TO FILE | $14.00/M |
| NIELSEN COUNTY | $9.00/M |
| PRESENCE OF CHILDREN | $14.00/M |
| PRODUCT | $14.00/M |
| PUBLICATION TITLE | |
| RELIGION/RELIGIOUS | $14.00/M |
| RUNNING CHARGE | $8.00/M |
| SOURCE / NEW TO FILE / RENEWALS | $14.00/M |
| STATE/SCF/ZIP | $9.00/M |
| VOTER PARTY | $14.00/M |

| ADDRESSING | |
|---|---|
| KEY CODING | $2.00/M |
| EMAIL | $59.00/F |
| FTP | $59.00/F |

**DESCRIPTION**

Now Enhanced with E-Tech Data! This masterfile is comprised of subscribers to upscale publications by Condé Nast. Titles include: Vogue, W, Glamour, Allure, Self, Teen Vogue, GQ, Details, Architectural Digest, Brides, Lucky, Golf Digest, Golf World, Vanity Fair, Bon Appetit, Conde Nast Traveler, Wired, The New Yorker.

Note: A signed list rental agreement from mailer is required on an annual basis. List owner will not rent to sweepstakes, surveys, contests or telemarketing offers. Email Addresses are not available.

3,000 Minimum will apply on all reuse orders.

**RELATED LISTS**

 TOTALSOURCE PLUS - DEMOGRAPHIC

**ORDERING INSTRUCTIONS**

- To order this list, contact your List Broker and ask for NextMark List ID #299832 or click here to place your request.
- 10,000 NAME MINIMUM ORDER $0.00 MINIMUM PAYMENT

- 85% NET NAME AVAILABLE ON ORDERS OF 50,000 OR MORE ($8.00/M RUN CHARGE)
- EXCHANGE IS AVAILABLE
- REUSE IS AVAILABLE ON ORDERS OF 3,000
- CANCELLATION FEE AT $100.00/F

DISABLED AMERICAN VETERANS ACTIVE DONORS

TIME INC. MAGAZINES GROUP ENHANCED MASTERFILE

PARALYZED VETERANS OF AMERICA PREMIUM DONOR MASTERFILE

NOZA ENHANCED DONOR MASTERFILE

3D MULTI-TOUCH MAIL ORDER BUYERS

CHRISTIAN BOOK DISTRIBUTORS CATALOG BUYERS

RODALE, INC. MASTERFILE

ACTION NETWORK DONOR DATABASE

CHECKS UNLIMITED

**Get Count**    **Get Pricing**    **Get More Information**