UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SUZANNE BOELTER, individually and on behalf of all others similarly situated, | Case No.  15-CV-05671 |
| Plaintiff, | ECF Case |
| v. | Electronically filed |
| ADVANCE MAGAZINE PUBLISHERS INC., d/b/a CONDÉ NAST, | |
| Defendant. | |

### MEMORANDUM OF LAW OF DEFENDANT ADVANCE MAGAZINE PUBLISHERS INC. <u>IN SUPPORT OF ITS MOTION TO DISMISS</u>

Sandra D. Hauser
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Tel: (212) 768-6700
Fax: (212) 768-6800
sandra.hauser@dentons.com

Natalie J. Spears
Kristen C. Rodriguez
DENTONS US LLP
233 S. Wacker Drive, Suite 5900
Chicago, IL 60606-6404
Tel:  (312) 876-8000
Fax:  (312) 876-7934
natalie.spears@dentons.com
kristen.rodriguez@dentons.com

*Counsel for Defendant*
*Advance Magazine Publishers Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT .......................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 4

     A.     The Michigan VRPA ................................................................................. 4
     B.     Claims For VRPA Statutory Damages Cannot Be Brought On A Class Basis
               Under Michigan Law ................................................................................ 5
     C.     Plaintiff's Lawsuit ................................................................................... 6

ARGUMENT ...................................................................................................................... 6

I.     Standard of Review—12(b)(1) and 12(b)(6) ................................................. 6

II.     Plaintiff Lacks Article III Standing To Bring This No-Injury Action To Enforce a
       Purported Bare Violation of a Michigan State Statute ....................................... 7

III.    As a Prudential Matter of Comity and Federalism, The Court Should Decline To Assert
       Article III Jurisdiction Over Plaintiff's Attempt To Manufacture a Federal Class Action
       That Subverts Michigan Law ......................................................................... 12

IV.    CAFA Is the Sole Basis for Federal Jurisdiction Here, and CAFA Cannot Be Read to
       Create a Federal Forum for Class Action Litigation That State Law Expressly Disallows
       ........................................................................................................................ 15

V.     Even if Standing and Jurisdiction Could Be Established, Plaintiff Fails to State a Claim
       Because Condé Nast Provided Written Notice That Her Information Could Be Disclosed
       For Marketing Purposes, As The VRPA Expressly Allows .............................. 18

VI.    The VRPA Violates The First Amendment ................................................... 20

VII.   Plaintiff's Tag-Along Unjust Enrichment Claim Fails As A Matter of Law.................. 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allstate Ins. Co. v. Sabbagh*,
603 F.2d 228 (1st Cir. 1979) .................................................................14

*Ashcroft v. Free Speech Coalition*,
535 U.S. 234 (2002) ..............................................................................21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................7

*Austin-Spearman v. AMC Network Entm't, LLC*,
No. 14-CV-6840, 2015 WL 1539052 (S.D.N.Y. Apr. 7, 2015) ...........7, 8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................7

*Boelter v. Hearst Comm'cns, Inc.*,
No. 1:15-cv-03934-AT (S.D.N.Y. filed May 21, 2015) ........................1

*Bond v. United States*,
134 S. Ct. 2077 (2014) ..........................................................................17

*Bose v. Interclick, Inc.*,
No. 10 Civ. 9183 (DAB), 2011 WL 4343517 (S.D.N.Y. Aug. 17, 2011) ..............................11

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973) ..............................................................................21

*Brockett v. Spokane Arcades, Inc.*,
472 U.S. 491 (1985) ..............................................................................21

*Brown v. Entm't Merchs. Ass'n*,
131 S. Ct. 2729 (2011) .....................................................................20, 22

*Burford v. Sun Oil Co.*,
319 U.S. 315 (1943) .........................................................................13, 14

*Cain v. Redbox Automated Retail, LLC*,
981 F. Supp. 2d 674 (E.D. Mich. 2013) ................................................10

*Center for Reproductive Law and Policy v. Bush*,
304 F.3d 183 (2d Cir. 2002) .................................................................12

*Church of the Holy Trinity v. United States,*
143 U.S. 457 (1892)................................................................17

*Clarex Ltd. v. Natixis Sec. Am. LLC,*
No. 12 Civ. 0722 (PAE), 2012 WL 4849146 (S.D.N.Y. Oct. 12, 2012) ...............................6, 7

*Donoghue v. Bulldog Investors G.P.,*
696 F.3d 170, 175 (2d Cir. 2012).........................................................8

*In re DoubleClick Inc. Privacy Litig.,*
154 F. Supp. 2d at 525 .................................................................11, 24

*Erznoznik v. Jacksonville,*
422 U.S. 205 (1975)................................................................20

*Fox v. Condé Nast Publ'ns,*
No. 2:12-cv14312, ECF No. 6 (E.D. Mich. Oct. 1, 2012) ......................................1

*Garrison v. Louisiana,*
379 U.S. 64 (1964)................................................................21

*Gladstone Realtors v. Vill. of Bellwood,*
441 U.S. 91 (1979)................................................................8

*Gordon v. Crouchley,*
554 F. Supp. 796 (D.R.I. 1982) (Selya, J.) ................................................13, 14

*Halaburda v. Bauer Publ'g Co., LP,*
Nos. 12-CV-12831, 12-CV-14221, 12-CV-14390, 2013 WL 4012827 (E.D. Mich. Aug. 6, 2013)................................................................1, 10, 20

*Hess v. Port Authority Trans-Hudson Corp.,*
513 U.S. 30 (1994)................................................................13

*Hollingsworth v. Perry,*
133 S. Ct. 2652 (2013)................................................................9

*Jackson v. PKM Corp.,*
430 Mich. 262, 422 N.W.2d 657 (1988)................................................23

*In re JetBlue Airways Corp. Privacy Litig.,*
379 F. Supp. 2d 299 (E.D.N.Y. 2005) ..................................................11

*Kinder v. Meredith Corp.,*
No. 14-CV-11284, 2014 WL 4209575 (E.D. Mich. Aug. 26, 2014)......................................10

*King v. Burwell,*
135 S. Ct. 2480 (2015)................................................................17

*Kraft v. Detroit Ent'mnt, L.L.C.*,
261 Mich.App. 534, 683 N.W.2d 200 (2004) ........................................................................23

*L-7 Designs, Inc. v. Old Navy, LLC*,
647 F.3d 419 (2d Cir. 2011) ................................................................................................19

*Levin v. Commerce Energy, Inc.*,
560 U.S. 413 (2010) ..................................................................................................13, 14

*Linda R.S. v. Richard D.*,
410 U.S. 614 (1973) ..............................................................................................................8

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........................................................................................................7, 10

*Major Oldsmobile, Inc. v. General Motors Corp.*,
93-CV-2189 (SWK), 1995 WL 326475 (S.D.N.Y. May 31, 1995) ........................................17

*Malcolm v. City of East Detroit*,
437 Mich. 132, 139, 468 N.W.2d 479 (1991) ........................................................................5

*Mangini v. R.J. Reynolds Tobacco Co.*,
793 F. Supp. 925 (N.D. Cal. 1992) ........................................................................................9

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974) ............................................................................................................22

*N.J. Carpenters Vacation Fund v. HarborView Mortg. Loan Trust
2006-4*, 581 F. Supp. 2d 581 (S.D.N.Y. 2008) ..............................................................16, 17

*Owens v. Rodale, Inc.*,
No. 14–12688, 2015 WL 575004 (E.D. Mich. Feb. 11, 2015) ..............................................10

*Pacheco v. Boar's Head Provisions Co.*,
No. 1:09-CV-298, 2010 WL 1323785 (W.D. Mich. Mar. 30, 2010) ......................................23

*Estate of Pew v. Cardarelli*,
527 F.3d 25 (2d Cir. 2008) ..................................................................................................17

*Polytorx, L.L.C. v. Univ. of Mich. Regents*,
Nos. 318151, 320989, 2015 WL 2144800 (Mich. Ct. App. May 7, 2015) ............................23

*Public Citizen v. Dep't of Justice*,
491 U.S. 440 (1989) ......................................................................................................17, 18

*In re Reserve Fund Securities and Derivative Litig.*,
275 F.R.D. 154, 164 (S.D.N.Y. 2011) ..................................................................................11

*Ross v. AXA Equitable Life Ins. Co.*,
   14-CV-2904 (JMF), --F. Supp. 3d --, 2015 WL 4461654 (S.D.N.Y. July 21,
   2015), *appeal filed* (Aug. 19, 2015)........................................................................2, 8, 9, 10

*Ross v. Bank of Am., N.A. (USA)*,
   524 F.3d 217 (2d Cir. 2008)........................................................................................7

*Seattle Times Co. v. Rhinehart*,
   467 U.S. 20 (1984)........................................................................................................22

*Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*,
   559 U.S. 393 (2010)................................................................................................16, 17

*Sikhs for Justice v. Nath*,
   893 F. Supp. 2d 598 (S.D.N.Y. 2012)........................................................................10

*Sira v. Morton*,
   380 F.3d 57 (2d Cir. 2004)............................................................................................19

*Sorrell v. IMS Health Inc.*,
   131 S. Ct. 2653 (2011)............................................................................................22, 23

*Spokeo, Inc. v. Robins*,
   135 S. Ct. 1892 (2015)..............................................................................................2, 8

*Taylor v. Kochanowski*,
   No. 289660, 2010 WL 2696675 (Mich. Ct. App. July 8, 2010) ................................23

*Thornhill v. Alabama*,
   310 U.S. 88 (1940)........................................................................................................21

*LaPierre ex rel. Town of Yorktown v. DiBartolo*,
   No. 12-CV-1996 (ER), 2013 WL 656313 (S.D.N.Y. Feb. 21, 2013)........................9

*In the Matter of the Trusteeships Created by Tropic CDO I Ltd.*,
   No. 13-CV-8428(NRB), --- F.Supp.3d ---, 2015 WL 1175449 (S.D.N.Y. Mar.
   13, 2015) ........................................................................................................................19

*United States v. Am. Trucking Ass'ns.*,
   310 U.S. 534 (1940)......................................................................................................17

*Victory Carriers, Inc. v. Law*,
   404 U.S. 202 (1971)................................................................................................17, 18

*Virgin Enterps. Ltd. v. Am. Longevity*,
   No. 99-CV-9854 (CSH), 2001 WL 34142402 (S.D.N.Y. Mar. 1, 2001)..................9

*Warth v. Seldin*,
    422 U.S. 490 (1975)..................................................................................7, 12, 14

*Wilson v. Kellogg Co.*,
    No. 14-CV-2817, --- F. Supp. 3d ---, 2015 WL 3937511 (E.D.N.Y. June 25,
    2015), *appeal filed*, No. 15-2237 (2d Cir. July 15, 2015)......................................19

**Statutes**

18 U.S.C. § 2710 .....................................................................................................4

28 U.S.C. § 1332(d) ...........................................................................................6, 15

M.C.L. § 445.322(2) ...............................................................................................5

M.C.L. § 445.815(2) ...............................................................................................5

M.C.L. § 445.1711(a) .............................................................................................4

M.C.L. § 445.1712 ...........................................................................................1, 4, 20

M.C.L. § 445.1713(d) ...............................................................................4, 11, 18, 20

M.C.L. § 445.1715 ...................................................................................................5

Pub. Acts No. 206, § 5, 1989 Mich. Legis. Serv. 206 ..............................................5

Pub. L. No. 109-2, §§ 2, 4, 5...................................................................................16

**Rules**

Fed. R. Civ. P. 12(b)(1)...................................................................................1, 3, 6, 25

Fed. R. Civ. P. 12(b)(6).................................................................................... *passim*

Fed. R. Civ. P. 23....................................................................................................14, 16

M.C.R. § 3.501(A)(5) ...............................................................................................5

**Other Authorities**

Brief of Att'y Gens.' as Amici Curiae in Support of Petitioner,
    *Spokeo, Inc. v. Robins*, 742 F.3d 409 (9th Cir. 2014) (No. 13-1339), 2015 WL
    4194152...........................................................................................................8

Ronald S. Longhofer, Michigan Court Rules Practice, Text § 3501.3 (5th ed.
    2004) ...............................................................................................................5

Defendant Advance Magazine Publishers Inc., d/b/a Condé Nast (herein, "Condé Nast") by its attorneys Dentons US LLP, respectfully submits this Memorandum of Law in support of its Motion to Dismiss Plaintiff's Class Action Complaint (the "Complaint") pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

The Michigan Video Rental Privacy Act ("VRPA") was passed in the wake of a federal statute, the "Video Privacy Protection Act," prompted by concerns about the disclosure of video rental records (namely, a newspaper article that revealed Supreme Court nominee Judge Robert Bork's rather unremarkable video rental choices). Michigan's law is much broader than the federal Video Privacy Act. In addition to video rental records, its scope includes "books or other written materials," criminalizing the "disclosure" of a wide swath of First Amendment-protected speech "concerning the purchase, lease, rental, or borrowing of those materials," and imposing much higher penalties. M.C.L. § 445.1712. This dubious state statute sat on the books for nearly 30 years until an enterprising group of plaintiffs' lawyers dusted it off a few years ago, bringing a series of VRPA class action suits against magazine publishers.[1]

In this copycat suit, Plaintiff purports to bring a federal class action in New York on behalf of a putative class of Michigan magazine subscribers for an alleged violation of the VRPA that caused no injury. This lawsuit should not be in federal court. Not only is the conduct

---

[1] Condé Nast was one of the defendants in these suits, brought in the Eastern District of Michigan; the case against it was voluntarily dismissed. *See Fox v. Condé Nast Publ'ns*, No. 2:12-cv14312, ECF No. 6 (E.D. Mich. Oct. 1, 2012) (order dismissing case). Now, a different set of plaintiffs' lawyers sues Condé Nast here. The same lawyers—and same named Plaintiff— have also sued Hearst Communications in this District, *see Boelter v. Hearst Comm'cns, Inc.*, No. 1:15-cv-03934-AT (S.D.N.Y. filed May 21, 2015). The instant motion raises different arguments than those addressed in the previous motion practice in the Eastern District of Michigan, which continued after Condé Nast's dismissal. *See, e.g., Halaburda v. Bauer Publ'g Co., LP*, No. 1:12-cv-14221, 2013 WL 4012827 (E.D. Mich. Aug. 6, 2013).

alleged not actionable under the statute—which exempts precisely the kind of marketing "disclosures" of which Plaintiff complains—it was filed in federal court only because Plaintiff could not bring these claims on a class basis in Michigan state court, and her counsel seek to exploit what they see as a federal jurisdiction "loophole."  As a fundamental, threshold matter, this tactical litigation cannot proceed because Plaintiff lacks standing and this Court lacks jurisdiction.

First, Plaintiff does not allege that she suffered any cognizable concrete harm from the truthful "disclosure" that she subscribed to two Condé Nast magazines (*Self* and *Bon Appétit*). And even if *Congress* might, by federal statute, be able to legislatively "broaden the injuries that can support constitutional standing" to include an alleged statutory violation alone—a proposition cast in doubt by the Supreme Court's recent grant of *certiorari* in *Spokeo, Inc. v. Robins*, 135 S. Ct. 1892 (2015)—a *state* legislature may not confer Article III standing upon a plaintiff "who suffers no concrete harm merely by authorizing a private right of action based on a bare violation of a state statute."  *Ross v. AXA Equitable Life Ins. Co.*, 14-CV-2904 (JMF), --F. Supp. 3d --, 2015 WL 4461654, at *8 (S.D.N.Y. July 21, 2015), *appeal filed* (Aug. 19, 2015).

Second, in passing the VRPA, the Michigan Legislature was clear that VRPA claims seeking statutory penalties, like this one, are cognizable only on an *individual* basis; Plaintiff *could not bring this putative class action in Michigan state court*.  Accordingly, even if Article III injury-in-fact exists by dint of the judgment of the Michigan legislature—and it does not— Plaintiff's alleged class action lawsuit blatantly subverts the judgment of the Michigan Legislature in enacting this law.  Plaintiff asks this Court in the same breath to recognize a remedy created by the Michigan Legislature as sufficient to confer Article III standing, but then to ignore the Michigan Legislature's clear limitations on that very remedy, in particular its

proscription against class action suits based thereon.  The Court should, thus, decline to afford Article III jurisdiction as a prudential matter of comity and federalism.

Third, the only claimed basis for federal jurisdiction over this case, asserting exclusively Michigan state law claims on behalf of Michigan residents, is the Class Action Fairness Act of 2005 ("CAFA").  CAFA was designed to aid removal of state class actions; Congress never intended it to *create* class relief where the state legislature has determined that class actions are not permitted for this type of statutory penalty action.  Plaintiff's claim that CAFA permits this case to be brought as a federal putative class action where it could not be brought as such in state court is an unsupportable reading of CAFA and an absurd result that cannot be sustained.

Finally, even if standing and jurisdiction could be established, the Complaint would have to be dismissed.  The hastily drafted VRPA statute is breathtakingly overbroad and void under the First Amendment.  And even if the statute could withstand constitutional scrutiny, Plaintiff cannot state a cause of action under it.  Condé Nast, like most other publishers, makes lists of its subscribers available to direct mail marketers, unless the subscriber opts out.  Plaintiff contends this commonplace practice—the only sort of "disclosures" alleged in the Complaint—violates the VRPA's proscription against publication of information about the purchase or rental of "written material." (Compl. ¶¶ 18-19.)  However, in clear recognition of just how common this business practice is, the VRPA explicitly excludes from its ambit disclosures made for marketing purposes so long as notice is provided, as it was here.  As for Plaintiff's tag-along unjust enrichment claim, it is preempted by the VRPA, and in any event cannot be sustained on the facts alleged.

Dismissal is in order pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## STATEMENT OF FACTS

### A.   The Michigan VRPA

In 1987, the video rental history of Supreme Court nominee Judge Robert Bork was published in a newspaper (S. Rep. No. 100-599, at 5 (1988)); in response, Congress enacted, in November 1988, the Video Privacy Protection Act, prohibiting the disclosure of video rental records. 18 U.S.C. § 2710.  Soon thereafter, the Michigan Legislature passed its own, far broader version of the federal law, the "Video Rental Privacy Act" or "VRPA."  M.C.L. § 445.1711 *et seq.*  The VRPA provides:

> a person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials, sound recordings, or video recordings shall not disclose to any person, other than the customer, a record or information concerning the purchase, lease, rental, or borrowing of those materials by a customer that indicates the identity of the customer.

M.C.L. § 445.1712.  A "customer" is "a person who purchases, rents, or borrows a book or other written material, or a sound recording, or a video recording." M.C.L. § 445.1711(a).

The statute includes an express exception that permits disclosure "for the exclusive purpose of marketing goods and services directly to the consumer," if "written notice that the customer may remove his or her name at any time" is provided to the customer by the disclosing party. M.C.L. § 445.1713(d). Plaintiff alleges no non-marketing uses of her subscription information or that she asked that such information not be disclosed.[2]

---

[2]  Plaintiff alleges, in conclusory fashion, that Condé Nast failed to provide what she deems "effective notice" to subscribers before disclosing their subscription information for marketing purposes.  (Compl. ¶ 43.)  But the statutory exemption requires only "written notice" that the subscriber may opt out, which Condé Nast has unquestionably provided directly in the magazines themselves.  *See* Declaration of Sandra D. Hauser ("Hauser Decl.") submitted herewith, and discussion *infra*, § V.

**B.     Claims For VRPA Statutory Damages Cannot Be Brought On A Class Basis Under Michigan Law**

The Michigan Legislature originally passed the VRPA in 1988 as a criminal statute without any private right of action. A year later the statute was amended to add a civil remedy provision permitting individual "customers" to bring an action for the greater of actual or statutory damages. M.C.L. § 445.1715; Pub. Acts No. 206, § 5, 1989 Mich. Legis. Serv. 206. Importantly, in amending the VRPA, the Michigan Legislature did not authorize class actions.

The failure to do so is significant. Four years earlier, in 1985, the Michigan Court Rules were extensively revised to overhaul the state's treatment of class actions, creating Rule 3.501(A)(5). 5 Ronald S. Longhofer, Michigan Court Rules Practice, Text § 3501.3 (5th ed. 2004). Specifically, that Rule provides that an action for the recovery of a statutory minimum "without regard for actual damages" cannot be maintained as a class action unless the statute at issue "specifically authorizes" recovery in a class action. M.C.R. 3.501(A)(5).

Accordingly, in drafting the VRPA's civil remedy provision, the Michigan Legislature was well aware that if it wanted to allow Michigan residents to recover statutory damages under the VRPA on a class basis, it would need to specifically authorize such recovery in the text of the statute. *See, e.g., Malcolm v. City of East Detroit*, 437 Mich. 132, 139, 468 N.W.2d 479, 482 (1991) (Michigan Legislature "is held to be aware of the existence of the law in effect at the time of its enactments").[3] But instead, the Legislature specifically chose to confine VRPA recoveries to individual actions and to provide a substantial statutory minimum damage provision in the alternative. To further encourage individual actions, the Michigan Legislature also included a provision for attorney's fees. *See* M.C.L. § 445.1715. Thus, the absence of a class action

---

[3] Michigan statutes enacted after Rule 3.501 include specific class action authorization where the legislature so intends. *See, e.g.*, M.C.L. § 445.815(2) ("A person who suffers loss as a result of a violation of this act may bring an individual or a class action to recover actual damages or $50.00, whichever is greater") (enacted 1988); M.C.L. § 445.322(2) (same, enacted 2011).

authorization provision in the VRPA was not only intentional, it was meaningful and substantively impacted the available remedies.

### C.   Plaintiff's Lawsuit

Plaintiff's Complaint alleges that she subscribes to two Condé Nast magazines, *Self* and *Bon Appétit* (Compl. ¶ 7), and asserts that Condé Nast violated the VRPA by disclosing her "Personal Reading Information" (i.e., "full names, titles of magazines subscribed to, and home addresses").  (*Id.* ¶¶ 2, 62.)  The Complaint alleges that Personal Reading Information is information that "identif[ies] which individual purchased which magazines." (*Id.* ¶¶ 40, 62.) Plaintiff contends that "disclosing without permission *any* record or information concerning a Michigan customer's purchase of written materials, if the record identifies the customer," violates the Act. (*Id.* ¶ 5 (emphasis added).) [4]

Subject-matter jurisdiction over Plaintiff's state-law action is predicated exclusively on CAFA, 28 U.S.C. § 1332(d). (Compl. ¶ 9.)  Aside from styling her Complaint as a class action, Plaintiff has alleged no basis for federal subject matter jurisdiction over her individual claims.

Plaintiff's Prayer for Relief seeks, among other remedies, an award of "actual damages, including disgorgement and restitution, or $5,000, whichever is greater, to Plaintiff and each Class member." (Compl. ¶ 85 (Prayer for Relief).)

### ARGUMENT

### I.   Standard of Review—12(b)(1) and 12(b)(6)

When Article III standing is challenged on a Rule 12(b)(1) motion, the plaintiff bears the affirmative burden of proving, by a preponderance of evidence, that jurisdiction exists.  *Clarex*

---

[4]  The Complaint is larded with speculation about what Condé Nast purportedly discloses to third parties, referencing press reports about information-sharing practices and the "data mining" industry generally. (*E.g.*, Compl. ¶¶ 21-38.) Suffice it to say, these references say nothing about Condé Nast's practices, and do not address the specific information the VRPA covers.

*Ltd. v. Natixis Sec. Am. LLC*,  No. 12 Civ. 0722 (PAE), 2012 WL 4849146, at *2-3 (S.D.N.Y. Oct. 12, 2012).  Plaintiff may not meet this burden solely by reliance on favorable inferences from the pleadings, but rather each element must be supported with actual facts.  *Id.*

On a Rule 12(b)(6) motion, the Court "must accept as true all of the [factual] allegations contained in a complaint," but need not accept its "legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  To survive, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plaintiff cannot rely on a "threadbare" recitation of the elements of a cause of action, but must allege facts sufficient to show "more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft*, 556 U.S. at 678.

## II.   Plaintiff Lacks Article III Standing To Bring This No-Injury Action To Enforce a Purported Bare Violation of a Michigan State Statute

 "Standing is the threshold question in every federal case, determining the power of the court to entertain the suit." *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008). The "irreducible constitutional minimum" of standing requires a plaintiff to establish an "injury-in-fact"—the "invasion of a legally protected interest which is . . . concrete and particularized" and "'actual or imminent, not conjectural or hypothetical.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Although Congress may recognize previously unaddressed wrongs and grant a right of action, "Art. III's requirement remains: the plaintiff still must allege a distinct and palpable injury to himself." *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

Condé Nast is aware that in *Austin-Spearman v. AMC Network Entm't, LLC*, No. 14-CV-6840, 2015 WL 1539052 (S.D.N.Y. Apr. 7, 2015) (Buchwald, J.), this Court held a plaintiff had standing under the *federal* VPPA, relying on "Congress's ability to confer standing through statutory enactment": "while Congress cannot confer standing in the absence of an injury, it can

'broaden the injuries that can support constitutional standing,' . . . by 'creating legal rights, the invasion of which creates standing' . . ." *Id.* at *3 (quoting *Donoghue v. Bulldog Investors G.P.*, 696 F.3d 170, 175, 179 (2d Cir. 2012), quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973)); *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 99-100 (1979).

However, the Supreme Court recently granted *certiorari* to consider "[w]hether Congress may confer Article III standing upon a plaintiff who suffers no concrete harm, and who therefore could not otherwise invoke the jurisdiction of a federal court, by authorizing a private right of action based on a bare violation of a federal statute." *Spokeo, Inc. v. Robins,* No. 13-1339, 2014 WL 1802228, at *i (U.S.), *cert. granted*, 135 S. Ct. 1892 (Apr. 27, 2015).  Significantly, the Michigan Attorney General weighed in on the *Spokeo* case, joining a group of eight state attorney generals in an amicus brief taking the position that a mere technical violation of a statute cannot confer Article III standing—rather, a plaintiff must establish actual harm.  Brief of Att'y Gens.' as Amici Curiae in Support of Petitioner at 21, *Spokeo, Inc. v. Robins*, 742 F.3d 409 (9th Cir. 2014) (No. 13-1339), 2015 WL 4194152, at *21 ("although the violation of a statute can provide a cause of action and a remedy, it cannot, by itself, result in an injury in fact").

In any event, this Complaint is based on a Michigan state statute and presents a different issue than the federal statute in *Austin-Spearman.*  The Court's holding in *Austin-Spearman* was "premised on the theory that '*Congress* may, by legislation, expand standing to the full extent permitted by Art[icle] III.'"  *Ross v. AXA Equitable Life Ins. Co.*, 14-CV-2904 (JMF), -- F. Supp. 3d --, 2015 WL 4461654, at *8 (S.D.N.Y. July 21, 2015), *appeal filed* (Aug. 29, 2015)(quoting *Gladstone Realtors*, 441 U.S. at 99-100 (italics in original)); *Austin-Spearman*, 2015 WL 1539052, at *3.  Here, in contrast, it is the *Michigan legislature* that Plaintiff claims has 'broaden[ed] the injuries that can support constitutional standing."  *Id.*  But "where, as here, a

cause of action arises under *state* rather than *federal* law," the state legislature may not so expand Article III standing.  *Ross*, 2015 WL 4461654, at *8 (italics in original).

In *Ross*, Judge Furman found no authority to "suggest[] that a state legislature can confer Article III standing upon a plaintiff who suffers no concrete harm merely by authorizing a private right of action based on a bare violation of a state statute."  *Id.* (citing *Mangini v. R.J. Reynolds Tobacco Co.*, 793 F. Supp. 925, 929 (N.D. Cal. 1992) (even if Congress can "overrid[e] the prudential limitations and provide[ ] an injury which confers standing," the states do not "have the same power to waive by statute the prudential, or more problematically, the constitutional limitations on standing in federal court and, by way of a state created right, confer injury in the Art. III sense where none would otherwise exist")).[5]

Put differently, the federal courts' role in the constitutional scheme is set by Article III, and "[s]tates cannot alter that role simply by issuing to private parties who otherwise lack standing a ticket to the federal courthouse." *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2667 (2013).  "State courts may afford litigants standing to appear where federal courts would not, but the fact that a state court would permit a plaintiff to assert an action has no bearing on the plaintiff's standing under Article III." *LaPierre ex rel. Town of Yorktown v. DiBartolo*, No. 12-CV-1996 (ER), 2013 WL 656313, at *3 (S.D.N.Y. Feb. 21, 2013); *see also Virgin Enterps. Ltd. v. Am. Longevity*, No. 99-CV-9854 (CSH), 2001 WL 34142402, at *3-4 (S.D.N.Y. Mar. 1, 2001) (state statute that conferred standing without injury did not expand federal court standing, "which requires a distinct and palpable injury . . . to establish [federal] jurisdiction").

It is worth noting that these critical precepts—and Judge Furman's recent holding in

---

[5] It is beyond ironic that Plaintiff would have this Court rely on a purported VRPA violation to create standing with no injury, but ignores the Michigan Legislature's express intent that such cases not be brought as class actions.  Plaintiff cannot have her cake and eat it too.

*Ross*—were not raised or addressed in any of the previously filed VRPA cases in the Eastern District of Michigan (which, of course, are not binding on this Court).  Indeed, in the *Halaburda* case, Judge Steeh expressed "hesitation" and "reluctance" in finding that the VRPA plaintiffs' "allegations meet the definition of an injury in fact"; notably, the court there relied exclusively on cases that involved *federal* statutes and held that "*Congress* 'has the power to create new legal rights . . .  whose only injury-in-fact involves the violation of that statutory right."  *Halaburda v. Bauer Publ'g. Co., LP*, Nos. 12-CV-12831, 12-CV-14221, 12-CV-14390, 2013 WL 4012827, at *4-5 (E.D. Mich. Aug. 6, 2013) (emphasis added; citations omitted).[6]

In short, the Michigan Legislature did not and could not have created Article III standing merely by recognizing a new limited right under the VRPA.  The bedrock of Article III is and remains injury-in-fact, and it is insufficient for Plaintiff to argue that a violation of the VRPA, standing alone and in the absence of harm, confers upon her an "injury" sufficient to establish Article III standing.  Instead, she must establish that she has otherwise suffered actual, "concrete and particularized" harm sufficient to entitle her to sue in federal court.  *Lujan*, 504 U.S. at 560.  Here, Plaintiff's Complaint does not set forth any plausible theory of actual injury.[7]

To the extent Plaintiff purports to plead such injury-in-fact—based on conclusory allegations of "deprivation of value" or "overpayment" as a result of expected privacy interests

---

[6]  The other Eastern District cases that found plaintiffs had standing simply followed *Halaburda*. *See Owens v. Rodale, Inc.*, No. 14–12688, 2015 WL 575004, at *3 (E.D. Mich. Feb. 11, 2015); *Kinder v. Meredith Corp.*, No. 14-CV-11284, 2014 WL 4209575, at *2 (E.D. Mich. Aug. 26, 2014); *Cain v. Redbox Automated Retail, LLC*, 981 F. Supp. 2d 674, 683-84 (E.D. Mich. 2013).

[7]  Even if the Court declined to follow *Ross* and the other authority discussed above, and instead concluded that state legislatures *can* confer federal Article III standing by creating a statutory "injury," the Court should stay this action pending the Supreme Court's decision in *Spokeo*, which will decide once and for all whether a technical violation of a statute—federal or state— that causes no concrete harm can alone give rise to Article III standing.  *See, e.g., Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 622 (S.D.N.Y. 2012) (court may "properly exercise its staying power when a higher court is close to settling an important issue of law bearing on the action"; citing cases).

created by the existence of the VRPA (Compl. ¶ 80; *see also id.* ¶¶ 7, 69-71)—that attempt fails. Such allegations do not suffice to create an "injury in fact" sufficient to confer Article III standing.  Indeed, this Court squarely rejected a similar articulation of "harm" in the seminal privacy decision of *In re DoubleClick Inc. Privacy Litig.,* noting that although "demographic information is valued highly . . . the value of its collection has never been considered a economic loss to the subject" and rejecting the argument that the "value of this collected information constitutes damage to consumers or unjust enrichment to collectors." 154 F. Supp. 2d 497, 525 (S.D.N.Y. 2001) (Buchwald, J.).  Subsequent cases agree with this Court.[8]

Moreover, Plaintiff's conclusory allegations of injury are implausible on their face.  The notion that the price a Michigander pays for a subscription to *Self* or *Bon Appétit* includes a "non-disclosure" premium (as opposed to just the right to receive copies of the magazine) is implausible given both the VRPA's permissive disclosures for marketing purposes, and the magazines' own written notice of marketing disclosures. *See* M.C.L. § 445.1713(d) (permitting disclosures for marketing purposes), and *infra* § V.  Where a plaintiff is on notice of possible disclosure of personal information, there can be no reasonable expectation of privacy.  *See, e.g., In re Reserve Fund Securities and Derivative Litig.,* 275 F.R.D. 154, 164 (S.D.N.Y. 2011) (no reasonable expectation of privacy where employer "expressly reserved the right to access and monitor its employees' emails" and "warn[ed] employees that their email communications will be automatically saved and are subject to review . . . and disclosure to third parties").  Indeed, Plaintiff's claim that she has a reasonable and valuable privacy interest in the fact that she

---

[8]  *See, e.g., Bose v. Interclick, Inc.*, No. 10 Civ. 9183 (DAB), 2011 WL 4343517, at *4-6 (S.D.N.Y. Aug. 17, 2011) (plaintiff's "claim that Interclick collected her personal information . . . does not constitute cognizable loss"); *In re JetBlue Airways Corp. Privacy Litig.*, 379 F. Supp. 2d 299, 327 (E.D.N.Y. 2005) ("there is absolutely no support for the proposition that the personal information of an individual JetBlue passenger had any value for which that passenger could have expected to be compensated").

subscribes to *Self* and *Bon Appétit* is, in practical terms, fatally undermined by the fact she has made that information *a matter of public record* in this lawsuit and in the lawsuit she filed against Hearst Communications in this Courthouse on May 21, 2015.

**III.    As a Prudential Matter of Comity and Federalism, The Court Should Decline To Assert Article III Jurisdiction Over Plaintiff's Attempt To Manufacture a Federal Class Action That Subverts Michigan Law**

Even if the Court was inclined to recognize an alleged *state* statutory violation as sufficient "injury" to confer Article III standing, it is not obliged to punch Plaintiff's "ticket to the federal courthouse" where exercising jurisdiction would subvert Michigan's express intent that VRPA actions like Plaintiff's not be brought as putative class actions.  In other words, this Court should not permit Plaintiff to cherry-pick which aspects of the intent of the Michigan Legislature should be recognized in Federal Court, as Plaintiff does here, by simultaneously insisting that the violation of the VPRA standing alone constitutes sufficient injury to confer Article III standing, and then blatantly running away from the limitations that Michigan imposed on that very same right, claiming amnesty under the Federal Rules of Civil Procedure.

"Apart from [the] minimum constitutional mandate" of Article III and its bedrock requirement of injury-in-fact to the plaintiff, the Supreme Court has recognized prudential limits on federal jurisdiction that are "closely related to Art. III concerns but essentially matters of judicial self-governance," including, among other things, that "other governmental institutions may be more competent to address the questions" presented by the suit.  *Warth v. Seldin*, 422 U.S. 490, 500 (1975). "The prudential requirements of standing have been developed by the Supreme Court on its own accord and applied in a more discretionary fashion as rules of judicial 'self-restraint' further to protect, to the extent necessary under the circumstances, the purpose of Article III."  *Center for Reproductive Law and Policy v. Bush*, 304 F.3d 183, 196 (2d Cir. 2002) (Sotomayor, J.).

Federalism and comity are certainly "prudential" considerations that the Court may consider in determining the exercise of Article III jurisdiction. *Cf. Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 432 (2010) ("Comity . . . is a prudential doctrine"); *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30, 53 (1994) (Stevens, J., concurring) (referencing "prudential considerations of comity and federalism"). Thus, even if a federal court has "jurisdiction of a particular proceeding, it may, in its sound discretion, whether its jurisdiction is invoked on the ground of diversity of citizenship or otherwise, 'refuse to enforce or protect legal rights, the exercise of which may be prejudicial to the public interest'"—it being in the public interest that federal courts "exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy.'" *Burford v. Sun Oil Co.*, 319 U.S. 315, 317–18 (1943) (citations omitted). Condé Nast recognizes that courts do not often invoke these considerations to decline jurisdiction. But where, as here, the exercise so thwarts legislative intent and the case is so obviously an attempt to take advantage of a perceived federal jurisdiction loophole, it would be appropriate to do so.

Thus, in *Gordon v. Crouchley*, 554 F. Supp. 796 (D.R.I. 1982) (Selya, J.), "well-founded principles of comity and of abstention" counseled dismissal of a Section 1983 action complaining of misconduct by a state court judge, where the state provided "a forum to which citizens can resort for correction" of claimed judicial misconduct; the court's reasoning is instructive:

> While it is true that there is no specific state court proceeding pending to which this action is directly addressed, and that in such instances principles of comity usually have less force, . . . the absence of such a proceeding is due solely to the choice of the plaintiff and those whose interests he seeks to protect. *The plaintiff cannot, by the simple expedient of electing to ignore unobstructed state avenues of redress, pave the way for a detour through the federal courts, especially in a situation in which important issues of state policy would perforce be by-passed by such quixotic re-routing.*

13

*Id.* at 799-800 (citing *Burford*, 319 U.S. at 317–18; *Allstate Ins. Co. v. Sabbagh*, 603 F.2d 228, 230 (1st Cir. 1979)) (emphasis added).

Here, as in *Gordon*, Plaintiff clearly could have pursued "state avenues of redress" for her individual claim under the VPRA.  Her class action lawyers chose not to do so, because Michigan law expressly barred her from bringing that claim on a class basis in state court.  That attempt to end-run the law by a "detour through the federal courts" clearly would infringe upon "important issues of state policy." *Id.*; *cf. Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("the source of the plaintiff's claim to relief assumes critical importance with respect to the prudential rules of standing").

In *Levin v. Commerce Energy, Inc.*, the district court "'decline[d] to exercise jurisdiction' as a matter of comity" where the plaintiff "requested relief that would 'requir[e] Ohio to collect taxes which its legislature has not seen fit to impose,'" finding that a "federal court should not 'impose its own judgment on the state legislature mandating which remedy is appropriate.'"  560 U.S. at 419-20. Affirming that ruling, the Supreme Court emphasized that "[s]tatutes conferring federal jurisdiction, we have repeatedly cautioned, should be read with sensitivity to 'federal-state relations' and 'wise judicial administration.'"  *Id.* at 423.  Likewise here, Plaintiff's lawsuit invites the Court to overrule the Michigan Legislature's judgment about the proper remedy for enforcement of its statute; accepting that invitation disregards federal-state comity and is not "wise judicial administration."  Alternatively, and under the same principles, this Court can strike the class allegations and decline jurisdiction for failure to establish the minimum requirements of Fed. R. Civ. P. 23. [9]

Either as an assertion of its discretionary authority to impose prudential limits on standing,

---

[9]  There are manifold reasons why class certification should be denied; Condé Nast disputes Plaintiff's class allegations, and if this case proceeds will contest certification at the appropriate juncture.

or its inherent power to abstain from asserting subject matter jurisdiction, this Court should not indulge Plaintiff's misuse of the federal courts to end-run the intent of the Michigan legislature in creating the law she purports to enforce.  Moreover, as we next establish, the sole basis for Plaintiff's assertion of  federal jurisdiction is the Class Action Fairness Act of 2005 ("CAFA"), and that legislation cannot be construed to support Plaintiff's federal end-run of Michigan law.

**IV.    CAFA Is the Sole Basis for Federal Jurisdiction Here, and CAFA Cannot Be Read to Create a Federal Forum for Class Action Litigation That State Law Expressly Disallows**

The sole basis for jurisdiction alleged in the Complaint is CAFA, and its more lenient diversity requirements for class actions.  *See* Compl. ¶ 9; 28 U.S.C. § 1332(d).  This legislation was never intended to—and does not—provide a federal forum for a case that could not have been initiated as a prospective class action in Michigan state court.  By suggesting that it does, Plaintiff creates an absurd and unsustainable result that must be rejected as a matter of law.

Congress enacted CAFA in 2005 to make it easier for defendants to remove multi-state class actions to federal court by easing some of the requirements for invoking a court's diversity jurisdiction for qualifying "class actions."  Under the statute, the term "class action" is defined to include any civil action filed under Rule 23 "or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. § 1332(d)(1)(B).  In contrast to standard diversity jurisdiction, CAFA jurisdiction permits individual class members' claims to be aggregated for purposes of the amount in controversy, which under CAFA is $5 million.  28 U.S.C. § 1332(d)(2), (6).

CAFA was passed in reaction to abusive class action litigation practiced in state courts. Congress found these abuses undermined "the national judicial system, the free flow of interstate commerce, and the concept of diversity jurisdiction . . . in that State and local courts are . . . keeping cases of national importance out of Federal court"; the Act's purpose was to correct these abuses and

15

"provid[e] for Federal court consideration of interstate cases of national importance under diversity jurisdiction. . . ." Pub. L. No. 109-2, § 2, 119 Stat. 4 (2005); *N.J. Carpenters Vacation Fund v. HarborView Mortg. Loan Trust 2006-4*, 581 F. Supp. 2d 581, 584 (S.D.N.Y. 2008).

Thus, CAFA's purpose was to provide an expanded basis for defendants to *remove* appropriate state class actions to federal court—not to provide a forum for state-law based lawsuits that could not be brought in state court because of designed constraints enacted by a state legislature. *See, e.g.,* Pub. L. No. 109-2, §§ 2, 4, 5; 151 Cong. Rec. H723-01, H727 (daily ed. Feb. 17, 2005) (statement of Rep. Sensenbrenner) (under CAFA, "interstate class actions should be heard in a Federal court if removed by any defendant"). In enacting CAFA, there is no doubt that "Congress envisioned fewer—not more—class actions overall. Congress surely never anticipated that CAFA would make federal courts a mecca for . . . class actions seeking state-created penalties for claims arising under state law . .  that would be barred from class treatment in the State's own courts." *Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 459 (2010)  (Ginsberg, J., dissenting).[10]  "'Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their

---

[10]  The Court in *Shady Grove* did not consider what a "class action" is under CAFA. The Court considered a separate question, namely, the circumstances under which Rule 23 must give way (or not) to state class action limitations. The plurality in *Shady Grove* emphasized that divergent consequences in state and federal court were "the inevitable (indeed, one might say the intended) result of a uniform system of federal procedure" and that it would "'disembowel either the Constitution's grant of power over federal procedure' or Congress's exercise of it" to give priority to conflicting state rules on the same subject. 559 U.S. at 416. Here, however, the question is not simply one of substance or procedure: in CAFA, Congress statutorily created *a new basis for jurisdiction*, and did so with some purpose. Plaintiff's position would subvert and "disembowel" that purpose. The Court did not pass on the question of whether *CAFA* could be construed to provide a federal forum for cases that, due to considered legislative design, could not have been brought in state court. Justice Ginsburg's comment in dissent that Congress could "exclude from federal-court jurisdiction under [CAFA], claims that could not be maintained as a class action in state court" (559 U.S. at 459 n. 15) does not mean that the statute as it exists can be interpreted to include such claims without subverting statutory purpose and leading to absurd results. None of the opinions in *Shady Grove* reached that statutory interpretation issue.

own jurisdiction to the precise limits which (a federal) statute has defined.'" *Victory Carriers, Inc. v. Law,* 404 U.S. 202, 212 (1971) (citations omitted).

Courts have found CAFA's text to be ambiguous, if not "cryptic."  *See, e.g., N.J. Carpenters*, 581 F. Supp. 2d at 584 n. 2 (citing *Estate of Pew v. Cardarelli*, 527 F.3d 25, 30, 32 (2d Cir. 2008) (referring to "CAFA's cryptic text")).  As the Supreme Court has observed, a statute can be ambiguous because of "the improbably broad reach of the key statutory definition." *Bond v. United States*, 134 S. Ct. 2077, 2090, 2096 (2014).  But, of course, as the Court recently re-emphasized, when interpreting statutes, the law's context must be taken into account in interpreting even seemingly unambiguous terms, in order to avoid absurd or unreasonable results.  *E.g., King v. Burwell*, 135 S. Ct. 2480, 2496 (2015) ("A fair reading of legislation demands a fair understanding of the legislative plan").  This has long been the law:

> [F]requently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act.

*Public Citizen v. Dep't of Justice*, 491 U.S. 440, 454 (1989) (quoting *Church of the Holy Trinity v. United States*, 143 U.S. 457, 459 (1892)).[11]

Here, in view of the legislative plan, the only plausible reading of CAFA's "improbably broad" definition of "class action" is that, for diversity purposes, it be limited to class actions that would not be categorically barred from state court from the start.  This case, by contrast, attempts

---

[11]  *See also United States v. Am. Trucking Ass'ns.*, 310 U.S. 534, 543-44 (1940) ("even when the [statute's] plain meaning did not produce absurd results but merely an unreasonable one 'plainly at variance with the policy of the legislation as a whole' this Court has followed that purpose, rather than the literal words"); *Major Oldsmobile, Inc. v. General Motors Corp.*, 93-CV-2189 (SWK), 1995 WL 326475, at *4 (S.D.N.Y. May 31, 1995) (Buchwald, J.) (even if the statutory language is clear, a court is not required to follow it if "such a literal reading of a statutory term [would] compel an odd result'") (citations omitted).

to misuse CAFA to end-run Michigan's bar against class actions in VRPA cases.  To paraphrase *Public Citizen*, 491 U.S. at 452-53, even a "nodding acquaintance with [CAFA's] purposes . . . reveals that it cannot have been Congress' intention" that CAFA's definition of "class action" created federal jurisdiction over a state statutory claim brought on behalf of a class comprised entirely of Michigan residents, that was not (and could not be) brought as a class action in Michigan state court because the state legislature specifically determined that the claims should be maintained only on an individual basis.  To read CAFA's definition of "class action" in that way would be inconsistent with Congress's legislative plan in passing the statute, and lead to a manifestly unreasonable, if not absurd, result—and one inconsistent with the "[d]ue regard for the rightful independence of state governments" mandated in evaluating federal jurisdiction. *Victory Carriers, Inc. v. Law,* 404 U.S. at 212.

**V.     Even if Standing and Jurisdiction Could Be Established, Plaintiff Fails to State a Claim Because Condé Nast Provided Written Notice That Her Information Could Be Disclosed For Marketing Purposes, As The VRPA Expressly Allows**

The VRPA expressly permits disclosure of information about an individual's purchase of written materials for the "exclusive purpose of marketing goods and services directly to the consumer" as long as the person disclosing the information "inform[s] the customer by written notice that the customer may remove his or her name at any time by written notice to the person disclosing the information." M.C.L. § 445.1713(d).  Plaintiff has alleged no non-marketing uses of her subscription information or that she asked that such information not be disclosed.

Instead, Plaintiff asserts, in conclusory fashion, that Condé Nast "uniformly fails to obtain any form of consent from—or even provide effective notice to—its subscribers before disclosing their Personal Reading Information."  (Compl. ¶ 43.)  While "consent" is an *additional* ground for why the VRPA does not apply, it is *not* required for the VRPA's marketing

exception to apply—only notice and an opportunity to opt out is required. *See* M.C.L. § 445.1713(d). There can be no dispute that *Self* and *Bon Appétit* magazines provide just that.

Issues of *Self* magazine state as follows:

> Occasionally, we make our subscriber list available to carefully screened companies that offer products and services that we believe would interest our readers.  If you do not want to receive these offers and/or information, please advise us at P.O. Box 37662, Boone, IA 50037-0662, or call 800-274-6111.  (Hauser Decl., Ex. A.)

Issues of *Bon Appétit* contain the same notice, with a different P.O. Box and phone number.  *Id*., Hauser Decl. Ex. B.

This Court can take judicial notice of the contents of these disclosures (and of the respective magazines) because the contents of the magazines and their subscription websites, and disclosures therein, are "integral to the Complaint."  *See, e.g., In the Matter of the Trusteeships Created by Tropic CDO I Ltd.,* No. 13-CV-8428(NRB), --- F.Supp.3d ---, 2015 WL 1175449, at *7 (S.D.N.Y. Mar. 13, 2015) (Buchwald, J.) (citing *Sira v. Morton,* 380 F.3d 57, 67 (2d Cir. 2004)).  Notably, Plaintiff has not alleged any details of her alleged subscription, including the date(s) on which she subscribed or the method of her subscription.  Plaintiff cannot, however, avoid consideration of relevant documents that would reasonably be expected to be referenced in a complaint by carefully omitting such references. *E.g., Wilson v. Kellogg Co.*, No. 14-CV-2817, --- F. Supp. 3d ---, 2015 WL 3937511, at *3 (E.D.N.Y. June 25, 2015), *appeal filed*, No. 15-2237 (2d Cir. July 15, 2015) (plaintiff's "failure to include matters of which as [ ] pleader[ ] [he] had notice and which were integral to [his] claim—and that [he] apparently most wanted to avoid— may not serve as a means of forestalling the district court's decision on [a 12(b)(6) motion'") (quoting *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011)).

In short, it is clear from the magazines themselves that Condé Nast provided explicit written notice to Plaintiff that her subscription purchase information could be disclosed for marketing purposes, and that she could opt out.  *This is exactly what the VRPA permits*. *See* M.C.L. § 445.1713(d).  Accordingly, Plaintiff's First Cause of Action should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

## VI.   <u>The VRPA Violates The First Amendment</u>

"Where First Amendment freedoms are at stake we have repeatedly emphasized that precision of drafting and clarity of purpose are essential."  *Erznoznik v. Jacksonville*, 422 U.S. 205, 217-18 (1975).  Hardly a model of drafting, the Michigan VRPA was hastily enacted in response to the Bork contretemps.  In seeking to restrain truthful reporting on individual viewing and reading choices (*see* Compl. ¶ 18 & Ex. A), the VRPA not only rests on a fundamentally unconstitutional premise, its obscure terms sweep far broader in doing so than the federal Video Privacy Act that preceded it: the VRPA criminalizes speech by anyone who rents, lends, or sells at retail any "written materials" or "sound recordings," if the speech includes "information concerning the purchase, lease, rental, or borrowing of those materials by a customer that indicates the identity of the customer." M.C.L. § 445.1712.

A statute targeting speech based on its specific content—i.e., "information concerning" purchase or rental of written materials and other media—is presumed unconstitutional.  *See, e.g., Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2738 (2011).[12]  Here, that content-based regulation encompasses everything from news reporting about public figures' media

---

[12]   The Michigan VRPA has never been directly challenged on First Amendment grounds, likely because it was not subject of litigation at all until recently.  The defendant in *Halaburda* suggested that "a determination by the court that the act covers magazines will raise 'difficult First Amendment issues,'" but the court found that cursory assertion was not a basis for dismissal. *Halaburda v. Bauer Pub. Co*, 2013 WL 4012827, at *7.  Neither that court nor any other has ruled on an overbreadth challenge to the statute.

consumption (the subject of the Bork article) to speech about any person's purchase of any "written materials." Such a facially overbroad statute cannot survive First Amendment scrutiny.

"The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002) (citing *Broadrick v. Oklahoma*, 413 U.S. 601 (1973)). The "overbreadth" doctrine permits a challenge to a statute on its face because it threatens others not before the court. *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503-04 (1985). A law is void under the overbreadth doctrine if it "sweeps within its ambit other activities that . . . constitute an exercise" of protected expression. *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940). That is precisely what the VRPA does.

By its terms, the VRPA would criminalize and civilly penalize any news organization that sells its publications "at retail"[13] for publishing a truthful story indicating that someone—including, for example, a candidate for public office—bought one of its publications, no matter how newsworthy that information was.[14] "Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned." *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964). A statute that would allow such an intrusion into a news organization's

---

[13] Strictly speaking, Condé Nast and other magazine publishers are not in the "retail" business as that word is commonly understood, nor is the sale of *subscriptions* "at retail"; unlike point-of-sale purchases of magazines, a subscription is a long-term relationship in which subscribers buy the right to receive yet-to-be-published magazines directly from the publisher, often at a discount off the cover (retail) price. Use of the term "retail" is just one example of the sloppy drafting that makes this statute so uncertain and problematic.

[14] For example, the statute would prohibit the Grand Rapids Press from reporting that Michigan Governor Rick Snyder commented in a public speech that he has been closely following the Michigan State football team by reading the Grand Rapids Press religiously. However, that statement could be repeated by anyone else who did not sell a publication "at retail" to Gov. Snyder. The statute would threaten to punish even the most prosaic interactions; for example, if the employee of a Michigan newsstand that sells, or library that lends, written materials just sold or lent Michael Moore a copy of *National Review*, they could not answer if the next patron in line asked if that was Michael Moore buying a copy of *National Review*.

editorial process, threatening to punish truthful speech of public importance, is wholly

inconsistent with the First Amendment and cannot be countenanced.  *See, e.g., Miami Herald*

*Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974).

The statute's impact on First Amendment values is real and cannot be dismissed.  "An

individual's right to speak is implicated when information he or she possesses is subjected to

'restraints on the way in which the information might be used' or disseminated."  *Sorrell v. IMS*

*Health Inc.*, 131 S. Ct. 2653, 2665 (2011) (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20,

32 (1984)).  The VRPA is not only a content-based restraint on the way in which information

might be used or disseminated, it also discriminates between different types of speech (marketing

and non-marketing) and different speakers (retailers and non-retailers).  *See Brown*, 131 S. Ct. at

2740  (statute singling out video game manufacturers for "disfavored treatment" (but not

"booksellers, cartoonists, and movie producers") was "wildly underinclusive when judged

against its asserted justification, which in our view is alone enough to defeat it").

In short, the VRPA's overbreadth chills protected speech and for this reason alone, the

statute should be invalidated under the First Amendment. [15]

## VII.   <u>Plaintiff's Tag-Along Unjust Enrichment Claim Fails As A Matter of Law</u>

Plaintiff's unjust enrichment claim is premised exclusively on the notion that the price

she paid for her subscriptions to *Self* and *Bon Appetit* included a "premium" for non-disclosure

---

[15]  Condé Nast is aware that the Court will avoid constitutional issues where other dispositive
grounds exist, and as shown above, there are ample other grounds, both jurisdictional and on the
merits, for dismissal.  In the unlikely event this case goes forward, Condé Nast intends to fully
litigate the statute's other First Amendment infirmities, including that it is unconstitutional as
applied here.  Whatever privacy rationale might be articulated in support of the VRPA,
criminalizing the vast array of protected speech the law covers cannot withstand heightened First
Amendment scrutiny. "Both on its face and in its practical operation," the VRPA impermissibly
"imposes a burden based on the content of speech and the identity of the speaker." *Sorrell*, 131
S. Ct. at 2665 (invalidating statute prohibiting pharmacies from providing information about
doctors' prescribing preferences to "data miners" and others, for use by pharmaceutical
companies in marketing their products to doctors).

of her subscription information. (Compl. ¶¶ 7, 78-79, 82-83.)  However, that purported

expectation is only alleged to—and only can—arise from VRPA's prohibition on disclosure of

the subscription information. (Compl. ¶¶ 7, 78-79, 82.)

First, any privacy interest in non-disclosure of Plaintiff's subscription information is

explicitly covered by the VRPA, which provides her exclusive remedy, and Plaintiff's unjust

enrichment claim is preempted under Michigan law.  Where, as here, "comprehensive legislation

prescribes in detail a course of conduct to pursue and the parties and things affected, and

designates specific limitations and exceptions, the Legislature will be found to have intended that

the statute supersede and replace the common law dealing with the subject matter." *Kraft v.

Detroit Ent'mnt, L.L.C.,* 261 Mich.App. 534, 545, 683 N.W.2d 200, 206 (2004) (citations

omitted) (unjust enrichment and other common law claims preempted by Michigan Gaming

Control and Revenue Act); *Jackson v. PKM Corp.*, 430 Mich. 262, 279, 422 N.W.2d 657, 665

(1988) (where "common-law action is predicated on defendant's alleged wrongful furnishing of

intoxicants to her" it was "preempted by the dramshop act's exclusive remedy").[16]

Second,  unjust enrichment is an equitable doctrine, and "Michigan cases have

consistently held that '[e]quity will not take jurisdiction where there is a full, complete, and

adequate remedy at law'"—here, under the VRPA.  *Pacheco v. Boar's Head Provisions Co.*, No.

1:09-CV-298, 2010 WL 1323785, at *4-5 (W.D. Mich. Mar. 30, 2010) (where plaintiffs sought

"the same relief under both the FLSA claim and their unjust enrichment claim" and "have not

---

[16] *See also Polytorx, L.L.C. v. Univ. of Mich. Regents*, Nos. 318151, 320989, 2015 WL 2144800, at *11 (Mich. Ct. App. May 7, 2015) (where claim under Uniform Trade Secrets Act failed, claim for "unjust enrichment from the misappropriation of confidential and proprietary information and trade secrets" also had to be dismissed); *Taylor v. Kochanowski*, No. 289660, 2010 WL 2696675, at *3 (Mich. Ct. App. July 8, 2010) ("because the unjust enrichment claim is simply a derivative of [plaintiff's] commercial misappropriation [claim], it must also fail").

suggested that they do not have a full, complete, and adequate remedy at law under the FLSA," their was no basis "for bringing an independent action for equitable relief"; dismissing claim).

In short, Plaintiff either has a claim under the VRPA for Condé Nast's allegedly improper disclosure of her subscription information (in which case the VRPA provides her a complete and adequate remedy), or she does not (in which case, Condé Nast cannot have been unjustly enriched under Plaintiff's theory).  Because the VRPA provides the exclusive legal remedy, if any, for Plaintiff's claims, her equitable claim for unjust enrichment claim must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

In any event, as discussed *supra*, pp. 10-11, the premise for Plaintiff's unjust enrichment claim—that the privacy of her subscription information has intrinsic monetary value (*see* Compl. ¶¶ 7, 69, 80, 82)—is both legally and factually untenable, and cannot support any claim for unjust enrichment.  Certainly, Plaintiff does not and could not allege that she was charged more than non-Michigan subscribers, or that Condé Nast would have charged less for her subscriptions if the VRPA did not exist. *Cf. In re DoubleClick Inc. Privacy Litig.*, 154 F. Supp. 2d at 525 ("[W]e are unaware of any court that has held the value of this collected [demographic] information constitutes damage to consumers or unjust enrichment to collectors").  The Complaint fails to allege any unjust benefit that Condé Nast received here.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's Class Action Complaint should be dismissed in its entirety and with prejudice pursuant to Fed. R. Civ. P. 12(b)(6); dismissed for lack of standing and/or jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1); or, in the alternative, stayed pending the U.S. Supreme Court's ruling in *Spokeo, Inc. v. Robins*.

Dated:   October 2, 2015

                              Respectfully Submitted,

                              DENTONS US LLP

                              By:   /s/ Sandra D. Hauser
                                    Sandra D. Hauser
                                    DENTONS US LLP
                                    1221 Avenue of the Americas
                                    New York, New York 10020
                                    Tel: (212) 768-6700
                                    Fax: (212) 768-6800
                                    sandra.hauser@dentons.com

                                    Natalie J. Spears
                                    Kristen C. Rodriguez
                                    DENTONS US LLP
                                    233 S. Wacker Drive, Suite 5900
                                    Chicago, IL 60606-6404
                                    Tel:  (312) 876-8000
                                    Fax:  (312) 876-7934
                                    natalie.spears@dentons.com
                                    kristen.rodriguez@dentons.com

                                    *Counsel for Defendant*
                                    *Advance Magazine Publishers Inc.*

84855569