UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X
SUZANNE BOELTER, individually
and on behalf of all others
similarly situated,

                Plaintiff,           **MEMORANDUM AND ORDER**

    - against -                15 Civ. 5671 (NRB)

ADVANCE MAGAZINE PUBLISHERS INC.,
d/b/a CONDÉ NAST,

                Defendant.
--------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


    Plaintiff Suzanne Boelter brings this action against defendant Advance Magazine Publishers Inc., d/b/a Condé Nast ("Condé Nast"), alleging that Condé Nast disclosed her subscription information in violation of the Michigan Preservation of Personal Privacy Act, Mich. Comp. Laws § 445.1711 <u>et seq</u>. She also brings a claim for unjust enrichment under Michigan law. Condé Nast moved to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons stated herein, Condé Nast's motion is denied.

BACKGROUND[1]

## I.   **Factual Background**

Condé Nast, based in New York, is an international media company that publishes some of the most widely circulated magazines in the United States. Compl. ¶¶ 1, 8. According to Boelter, the company maintains a digital database comprised of subscribers' "Personal Reading Information" ("PRI"), which includes "full names, titles of magazines subscribed to, and home addresses." Id. ¶¶ 2, 39. Condé Nast discloses this PRI to data mining companies, who supplement it with additional information about subscribers, including "gender, purchasing habits, political affiliation, religious practice, [and] charitable donations." Id. ¶ 39. It also sells mailing lists, which include subscribers' PRI and can include the other information obtained from data miners, to various third-party entities. Id. ¶¶ 2, 40. Companies can thus purchase lists from Condé Nast identifying its subscribers by income, political affiliation, religious practice, and charitable donations. Id. ¶ 41. According to Boelter, regardless of subscription method, Condé Nast never requires an individual to read or agree to any terms of service, privacy policy, or information-sharing policy, and fails to obtain any form of consent from--or provide

---

[1] The facts recited here and throughout this Memorandum and Order are drawn from the Complaint filed July 20, 2015 (or "Compl."), and are assumed to be true for purposes of this motion.

2

effective notice to--its subscribers before disclosing their PRI. Id. ¶¶ 42-43.

Boelter, a citizen of Michigan, subscribes to Condé Nast magazines Bon Appétit and Self. Id. ¶ 7. Condé Nast has disclosed Boelter's PRI in at least two ways: first, by disclosing mailing lists containing her PRI to data miners, who supplemented the PRI with other information from their own databases before sending the mailing lists back to Condé Nast; and second, by selling the supplemented mailing lists containing her PRI to "consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes." Id. ¶¶ 58-59.

Boelter paid for her subscriptions and claims that because she ascribed value to the privacy of her PRI, its sale and disclosure caused her to receive less value than she had paid for in her subscription costs. Had she been adequately informed of Condé Nast's disclosure practices, she would not have been willing to purchase her Bon Appétit and Self subscriptions at the full price charged, if at all. Id. ¶¶ 69-71. Moreover, Condé Nast's disclosure of Boelter's PRI to third parties caused an influx of junk mail and marketing calls to her cell phone. Id. ¶¶ 7, 72.

## II.  **Procedural Background**

On July 20, 2015, Boelter commenced this putative class action on behalf of Michigan residents who had their PRI disclosed to third parties by Condé Nast without their consent. Condé Nast has moved to dismiss pursuant to Federal Rules 12(b)(1) and 12(b)(6).[2]

DISCUSSION

## I.  **Motion to Dismiss - Legal Standard**

To survive a motion to dismiss for lack of subject matter jurisdiction based on standing pursuant to Rule 12(b)(1), the plaintiff "must allege facts that affirmatively and plausibly suggest that it has standing to sue." Amidax Trading Grp. V. S.W.I.F.T. SCRL, 671 F.3d 140, 145 (2d Cir. 2011).  Where a defendant places jurisdictional facts in dispute, the court may properly consider "evidence relevant to the jurisdictional question [that] is before the court." Robinson v. Gov't of Malaysia, 269 F.3d 133, 140 (2d Cir. 2001).  However, if a defendant challenges only the legal sufficiency of the jurisdictional allegations, "the court must take all facts alleged in the complaint as true and draw all reasonable

---

[2] Another court in this district recently considered and denied a motion to dismiss a consolidated class action complaint brought by the same plaintiff and another Michigan resident that asserted the same claims against a different magazine publisher. Boelter v. Hearst Commc'ns, Inc., --- F. Supp. 3d ----, Nos. 15 Civ. 3934 (AT), 15 Civ. 9279 (AT), 2016 WL 3369541 (S.D.N.Y. June 17, 2016) ("Hearst").

4

inferences in favor of plaintiff." Id. (internal quotation marks omitted).

Similarly, a court ruling on a motion to dismiss pursuant to Rule 12(b)(6) must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). A claim only has "facial plausibility" when the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678.

In considering a Rule 12(b)(6) motion, we do not look beyond the "facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken." Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016) (internal quotation marks and ellipses omitted). We may also consider a document not expressly incorporated by reference in the complaint "where the complaint relies heavily upon its terms and effect." Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks omitted).

## II.  __The Michigan PPPA__

Michigan's Preservation of Personal Privacy Act (or the "PPPA") was enacted in 1988, shortly after the enactment of the federal Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710. As the First Circuit has explained,

> Congress enacted the VPPA in response to a profile of then-Supreme Court nominee Judge Robert H. Bork that was published by a Washington, D.C., newspaper during his confirmation hearings.  S. Rep. No. 100-599, at 5 (1988), reprinted in 1988 U.S.C.C.A.N. 4342-1.  The profile contained a list of 146 films that Judge Bork and his family had rented from a video store.  Id.  Members of Congress denounced the disclosure as repugnant to the right of privacy.  Id. at 5-8. Congress then passed the VPPA "[t]o preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials."  Id. at 1.
>
> To effectuate this purpose, Congress in the VPPA created a civil remedy against a "video tape service provider" for "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1).

Yershov v. Gannett Satellite Info. Network, Inc., 820 F.3d 482, 485 (1st Cir. 2016) (alterations in Yershov).

Less than two months after the VPPA was signed into law, Michigan enacted the PPPA.[3]  The bill was enacted to "preserve

---

[3] While other courts have referred to the Michigan statute as the "Video Rental Privacy Act," or "VRPA," we refer to it as the Preservation of Personal Privacy Act, or "PPPA," following the lead of the Michigan Supreme Court.  See Deacon v. Pandora Media, Inc., 499 Mich. 477, --- N.W.2d ----, No. 151204, 2016 WL 3619346, slip op. at 2 n.1 (Mich. July 6, 2016).

As discussed in more detail below, the PPPA was amended in May 2016, while Condé Nast's motion to dismiss was pending.  2016 Mich. Pub. Acts No. 92 (codified at Mich. Comp. Laws § 445.1711 et seq.).  We refer to the version of the Act in effect prior to the May 2016 amendment and codified at Mich. Comp. Laws §§ 445.1711-1715 (effective through July 30, 2016), as the "PPPA."  We refer to the version of the Act in effect now as the "Amended

personal privacy with respect to the purchase, rental, or borrowing" of written materials, sound recordings, and video recordings.  1988 Mich. Pub. Acts No. 378 at p. 1559.  Although drafted to reach a broader range of materials than the VPPA, the PPPA pursues a similar objective.  According to an accompanying bill analysis, the PPPA was meant to address concerns raised by many who viewed the disclosure of Judge Bork's video rentals as an "unwarranted invasion of privacy"; noting the recent passage of the VPPA, the analysis states that "[m]any in Michigan also believe that one's choice in videos, records, and books is nobody's business but one's own, and suggest the enactment of a statute to explicitly protect a consumer's privacy in buying and borrowing such items."  House Legislative Analysis, Privacy: Sales, Rentals of Videos, Etc., H.B. 5331, (Jan. 20, 1989) ("House Analysis").[4]

With certain exceptions, the PPPA, prior to its recent amendment, prohibited persons "engaged in the business of selling at retail, renting, or lending books or other written materials, sound recordings, or video recordings" from disclosing

> to any person, other than the customer, a record or
> information concerning the purchase, lease, rental, or

---

PPPA."  Citations to the pre-May 2016 amendment Act are to the "PPPA," and citations to the Act in effect now are to the "Am. PPPA."

[4] The House Analysis is attached as Exhibit A to the Complaint.

borrowing of those materials by a customer that indicates the identity of the customer.

PPPA § 2.   Such a "record or information" could be disclosed only in circumstances listed in Section Three of the Act.   Prior to the amendment, those exceptions included disclosure "[w]ith the written permission of the customer"; "[p]ursuant to a court order" or "a search warrant"; "[t]o the extent reasonably necessary to collect payment for the materials"; and for the "exclusive purpose of marketing goods and services directly to the consumer," provided that the disclosing party informed "the customer by written notice that the customer may remove his or her name at any time by written notice to the person disclosing the information." Id. § 3.

The PPPA was initially passed in 1988 as a criminal statute without any private right of action.   See 1988 Mich. Pub. Acts No. 378, § 4, at p. 1560.   ("A person who violates this act is guilty of a misdemeanor.").   It was amended in 1989 to add Section Five, which provides for a civil cause of action.   1989 Mich. Pub. Acts No. 206, § 5, at p. 1352.   Prior to the 2016 amendment, a customer "identified in a record or other information disclosed in violation" of the PPPA could sue to recover "[a]ctual damages, including damages for emotional distress, or $5,000, whichever is greater."   PPPA § 5.

While Condé Nast's motion to dismiss was pending, the Michigan Legislature amended the PPPA. 2016 Mich. Pub. Acts No. 92. With respect to Section Three, the Amended PPPA added an exception permitting disclosure of covered information "[t]o any person if the disclosure is incident to the ordinary course of business of the person that is disclosing the record or information." Am. PPPA § 3(d). In addition, the exception permitting disclosure for the "exclusive purpose of marketing goods and services directly to the consumer" was modified to, inter alia, omit the words "exclusive" and "directly" and add provisions concerning what constitutes effective written notice to customers. Id. § 3(e). With respect to Section Five, the amendment added language stating that only a customer "who suffers actual damages as a result of a violation of this act may bring a civil action," and removed the provision permitting recovery of $5,000 in statutory damages. Id. § 5(2).

### III. **Article III Standing**

Condé Nast first seeks dismissal of the Complaint on the ground that Boelter lacks standing under Article III to assert her claims. To establish Article III standing, a plaintiff bears the burden of establishing (1) that she has suffered "an injury in fact--an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical"; (2) "a causal

connection between the injury and the conduct complained of"; and (3) a "likel[ihood]" that the injury "will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted). A named plaintiff must allege that she has "personally . . . been injured, not that injury has been suffered by other, unidentified members of the class." Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 40 n.20 (1976) (internal quotation marks omitted). Condé Nast argues that Boelter has failed to establish standing because she does not allege an "injury in fact" sufficient to satisfy Article III.

To be "particularized," an "injury must affect the plaintiff in a personal and individual way." Lujan, 504 U.S. at 560 n.1. To be "concrete," an injury must be "real, and not abstract." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1548 (2016) (internal quotation marks omitted). As the Supreme Court recently explained in Spokeo, "Article III standing requires a concrete injury even in the context of a statutory violation," and thus a plaintiff may not "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement." Id. at 1549.[5]

---

[5] Although the Supreme Court's decision in Spokeo was issued after Condé Nast's motion was fully briefed, the parties provided supplemental submissions addressing Spokeo and notifying the Court of many lower court decisions interpreting Spokeo. We have taken into consideration the cases cited and any arguments made by the parties in these submissions.

The _Spokeo_ Court recognized, however, that "concrete" is "not . . . necessarily synonymous with 'tangible,'" and that "intangible injuries can . . . be concrete." _Id_. It highlighted two factors for courts to consider in determining whether an alleged intangible harm is sufficiently concrete: "history and the judgment of Congress." _Id_. Observing that the case-or-controversy requirement at the heart of the standing inquiry is "grounded in historical practice," the Court found it "instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." _Id_. In addition, Congress's judgment should be weighed in assessing concreteness, as Congress is "well positioned to identify intangible harms that meet minimum Article III requirements." _Id_.

The _Spokeo_ Court applied these principles to the claims before it, brought by the plaintiff under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 _et seq_. Through the FCRA, Congress adopted procedures designed to ensure "'fair and accurate credit reporting'" and provided individuals with a private cause of action for violations of the statute. _Spokeo_, 136 S. Ct. at 1545 (quoting 15 U.S.C. § 1681(a)(1)). The Court provided two examples of violations of FCRA-imposed obligations that would result in no harm: First, a consumer reporting agency

fails to provide a statutorily-required notice to a user of the agency's consumer information, but the information nevertheless is entirely accurate. Second, even though such agencies were required to follow reasonable procedures to assure maximum accuracy of consumer reports, it was "difficult to imagine how the dissemination of an incorrect zip code, without more, could work any concrete harm." Id. at 1550. The Court vacated the decision below and remanded the case for the Ninth Circuit to determine whether "the particular procedural violations alleged . . . entail a degree of risk sufficient to meet the concreteness requirement." Id.

Here, it is not disputed that Boelter has satisfied the particularization requirement: she alleges disclosure of her own PRI in violation of her rights under the PPPA. See Compl. ¶¶ 7, 53-68. Condé Nast's argument is aimed at "concreteness." Initially, Condé Nast emphasizes the fact that the PPPA was enacted by a state legislature rather than by Congress.

We agree that "[a]lthough states may create a statutory cause of action where none exists in federal law, states may not bypass constitutional or prudential standing requirements." Robainas v. Metro. Life Ins., No. 14cv9926 (DLC), 2015 WL 5918200, at *6 (S.D.N.Y. Oct. 9, 2015) (footnotes omitted); see id. ("Plaintiffs still must demonstrate a concrete injury-in-fact, even if that injury is based on a deprivation of a right

created under state law."). Yet, as Judge Cote explained in Robainas and as reaffirmed in Spokeo, even Congress "may not bypass the constitutional requirements of standing." Robainas 2015 WL 5918200, at *6. We do not read Spokeo to mean that only Congress may create legally protected interests that support standing. Cf. Diamond v. Charles, 476 U.S. 54, 65 n.17 (1986) ("The Illinois Legislature, of course, has the power to create new interests, the invasion of which may confer standing. In such a case, the requirements of Art. III may be met."); Utah ex rel. Div. of Forestry, Fire & State Lands v. United States, 528 F.3d 712, 721 (10th Cir. 2008) ("Although Article III standing is a question of federal law, state law may create the asserted legal interest."). Accordingly, the Court must still determine whether the alleged statutory violation constitutes a "palpable deprivation," Robainas, 2015 WL 5918200, at *6, giving rise to injury in fact.

Analogizing to Spokeo, Condé Nast argues that because Section Three of the PPPA provided an exception for disclosure with the "exclusive purpose of marketing goods and services directly to the consumer" as long as "written notice" of the ability to opt out was provided, PPPA § 3(d), Boelter's claim is based on a violation of a procedural notice requirement. We reject this argument for two reasons. First, it is not clear from the Complaint that this exception applies to Boelter's

13

claim.   She has alleged that Condé Nast disclosed her PRI to data miners, which supplemented the PRI with additional information from their own databases, and supplied the supplemented information back to Condé Nast; and she has alleged that Condé Nast subsequently included her PRI in enhanced mailing lists sold to various entities.   Compl. ¶¶ 58-59.   The allegations thus include dissemination to data miners to enhance the value of the PRI, which does not neatly fall within the exception for disclosure with the exclusive purpose of marketing directly to a consumer.[6]

Second, Boelter's allegations squarely implicate the right to privacy in her PRI protected by the PPPA.   The PPPA's requirement that notice be provided to the customer of the ability to "remove his or her name at any time by written notice," PPPA § 3(d), gives individuals the opportunity to prohibit disclosure of their protected information even if the disclosure falls within the direct-marketing exception.   The harm resulting from failing to satisfy this notice requirement is not simply lack of notice itself, but denial of the right to prevent disclosure.   This is distinct from the procedural "notice" violation discussed in Spokeo, which resulted in no additional harm.   If, as Boelter alleges, Condé Nast failed to

---

[6] Because we conclude below that the PPPA, rather than the Amended PPPA, applies to Boelter's claim, we need not determine whether these allegations would fit within the amended exception for marketing to customers.

give her notice and an opportunity to opt out, then the disclosure of her PRI would have violated the PPPA's substantive disclosure prohibition.

Having rejected the argument that Boelter has pled only a harmless procedural violation, we also conclude that the asserted harm is sufficiently concrete. In light of the related aims of the two statutes, it is significant that all courts to consider the question, including this one, have concluded--both pre- and post-Spokeo--that consumers alleging that a defendant violated the VPPA by "knowingly disclos[ing] their [personally identifiable information] to a third party without their consent have satisfied the concreteness requirement for Article III standing." Yershov v. Gannet Satellite Info. Network, Inc., --- F. Supp. 3d ----, No. 14-13112-FDS, 2016 WL 4607868, at *7 (D. Mass. Sept. 2, 2016); see, e.g., In re Nickelodeon Consumer Privacy Litig., 827 F.3d 262, 274 (3d Cir. 2016) (finding harm "concrete" because it "involves a clear de facto injury, i.e., the unlawful disclosure of legally protected information"); Sterk v. Redbox Automated Retail, LLC, 770 F.3d 618, 623 (7th Cir. 2014); Austin-Spearman v. AMC Network Entm't LLC, 98 F. Supp. 3d 662, 668 (S.D.N.Y. 2015).

In finding the alleged intangible harm of disclosure of video-viewing information to be concrete, the above post-Spokeo VPPA decisions recognized that Congress may "elevate[] an

otherwise non-actionable invasion of privacy into a concrete, legally cognizable injury." Yershov, 2016 WL 4607868, at *8; see In re Nickelodeon, 827 F.3d at 274 ("Congress has long provided plaintiffs with the right to seek redress for unauthorized disclosures of information that, in Congress's judgment, ought to remain private."). With respect to history, at least one decision grounded the VPPA's disclosure prohibition in a common law right to privacy in one's personal information. See Yershov, 2016 WL 4607868, at *8 ("'[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.'" (quoting U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 763 (1989))).

The harm protected against by the PPPA's disclosure prohibition is essentially the same as that protected against by the VPPA's disclosure prohibition. Both statutes reflect legislative determinations as to what kinds of unauthorized disclosures invade the privacy interests of consumers in the content they consume. Even if the Michigan Legislature's judgment warrants less deference than that of Congress in the standing inquiry, the harms contemplated by both statutes have close ties to those recognized by the common law tort of invasion of privacy. See Restatement (Second) of Torts § 652A cmts. a-b (Am. Law Inst. 1977) (summarizing history of right of

privacy and explaining that invasion of privacy tort developed to address four wrongs "whose only relation to one another is that each involves interference with the interest of the individual in leading, to some reasonable extent, a secluded and private life, free from the prying eyes, ears and publications of others").

Moreover, Boelter has alleged a non-negligible invasion of her interests in her protected information. She asserts that Condé Nast has disclosed her PRI to a range of entities, and she claims that the disclosure has led to an influx of third-party ads in her mail and marketing calls to her cell phone. Compl. ¶¶ 7, 58-59, 72. She claims that these solicitations are harassing and waste her time, money, and resources. Id. ¶ 7. Considering the pleading as a whole, Boelter has alleged considerable disclosure and use of her PRI as a result of Condé Nast's practices, which allegations go directly to the harm the PPPA intended to address. This suffices to assert a concrete, if hard to measure, intrusion on protected privacy interests so as to give rise to injury in fact.[7]

---

[7] We reject Condé Nast's argument that the fact that Boelter has made her PRI a matter of public record by bringing this suit undermines her claim of a privacy injury. It would undoubtedly chill enforcement of privacy rights if attempting to vindicate them through the judicial process undermined one's claimed interest.

Finally, at this stage, the harms alleged are fairly traceable to Condé Nast's disclosure practices and are judicially redressable.[8]

## IV.   CAFA Jurisdiction

The Complaint alleges that this Court has subject matter jurisdiction based on the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in scattered sections of 28 U.S.C.). "CAFA provides the federal district courts with 'original jurisdiction' to hear a 'class action' if the class has more than 100 members, the parties are minimally diverse, and the 'matter in controversy exceeds the sum or value of $5,000,000.'" Standard Fire Ins. v. Knowles, 133 S. Ct. 1345, 1348 (2013) (quoting 28 U.S.C. § 1332(d)(2), (d)(5)(B)). It also contains certain limited exceptions to jurisdiction, including exceptions "designed to draw a delicate balance between making a federal forum available to genuinely national litigation and allowing the state courts to retain cases when the controversy is strongly linked to that state." Hart v. Rick's NY Cabaret Int'l, Inc., 967 F. Supp. 2d 955, 962 (S.D.N.Y. 2014) (internal quotation marks omitted).

---

[8]  As Condé Nast argues, Boelter does not provide any timeline for her subscription and any subsequent increase in junk mail and marketing calls. Given the other possible explanations for an increase in third-party solicitations, the Court shares Condé Nast's skepticism as to the extent that its practices are responsible for the alleged influx.  At this stage, however, it is at least plausible that Condé Nast's disclosure of Boelter's name, address, and subscription information to various third-parties purchasing the information for purposes of soliciting consumers did in fact lead to some increase in solicitation activity.

Condé Nast points out that Boelter's ability to file this suit pursuant to CAFA creates an anomaly because she could not have maintained this action as a class action in Michigan state court.  Michigan Court Rule ("M.C.R.") 3.501 provides that "[a]n action for a penalty or minimum amount of recovery without regard to actual damages imposed or authorized by statute may not be maintained as a class action unless the statute specifically authorizes its recovery in a class action."  M.C.R. 3.501(A)(5).  The PPPA is silent on class recovery, and Boelter seeks the greater of actual or statutory damages under the pre-May 2016 amendment statute.  Condé Nast thus asserts, and Boelter does not appear to contest, that Boelter could not have brought the same class allegations in a Michigan court.

Given this inconsistency, Condé Nast argues that we cannot read CAFA to provide this action a federal forum.  Specifically, it argues that given CAFA's purpose of providing an expanded basis for defendants to remove state class actions to federal court, Congress surely did not expect to provide plaintiffs with a federal forum for state-law based class actions they could not pursue in state court.  Accordingly, Condé Nast argues, we must read the term "class action" in CAFA to exclude such suits.

In interpreting CAFA, "[w]e begin our analysis, as we must, with the plain language of the statute."  Purdue Pharma L.P. v. Kentucky, 704 F.3d 208, 214 (2d Cir. 2013).  "'When the words of

a statute are unambiguous, then . . . judicial inquiry is complete.'" Id. (quoting Conn. Nat'l Bank v. Germain, 503 U.S. 249, 254 (1992)).  CAFA defines a "class action" as "any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action."  28 U.S.C. § 1332(d)(1)(B).

This definition is unambiguous.  Any civil action filed in federal court under Rule 23 qualifies as a class action under CAFA.  There is no mention of actions that could not be filed on a class basis in state court.   Indeed, the fact that CAFA provides exceptions for certain local controversies but does not contain the exception Condé Nast advances only bolsters the conclusion that we cannot read "class action" to exclude this action.   See N.J. Carpenters Vacation Fund v. HarborView Mortg. Loan Tr. 2006-4, 581 F. Supp. 2d 581, 584 (S.D.N.Y. 2008) ("[B]y its clear language, CAFA creates original jurisdiction for and removability of all class actions that meet the minimal requirements and do not fall under one of the limited exceptions.").

Condé Nast asks the Court to nonetheless read such an exception into CAFA to avoid an absurd result.  Whatever the merits of Condé Nast's position, this result has already been recognized as a valid consequence of a uniform system of federal

procedure by a majority of the Supreme Court in Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co., 559 U.S. 393 (2010). There, the Court, applying Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938), and its progeny, held that Rule 23 displaced a New York state law that, like M.C.R. 3.501(A)(5), prohibited parties from maintaining class action lawsuits on claims seeking statutory damages. See Shady Grove, 559 U.S. at 410; id. at 436 (Stevens, J., concurring in part and concurring in the judgment). In so holding, the Court expressly acknowledged that precluding the application of certain state rules prohibiting class actions in state court would, as Condé Nast argues, "produce forum shopping" by encouraging filing of such actions in federal court. Id. at 415 (plurality opinion); see id. at 435 n.18 (Stevens, J., concurring in part and concurring in the judgment) (recognizing that permitting class certification unavailable under New York law "would transform 10,000 $500 cases into one $5,000,000 case").[9] Accordingly, we cannot agree that CAFA must be read to exclude this putative class action. To the extent that this is a result "surely never anticipated" by Congress when it enacted CAFA, "[i]t remains open to Congress . . . to exclude from federal-court jurisdiction under [CAFA] claims that could not be maintained as

---

[9] Condé Nast does not contend that M.C.R. 3.501(A)(5) is a substantive rule that, under the Rules Enabling Act, 28 U.S.C. § 2072(b), displaces Rule 23 and bars Boelter from seeking class treatment. Hearst, relying on Shady Grove, rejected that argument. See 2016 WL 3369541, at *7-8.

a class action in state court."  Id. at 459 & n.15 (Ginsberg,
J., dissenting).

**V.  Prudential Considerations**

For similar reasons, we reject Condé Nast's argument that
we should decline to exercise jurisdiction over this action
because of federalism and comity concerns.  In invoking comity,
Condé Nast relies on Levin v. Commerce Energy, Inc., which
explains that the "comity doctrine" "restrains federal courts
from entertaining claims for relief that risk disrupting state
tax administration."  560 U.S. 413, 417 (2010).  The Supreme
Court has discussed this doctrine "in the context of challenges
to state tax laws," Z & R Cab, LLC v. Phila. Parking Auth., 616
F. App'x 527, 533 (3d Cir. 2015) (Ambro, J., concurring in part
and concurring in the judgment), where the constraint on federal
jurisdiction is motivated by "'a proper reluctance to interfere
. . . with the fiscal operations of the state governments . . .
[if] the Federal rights of the persons could otherwise be
preserved unimpaired,'" Levin, 560 U.S. at 422 (quoting Boise
Artesian Hot & Cold Water Co. v. Boise City, 213 U.S. 276, 282
(1909)).

Condé Nast also relies on Burford v. Sun Oil Co., 319 U.S.
315 (1943), pursuant to which a distinct but related concern of
"interfering in complex state administrative schemes" animates
the federal court's decision to abstain, Greer v. Mehiel, No.

22

15-cv-6119(AJN), 2016 WL 828128, at *7 (S.D.N.Y. Feb. 24, 2016).
The abstention doctrine established in Burford requires "'a
federal court sitting in equity [to] decline to interfere with
the proceedings or orders of state administrative agencies'" in
certain narrow circumstances.  Liberty Mut. Ins. v. Hurlbut, 585
F.3d 639, 649-50 (2d Cir. 2009) (quoting New Orleans Pub. Serv.,
Inc. v. Council of City of New Orleans, 491 U.S. 350, 361
(1989)).

   Dismissal on either comity or Burford grounds is not
warranted here.  This action seeking monetary damages does not
threaten to disrupt Michigan's fiscal operations or Michigan's
efforts to establish coherent policy in an area of comprehensive
state regulation.  Instead, the salient state interest that
Condé Nast argues this suit threatens is Michigan's legislative
decision to disallow class treatment of PPPA claims seeking
statutory damages in Michigan courts.  As discussed, however,
any interference with this decision flows from CAFA's grant of
jurisdiction to certain class actions filed pursuant to Rule 23
and Shady Grove's determination that Rule 23 displaces
conflicting state laws governing the maintenance of a class
action.

   "When a Federal court is properly appealed to in a case
over which it has by law jurisdiction, it is its duty to take
such jurisdiction . . . .  The right of a party plaintiff to

23

choose a Federal court where there is a choice cannot be properly denied." <u>Willcox v. Consol. Gas Co. of N.Y.</u>, 212 U.S. 19, 40 (1909). Condé Nast has not supplied any authority allowing this Court to dismiss this action simply because the Federal Rules permit it to proceed forward in a posture that would be impossible in state court. <u>Cf.</u> <u>Shady Grove</u>, 559 U.S. at 415-16 (plurality opinion) ("Congress itself has created the possibility that the same case may follow a different course if filed in federal instead of state court.").[10]

## VI.  **<u>Retroactive Application of the Amended PPPA</u>**

As discussed, the Michigan Legislature amended the PPPA to add an "actual damages" requirement while Condé Nast's motion was pending. Condé Nast argues that this amendment bars Boelter's statutory claim. Under Michigan law, "statutes are presumed to operate prospectively unless the contrary intent is clearly manifested." <u>Frank W. Lynch & Co. v. Flex Techs., Inc.</u>, 463 Mich. 578, 583, 624 N.W.2d 180, 182 (2001) ("<u>Lynch</u>") (internal quotation marks omitted). Accordingly, the Michigan Supreme Court has "required that the Legislature make its intentions clear when it seeks to pass a law with retroactive effect." <u>LaFontaine Saline, Inc. v. Chrysler Grp., LLC</u>, 496 Mich. 26, 38, 852 N.W.2d 78, 85 (2014). It has also recognized,

---

[10] For these reasons, we deny Condé Nast's request based on the same arguments to strike the class allegations from the Complaint.

however, that a "remedial or procedural act not affecting vested rights may be given retroactive effect where the injury or claim is antecedent to the enactment of the statute." Id. at 39, 852 N.W.2d at 86.

Condé Nast argues that the Michigan Legislature has conclusively demonstrated its retroactive intent. Condé Nast relies on the Amended PPPA's second enacting section:

> This amendatory act is curative and intended to clarify that the prohibitions on disclosing information contained in [the original Act], do not prohibit disclosing information if it is incident to the ordinary course of business of the person disclosing the information, including marketing goods and services to customers or potential customers when written notice is provided, and that a civil action for a violation of those prohibitions may only be brought by a customer who has suffered actual damages as a result of the violation.

2016 Mich. Pub. Acts No. 92, enacting § 2 (emphases added). Condé Nast argues that, in light of recent class action lawsuits asserting PPPA claims, the "curative and intended to clarify" language confirms the Legislature's retroactive intent.

We disagree. The words "curative" and "clarify" do not clearly manifest retroactive, as opposed to prospective, repair. "[T]he choice to enact a statute that responds to a judicial decision is quite distinct from the choice to make the responding statute retroactive." Rivers v. Roadway Express, Inc., 511 U.S. 298, 305 (1994); see id. at 307 n.7 ("We do not suggest that Congress' use of the word 'restore' necessarily bespeaks an intent to restore retroactively.").

Nor does Michigan law suggest these words are themselves decisive on the issue.  In recent years, the Michigan Supreme Court has emphasized that the Michigan "Legislature has shown . . . that it knows how to make clear its intention that a statute apply retroactively."  Lynch, 463 Mich. at 584, 624 N.W.2d at 183 (citing Mich. Comp. Laws § 141.1157 ("This act shall be applied retroactively . . . ."); Mich. Comp. Laws § 324.21301a(2) (effective through Apr. 30, 2012) ("The changes in liability that are provided for in the amendatory act that added this subsection shall be given retroactive application."), amended by 2012 Mich. Pub. Acts No. 108); see Johnson v. Pastoriza, 491 Mich. 417, 430-31, 818 N.W.2d 279, 286 (2012) (contrasting amendment silent on retroactivity with earlier amendment to same statute providing that "[t]his amendatory act applies to cases and matters pending on or filed after the effective date of this amendatory act" (quoting 1985 Mich. Pub. Acts No. 93, § 2, at p. 224)).

While we do not suggest that use of "retroactive" is required, in considering Condé Nast's argument it is instructive that the Legislature often uses that word or some other express indication of retroactivity in tandem with language demonstrating an intent to clarify or cure.  See Gen. Motors Corp. v. Dep't of Treasury, 290 Mich. App. 355, 366-67, 803 N.W.2d 698, 707 (Mich. Ct. App. 2010) (amendment applied

retroactively where enacting provisions stated it "is curative," "intended to prevent any misinterpretation" based on a Michigan Court of Appeals decision, and "is retroactive" (quoting 2007 Mich. Pub. Acts No. 104, enacting § 2, at p. 476)); Daimler Chrysler Servs. of N. Am., LLC v. Dep't of Treasury, No. 288347, 2010 WL 199575, at *2 n.1 (Mich. Ct. App. Jan. 21, 2010) (enacting provision stated that "[t]his amendatory act is curative and shall be retroactively applied" (quoting 2007 Mich. Pub. Acts No. 105, enacting § 1, at p. 480)).[11]  Indeed, some of the cases highlighted by Condé Nast as emphasizing "cure" or "clarify" language also rely on additional evidence of retroactivity in the amendment or legislative analysis, such as references to an antecedent date or interpretative controversies arising out of the existing statute.  See In re Oswalt, 444 F.3d 524, 527-28 (6th Cir. 2006) (amendment stated that it applied even if the transaction, lien, or mortgage was entered into or created before the date of prior amendment); People v. Sheeks, 244 Mich. App. 584, 590-91, 625 N.W.2d 798, 802 (Mich. Ct. App. 2001) (legislative analysis stated that amendment was introduced to clarify statutory provision in response to judicial interpretation of the provision); Romein v. Gen. Motors Corp.,

---

[11] See also Mich. Comp. Laws § 324.20140(4) ("Subsection (3) is curative and intended to clarify the original intent of the legislature and applies retroactively."); 2011 Mich. Pub. Acts No. 305, enacting § 1, at p. 7 ("This amendatory act is curative and intended to clarify the original intent of 2007 PA 36.  This amendatory act is retroactive and effective for taxes levied on and after January 1, 2008.").

168 Mich. App. 444, 450-51, 425 N.W.2d 174, 176-77 (Mich. Ct. App. 1988) (amendment both stated that Michigan Supreme Court decision had misinterpreted statute and explained how amendment applied to occurrences before its effective date), aff'd, 436 Mich. 515, 462 N.W.2d 555 (1990), aff'd, 503 U.S. 181 (1992). Nothing similar is present here.

Condé Nast suggests that the presence of language of future application in the Amended PPPA's new exception for disclosures "incident to the ordinary course of business," Am. PPPA § 3(d), is evidence of the retroactive application of provisions lacking such language, such as the new actual damages requirement.  The Amended PPPA provides that the ordinary course of business exception "only applies to a record or information that is created or obtained after the effective date of the amendatory act."  Id.  This forward-looking language, however, concerns "only the information to which the exception applies," which is information created or obtained after the effective date, and not the "prospective force of the provision itself."  Hearst, 2016 WL 3369541, at *5.  As this language serves only to identify the information subject to the exception, it at most suggests that the remainder of the amendment, including the new actual damages requirement, should be read to concern the

prospective "disclosure of consumer data regardless of whether the information pre- or post-dates the amendment." Id.[12]

Even if the amendment's language does not provide a strong indicator of retroactive intent, Condé Nast argues we may assume retroactivity from the context surrounding its passage. If an "amendment was enacted soon after controversies arose as to the interpretation of the original act, it is logical to regard the amendment as a legislative interpretation of the original act--a formal change--rebutting the presumption of substantial change." Detroit Edison Co. v. Dep't of Revenue, 320 Mich. 506, 520, 31 N.W.2d 809, 816 (1948) (internal quotation marks omitted); see id. at 520-21, 31 N.W.2d at 816 (amendment retroactive where it resolved dispute concerning construction of statute between Department of Revenue and State Board of Tax Appeals). Condé Nast contends that we can infer retroactive intent because the amendment was passed after a sudden influx of class action lawsuits in which federal district court judges had held that actual damages were not required to bring a PPPA claim.

We do not, however, read those decisions to suggest any serious interpretative uncertainty with respect to whether

---

[12] At the same time, the presence of language of future application in the ordinary course of business exception undermines Condé Nast's argument that the words "curative" and "clarify" necessitate retroactive application. The "curative" and "intended to clarify" language in the 2016 Act refers not only to the new actual damages requirement but also to the ordinary course of business exception. 2016 Mich. Pub. Acts No. 92, enacting § 2. Yet the latter clarification applies only to information post-dating the amendment.

actual damages were required under the PPPA.  See Halaburda v. Bauer Publ'g Co., No. 12-CV-12831, 2013 WL 4012827, at *4 (E.D. Mich. Aug. 6, 2013) (noting that a "close reading of the [PPPA] reveals that it contains absolutely no language to require that a claimant suffer any actual injury apart from a violation of the statute").  As Condé Nast emphasizes, the court in Halaburda did express "hesitation" and "reluctance" in its decision, but that was with respect to the question of Article III, not statutory, standing.  Id. at *4-6.  Indeed, "every single court" to consider an argument that the PPPA should be interpreted to require actual damages rejected it, Kinder v. Meredith Corp., No. 14-cv-11284, 2014 WL 4209575, at *2 (E.D. Mich. Aug. 26, 2014), and a plain reading of the pre-amendment PPPA supports that result.  Condé Nast has not pointed to evidence that the Amended PPPA was "passed in the midst of controversy over a provision's meaning."  Workman v. Detroit Auto. Inter-Ins. Exch., 404 Mich. 477, 521, 274 N.W.2d 373, 391 (1979) (Levin, J., concurring in part and dissenting in part) (emphasis added). Moreover, the amendment makes no reference to any specific interpretive error.  Cf. Romein, 168 Mich. App. at 450-51, 425 N.W.2d at 176-77 (amendment referring to Michigan Supreme Court decision).[13]

---

[13] We also reject Condé Nast's argument that statements made by a legislator during a debate on the amendment and by a plaintiff's lawyer during committee hearing testimony expressing concern about possible retroactive application

Finally, Condé Nast argues that the amendment is remedial and affects no vested rights, and therefore applies retroactively.  The term "remedial" is "employed to describe legislation that does not affect substantive rights."  <u>Lynch</u>, 463 Mich. at 585, 624 N.W.2d at 183.  The cases cited by the parties are not instructive as to the amendment here.  Condé Nast principally relies on cases stating that a "remedial" amendment is one that relates to "the means employed to enforce a right or redress an injury," <u>Seaton v. Wayne Cty. Prosecutor</u>, 233 Mich. App. 313, 320, 590 N.W.2d 598, 601 (Mich. Ct. App. 1998) (internal quotation marks omitted), or that "operates to improve and further a remedy," <u>Karl v. Bryant Air Conditioning Co.</u>, 416 Mich. 558, 578, 331 N.W.2d 456, 466 (1982); <u>see</u> <u>id</u>. (statute imparting comparative negligence regime found "remedial" because it served to reduce damages).  Boelter cites cases stating that "[a] cause of action becomes a vested right when it accrues and all the facts become operative and known." <u>Doe v. Dep't of Corr.</u>, 249 Mich. App. 49, 61-62, 641 N.W.2d 269, 276 (Mich. Ct. App. 2001).  <u>But cf</u>. <u>Davis v. State Emps.' Ret. Bd.</u>, 272 Mich. App. 151, 158 n.4, 725 N.W.2d 56, 61 n.4 (Mich. Ct. App. 2006) (noting that "whether statutory rights equate to vested rights is somewhat muddled under Michigan law").

---

can demonstrate legislative intent.  That opponents of the amendment were concerned about its possible retroactive application is unsurprising, but these statements raising the possibility do not establish legislative intent.

Forced to divine how Michigan's highest court would rule on a Michigan statute, we believe that it would find that the Amended PPPA impacts substantive rights. Consumers who did not suffer consequential damages from disclosure of their PRI would have a PPPA claim under the pre-amendment Act, but the amendment's actual damages requirement has extinguished that claim. Accordingly, the amendment does not just remove a potential remedy in statutory damages, but adds a substantive element that precludes enforcement by certain consumers. Indeed, in Karl, the Court distinguished a statute reducing a plaintiff's damages from one barring an accrued cause of action to find that the former concerned "remedies or modes of procedure." 416 Mich. at 577-78, 331 N.W.2d at 466. In sum, we conclude that the Amended PPPA does not apply retroactively.

## VII.  First Amendment

Condé Nast argues that the PPPA claim must be dismissed because the Michigan statute violates the First Amendment. Condé Nast initially argued that the statute was unconstitutionally overbroad and thus invalid on its face. Following the completion of briefing on the motion to dismiss, the Court permitted the Michigan Attorney General to intervene and to file a brief in support of the constitutionality of the PPPA ("A.G. Mem."). In response, Condé Nast more fully developed an as-applied First Amendment challenge to the PPPA.

32

Whether the PPPA could survive an as-applied and a facial challenge was addressed at length in Hearst.  See 2016 WL 3369541, at *8-14.  We find the analysis as to the as-applied challenge persuasive and adopt much of it herein.  We find the facial challenge to be premature.

A.  As-Applied Challenge

**1. Type of Speech**

All parties agree that the PRI allegedly disclosed to data miners and sold in mailing lists is speech.  Where they disagree is as to whether it is "commercial speech" traditionally subjected to intermediate scrutiny under the Supreme Court's test in Central Hudson Gas & Electric Corp. v. Public Service Commission of New York, 447 U.S. 557, 561-66 (1980).  Condé Nast argues that the speech here is not commercial because it does not "propose a commercial transaction."  Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 473-74 (1989) (internal quotation marks omitted); see Cent. Hudson, 447 U.S. at 563 ("The First Amendment's concern for commercial speech is based on the informational function of advertising.").  Because disclosure of PRI does not fit within this definition of commercial speech, Condé Nast argues that we must subject the PPPA to strict scrutiny.

As Michigan points out, the Supreme Court has also defined commercial speech as "expression related solely to the economic

interests of the speaker and its audience." Id. at 561. Courts should not read this definition too broadly, as it "might, for example, permit lessened First Amendment protection and increased governmental regulation for most financial journalism and much consumer journalism simply because they are economically motivated, a notion entirely without support in the case law." CFTC v. Vartuli, 228 F.3d 94, 110 n.8 (2d Cir. 2000). Nonetheless, even outside the advertising context, speech may in certain circumstances be subject to less stringent scrutiny based on its "plainly commercial nature and effect." Conn. Bar Ass'n v. United States, 620 F.3d 81, 95 (2d Cir. 2010).

Whether the sale of data to third parties for targeted solicitation of consumers is commercial speech appears to be an open question in the Second Circuit. Cf. IMS Health Inc. v. Sorrell, 630 F.3d 263, 274-75 (2d Cir. 2010) (assuming without deciding that statute prohibiting data miners from disclosing prescription data to third-party marketers restricted data miners' commercial speech), aff'd, 564 U.S. 552 (2011). We conclude, largely for the reasons articulated in Hearst, that the speech at issue warrants qualified constitutional protection.

The disclosure of PRI to data miners and the sale of PRI to organizations that use it for solicitation purposes is speech

"related solely to the economic interests of the speaker and its audience." Cent. Hudson, 447 U.S. at 561. This speech, comprised of information obtained by Condé Nast though its business, is not only allegedly economically motivated, as Condé Nast sells the PRI through its enhanced mailing lists, see Compl., Exs. B-D (mailing list information), but also intended for use by its audience to initiate commercial activity, see id. ¶ 72 (alleging that disclosure of PRI caused Boelter to receive increased number of third-party print ads and marketing calls). As such, the sale of PRI "relays an individual's economic decisions, elucidates an individual's economic preferences, and 'facilitates the proposal of new commercial transactions' on the part of third parties." Hearst, 2016 WL 3369541, at *9 (alteration and ellipses omitted) (quoting Conn. Bar Ass'n, 620 F.3d at 95). The conclusion that this speech should receive intermediate scrutiny is supported by several out-of-circuit decisions addressing laws limiting disclosure of personal information to marketers based on similar privacy concerns.

For instance, in Trans Union Corp. v. FTC, the petitioner was a consumer reporting agency that sold the names and addresses of individuals meeting specific credit criteria to purchasers that contacted consumers with offers of products and services. 245 F.3d 809, 812 (D.C. Cir. 2001) ("Trans Union I"). Petitioner challenged on First Amendment grounds an FCRA

provision which permitted the sale of consumer reports to
facilitate offers of credit or insurance but not of other goods
or services. The D.C. Circuit concluded that the marketing
lists warranted "reduced constitutional protection." Id. at
818. In denying rehearing, the panel, alluding to the
commercial speech doctrine, emphasized that the marketing lists
"solely interest[ed] the speaker (Trans Union) and its 'specific
business audience' (its customers)," and that the information at
issue--"people's names, addresses, and financial circumstances"-
-"comprise[d] speech of purely private concern." Trans Union
Corp. v. FTC, 267 F.3d 1138, 1140, 1141-42 (D.C. Cir. 2001)
("Trans Union II") (quoting Dun & Bradstreet, Inc. v. Greenmoss
Builders, Inc., 472 U.S. 749, 762 (1985)). See also United
Reporting Publ'g Corp. v. Cal. Highway Patrol, 146 F.3d 1133,
1135, 1137 (9th Cir. 1998) (service selling names and addresses
of recently arrested individuals to clients including attorneys
and religious counselors was engaged in commercial speech),
rev'd on other grounds, 528 U.S. 32 (1999); U.S. West, Inc. v.
FCC, 182 F.3d 1224, 1233 n.4 (10th Cir. 1999) (internal business
communications of customer information intended to facilitate
marketing to individual customers categorized as commercial
speech).[14] Similarly, even if Condé Nast's disclosures here "do

---

[14] King v. Gen. Info. Servs., Inc., 903 F. Supp. 2d 303, 305, 307 (E.D. Pa.
2012) (consumer reporting agency selling consumer reports to employers
investigating criminal records of job applicants was engaged in commercial

not fit within the 'core' of commercial speech," the combination of the transactional context, the conveyance of "strictly private affairs," and the motivations of both speaker and audience lead us to conclude that the speech should still be afforded reduced constitutional protection.   <u>Hearst</u>, 2016 WL 3369541, at *9.

### 2. Applying Central Hudson[15]

Under <u>Central Hudson</u>, where the speech, as here, concerns lawful activity and is not misleading, the State has the burden of proving that the challenged law is justified by a substantial government interest.   447 U.S. at 566.   Assuming that the challenged law advances a substantial interest, the State must then show that the law advances that interest in a direct and material way, and is narrowly drawn and not more extensive than

---

speech); <u>Individual Reference Servs. Grp., Inc. v. FTC</u>, 145 F. Supp. 2d 6, 41 (D.D.C. 2001) ("[E]ven if the credit header information that is disseminated by plaintiffs is not commercial speech <u>per se</u>, it is entitled to the same level of protection."), <u>aff'd</u>, 295 F.3d 42 (D.C. Cir. 2002).

[15] Condé Nast argues that regardless of whether the speech at issue is commercial, the Supreme Court's decisions in <u>Reed v. Town of Gilbert</u>, 135 S. Ct. 2218 (2015), and <u>Sorrell v. IMS Health Inc.</u>, 564 U.S. 552 (2011), make clear that all content-based regulations of speech are subject to strict scrutiny.   We do not read either decision to overrule <u>Central Hudson</u> and its progeny.   Absent further guidance from the Supreme Court or the Second Circuit, we join numerous courts in applying <u>Central Hudson</u> to commercial speech following <u>Reed</u> and <u>Sorrell</u>.   <u>See</u> <u>CTIA-The Wireless Ass'n v. City of Berkeley</u>, 139 F. Supp. 3d 1048, 1061 (N.D. Cal. 2015) ("The Supreme Court has clearly made a distinction between commercial speech and noncommercial speech, . . . and nothing in its recent opinions, including <u>Reed</u>, even comes close to suggesting that that well-established distinction is no longer valid."); <u>see also</u> <u>Lone Star Sec. & Video, Inc. v. City of Los Angeles</u>, 827 F.3d 1192, 1198 n.3 (9th Cir. 2016); <u>RCP Publ'ns Inc. v. City of Chicago</u>, No. 15 C 11398, 2016 WL 4593830, at *4 (N.D. Ill. Sept. 2, 2016).   The Second Circuit has done the same in a summary order.   <u>Poughkeepsie Supermarket Corp. v. Dutchess Cty.</u>, 648 Fed. App'x 156, 157 (2d Cir. 2016).

necessary to serve that interest.   Id.; see United States v. Caronia, 703 F.3d 149, 164 (2d Cir. 2012).

In concluding that the PPPA is constitutional as applied to Condé Nast's speech, we adopt much of the analysis set forth in Hearst.   First, Michigan's interest in protecting consumer privacy is a substantial one.   See Trans Union I, 245 F.3d at 818 (protecting privacy of consumer credit information is a substantial governmental interest); see also Edenfield v. Fane, 507 U.S. 761, 769 (1993) (protecting consumers from unwanted solicitations is a substantial state interest).   The Michigan Legislature has articulated a specific interest in "preserv[ing] personal privacy with respect to the purchase, rental, or borrowing of certain materials."   1988 Mich. Pub. Acts No. 378 at p. 1559; see A.G. Mem. at 9 (statute's purpose is "consistent with an individual's rights to receive information and ideas to satisfy one's intellectual and spiritual needs, and the privacy one has in pursuing that satisfaction").   As reflected by the passage of the VPPA by Congress and of similar laws by numerous other states, see Hearst, 2016 WL 3369541, at *10 n.13, Michigan is not alone in concluding that disclosure to third parties of content that individuals choose to consume raises privacy concerns.   See also Stanley v. Georgia, 394 U.S. 557, 565 (1969) (obscenity statute infringed on defendant's "right to read or observe what he pleases--the right to satisfy his intellectual

and emotional needs in the privacy of his own home"); Am. Library Ass'n, State Privacy Laws Regarding Library Records, ALA.org, http://www.ala.org/advocacy/privacyconfidentiality/ privacy/stateprivacy (last visited Sept. 15, 2016) ("Forty-eight states and the District of Columbia have laws protecting the confidentiality of library records . . . .").

As the Supreme Court has recognized, "[t]he capacity of technology to find and publish personal information . . . presents serious and unresolved issues with respect to personal privacy and the dignity it seeks to secure." Sorrell, 564 U.S. at 579. Compilations of one's choices in books, magazines, and videos may reveal a great deal of information that a person may not want revealed, even if the choices are uncontroversial and are necessarily disclosed to the content provider. See United States v. Jones, 132 S. Ct. 945, 957 (2012) (Sotomayor, J., concurring) (noting that in digital age, "people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks"); Sorrell, 564 U.S. at 596 (Breyer, J., dissenting) (noting that Supreme Court has "affirmed the importance of maintaining 'privacy' as an important public policy goal--even in respect to information already disclosed to the public for particular purposes (but not others)"). Marketers who purchase mailing lists from Condé Nast are presumably interested in subscribers' PRI for a reason:

knowing what someone reads may not only reveal one's interests but also permit predictive inferences as to income level, marital status, and other lifestyle facts.  For purposes of this motion, we accept that Michigan has asserted a substantial state interest.[16]

At the next step of the <u>Central Hudson</u> inquiry, the PPPA's "data disclosure restrictions directly advance the state's asserted interest in protecting consumer privacy regarding the purchase or rental of videos, audio recordings, and written materials."  <u>Hearst</u>, 2016 WL 3369541, at *11.  Far from providing remote support for the stated privacy interest, the PPPA is aimed directly at the "speech . . . [that] causes the very harm the government seeks to prevent."  <u>Trans Union II</u>, 267 F.3d at 1142.  Unlike laws that have been struck down because of underinclusivity, the PPPA is not "riddled with exceptions," <u>Williams-Yulee v. Fla. Bar</u>, 135 S. Ct. 1656, 1669 (2015);

---

[16]  Condé Nast argues that Michigan has not provided any evidence, such as legislative findings, statistical studies, or public commentary and hearings, to substantiate its interest in protecting consumer privacy.  To begin, a State may demonstrate the substantiality of its interest through "reference to studies and anecdotes pertaining to different locales . . . [or] history, consensus, and simple common sense."  <u>Fla. Bar v. Went For It, Inc.</u>, 515 U.S. 618, 628 (1995) (internal quotation marks omitted).

Further, even if the passage of the PPPA was not accompanied by extensive legislative findings, Michigan need not rely solely on the justifications offered by its Legislature at that time.  <u>See</u> <u>Anderson v. Treadwell</u>, 294 F.3d 453, 461 n.5 (2d Cir. 2002).  Although there is no record of studies or other similar evidence supporting the privacy interests the PPPA serves, Condé Nast's First Amendment challenge was brought as part of a 12(b)(6) motion to dismiss, and no factual record has yet been developed.  Similarly, it is not clear that, at this stage, the Court can take into account Condé Nast's argument that Michigan's interests in privacy are undermined by its lack of enforcement of the PPPA's criminal provision.

instead, it contains limited exceptions permitting businesses to disclose the covered information to collect payments, comply with the law, and market to customers, and also allows disclosure based on consumer consent.

Condé Nast argues that the PPPA is still underinclusive when judged against its asserted privacy justification. Specifically, Condé Nast contends that the disclosure restrictions on those "engaged in the business of selling at retail, renting, or lending" the covered materials, PPPA § 2, favor those engaged in nonretail sales. Furthermore, because of the PPPA's marketing exception, Condé Nast argues that the law impermissibly favors marketing speech over nonmarketing speech.

As to the first argument, courts have defined "retail" in the PPPA based on its dictionary definition to mean "[t]he action or business of selling goods in relatively small quantities for use or consumption rather than for resale." Kinder v. Meredith Corp., No. 14-cv-11284, 2014 WL 4209575, at *6 (E.D. Mich. Aug. 26, 2014); see also Black's Law Dictionary 1509 (10th ed. 2014) (defining "retail" as "[t]he sale of goods or commodities to ultimate consumers, as opposed to the sale for further distribution or processing"). Although Condé Nast argues that the PPPA favors nonretail sellers, it provides no examples of such sellers or the comparable privacy harm they pose. The statute focuses on regulating disclosures arising

from the relationship between consumer and seller or lender. See Coulter-Owens v. Time, Inc., No. 12-CV-14390, 2016 WL 612690, at *3 (E.D. Mich. Feb. 16, 2016) (explaining that PPPA "contemplates a relationship created when there is a sale 'at retail'--i.e., selling goods for use not for resale--to a 'customer'--i.e., the person purchasing the magazine from the seller" (emphases omitted)). This focus directly supports the statute's privacy goals: "When a magazine is purchased, the information that forms the 'record' under the [PPPA] is provided to the seller. It is the seller who is in a position to disclose the customer's record in the first instance." Id. at *4. Whatever nonretail sellers are, it is possible that the PPPA could have further advanced Michigan's aims by reaching them, but "[a] State need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns." Williams-Yulee, 135 S. Ct. at 1668. As it stands, the law restricts those most likely to have protected information.

Also unpersuasive is Condé Nast's argument that the exception for marketing goods and services directly to the consumer renders the PPPA fatally underinclusive. Whereas disclosures falling within this exception require that the discloser provide notice and an opportunity to opt out, disclosures for most nonmarketing uses require customer consent

beforehand.   Yet this differentiation simply recognizes that consumers' privacy interests in PRI are "not absolute."  Trans Union II, 267 F.3d at 1143; see id. (privacy interests in personal information are "defined not only by the content of the information, but also by the identity of the audience and the use to which the information may be put").   It is consistent with the PPPA's purpose of protecting consumer privacy to ease restrictions on disclosures used to target the consumer herself, and to require consumer consent for disclosures to, for example, "gossipy publications" or the subject's "employers" or "clubs." House Analysis; cf. United Reporting Publ'g Corp., 146 F.3d at 1140 (irrational for statute purporting to advance governmental interest in privacy to allow information to be "published in any newspaper, article, or magazine in the country so long as the information is not used for commercial purposes").

Condé Nast relies largely on Sorrell, 564 U.S. 552, which struck down a Vermont statute restricting the sale, disclosure, and use for marketing purposes of prescriber-identifying information possessed by pharmacies.   However, the Supreme Court's decision supports the conclusion that the PPPA is comparatively well-crafted.  As relevant here, the Sorrell Court assumed that physicians have an interest in keeping their prescription decisions confidential, but explained that the statute was not drawn to serve that interest because pharmacies

43

could share prescriber-identifying information with "anyone for any reason" as long as it would not be used for marketing. Id. at 572. Further, pharmacies could sell the information for certain nonmarketing purposes, and although "insurers, researchers, journalists, the State itself, and others" could use the information, a "narrow class of disfavored speakers" who would use it for marketing could not. Id. at 573. In fact, the law was meant to target certain speakers by prohibiting data-based marketing practices by pharmaceutical manufacturers and marketers that Vermont believed caused doctors to make suboptimal prescribing decisions and led to increased drug costs. Id. at 561, 576. The Court found that Vermont impermissibly sought to achieve these policy objectives "through the indirect means of restraining certain speech by certain speakers." Id. at 577; see id. at 578-79 ("The State may not burden the speech of others in order to tilt public debate in a preferred direction.").

In contrast, there is no suggestion that the PPPA was enacted to target the message of particular speakers. The statute restricts the "group of individuals most likely to reveal consumer identifying information," Hearst, 2016 WL 3369541, at *12, and only permits disclosure based on narrow exceptions that still provide some measure of privacy protection, see PPPA § 3 (exceptions for customer consent,

44

"[p]ursuant to a court order," "[t]o the extent <u>reasonably</u> <u>necessary</u> to collect payment," "marketing goods and services directly to the consumer" if notice and opt-out opportunity provided, and "[p]ursuant to a search warrant" (emphasis added)).   The PPPA thus represents an example of a law addressing privacy concerns through "a more coherent policy" that "present[s] quite a different case than the one presented" in <u>Sorrell</u>.   564 U.S. at 573 (internal quotation marks omitted); <u>see</u> <u>id</u>. (citing as such an example the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. § 1320d-2; 45 CFR pts. 160 and 164 (2010)).

Finally, the PPPA is sufficiently narrowly drawn.   The law protects Condé Nast's interests in collecting payments and direct marketing, and it permits disclosure for any reason with the customer's permission.   Condé Nast contends that the PPPA would restrict less speech by requiring individuals to opt into, rather than out of, the law's protections, but our review does not require that the "manner of restriction [be] absolutely the least severe that will achieve the desired end." <u>Fox</u>, 492 U.S. at 480.   We cannot conclude that the opt-out procedure renders the PPPA unduly burdensome when compared to its aims; indeed, an opt-in procedure would likely undermine its effectiveness. <u>See</u> <u>Trans Union II</u>, 267 F.3d at 1143 (rejecting argument that opt-in

procedure was necessary to sustain statue under intermediate scrutiny).

For the above reasons, we reject Condé Nast's as-applied challenge to the constitutionality of the PPPA.

## B. Overbreadth Challenge

Pursuant to the First Amendment overbreadth doctrine, a party may bring a facial challenge against a statute, even though it is not unconstitutional as applied to that particular party, because "the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." Broadrick v. Oklahoma, 413 U.S. 601, 612 (1973). When a law is not unconstitutional in all of its applications, it may still be invalid if "a substantial number of its applications are unconstitutional judged in relation to the statute's plainly legitimate sweep." Expressions Hair Design v. Schneiderman, 808 F.3d 118, 129 (2d Cir. 2015) (internal quotation marks omitted).

The overbreadth claimant bears the burden of demonstrating, "from the text of [the law] and from actual fact," that substantial overbreadth exists. N.Y. State Club Ass'n, Inc. v. City of New York, 487 U.S. 1, 14 (1988). Invalidation for overbreadth is "strong medicine" that is not to be "casually employed." United States v. Williams, 553 U.S. 285, 293 (2008) (internal quotation marks omitted). The "mere fact that one can

46

conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." <u>Members of City Council of L.A. v. Taxpayers for Vincent</u>, 466 U.S. 789, 800 (1984).

Condé Nast argues that the PPPA is facially invalid because it would criminalize and civilly penalize truthful news reporting by any publisher subject to the statute regarding the identity of its customers. Condé Nast proffers the hypothetical of the Michigan Governor publicly announcing that he followed a story by reading the Grand Rapids Press; under the PPPA, Condé Nast argues, every publication other than the Grand Rapids Press could report on that statement.

The Supreme Court has held that "if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need . . . of the highest order." <u>Smith v. Daily Mail Publ'g Co.</u>, 443 U.S. 97, 103 (1979). Accordingly, application of the PPPA that punished a publisher for truthful news reporting regarding its customer's identity may at least in some instances implicate the "core purposes" of the First Amendment. <u>Bartnicki v. Vopper</u>, 532 U.S. 514, 533-34 (2001). At the same time, as noted in <u>Hearst</u>, a covered publisher "may [still] report the information,

so long as it obtains the consumer's consent." 2016 WL 3369541, at *14.

The Supreme Court has stressed that "'the sensitivity and significance of the interests presented in clashes between the First Amendment and privacy rights counsel relying on limited principles that sweep no more broadly than the appropriate context of the instant case.'" Bartnicki, 532 U.S. at 529 (brackets omitted) (quoting Florida Star v. B.J.F., 491 U.S. 524, 533 (1989)). The Supreme Court's jurisprudence in this area cautions against this Court making a blunt pronouncement as to the constitutionality of a state privacy law based solely on one or two hypotheticals. On this motion to dismiss, we cannot determine the degree of the PPPA's plainly legitimate sweep as compared to any conceivably impermissible applications involving publishers reporting on their customers, nor can we easily weigh the interests of such hypothetical publishers against the privacy interests the PPPA serves. Condé Nast's argument is thus premature.

## VIII. <u>Written Notice</u>

Condé Nast, submitting excerpts from the July 2015 issues of <u>Self</u> and <u>Bon Appétit</u>, contends that we may dismiss Boelter's PPPA claim because it provided her with "written notice" pursuant to the PPPA's marketing exception. PPPA § 3(d). Boelter alleges, however, that she was not provided with any

written notice or means of opting out. _See_ Compl. ¶¶ 7, 43, 64; _see also_ _Nicosia v. Amazon.com, Inc._, --- F.3d ----, No. 15-423-cv, 2016 WL 4473225, at *5 (2d Cir. Aug. 25, 2016) ("A necessary prerequisite for taking into account materials extraneous to the complaint is that the plaintiff _rely_ on the terms and effect of the document in drafting the complaint . . . ." (internal quotation marks omitted)). Moreover, as discussed in the Article III analysis, it is not clear from the Complaint that Condé Nast's alleged disclosures fit within the exception permitting disclosure with written notice. Accordingly, the notice argument does not support dismissal at this stage.

## IX. Unjust Enrichment

Condé Nast also moves to dismiss Boelter's claim for unjust enrichment under Michigan law. Unjust enrichment requires the "(1) receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant." _Sweet Air Inv., Inc. v. Kenney_, 275 Mich. App. 492, 504, 739 N.W.2d 656, 663 (Mich. Ct. App. 2007) (internal quotation marks omitted). Boelter claims that she was denied the full benefit of her subscription fees when Condé Nast disclosed her PRI in violation of the PPPA, and that Condé Nast was unjustly enriched through retention of those fees.

These allegations appear to state a claim for unjust enrichment under Michigan law. Condé Nast cites no relevant Michigan authority indicating that these allegations fail to support such a claim, and district courts have consistently denied motions to dismiss unjust enrichment claims based on nearly identical allegations brought under Michigan law. See, e.g., Kinder, 2014 WL 4209575, at *7.[17]

We reject Condé Nast's argument that the PPPA preempts Boelter's unjust enrichment claim. There is nothing in the PPPA to suggest legislative intent to preempt common law claims. Compare Kraft v. Detroit Entm't, L.L.C., 261 Mich. App. 534, 546, 683 N.W.2d 200, 207-09 (Mich. Ct. App. 2004) (inconsistent common law claims preempted by law stating that "[a]ny other law that is inconsistent with this act does not apply to casino gaming as provided for by this act" (quoting Mich. Comp. Laws § 432.203(3))), with Morris Pumps v. Centerline Piping, Inc., 273 Mich. App. 187, 201, 729 N.W.2d 898, 907 (Mich. Ct. App. 2006) (declining to find quantum meruit claims precluded where statute did "not expressly exclude alternative remedies provided under the common law").

---

[17] The scant allegations on this subject in the Complaint leave us skeptical as to the effect that any disclosure had on the independent value of magazines Boelter still received as a result of her subscriptions. See, e.g., Lewert v. P.F. Chang's China Bistro, Inc., 819 F.3d 963, 968 (7th Cir. 2016) (in standing context, expressing hesitance to extend such theories of injury beyond situations "where the product itself was defective or dangerous and consumers claim they would not have bought it (or paid a premium for it) had they known of the defect").

Finally, it is premature to dismiss the unjust enrichment claim on the ground that it is duplicative of the PPPA claim. "When a plaintiff has set forth both legal and equitable claims seeking identical relief and covering the same subject matter, the proper course is generally dismissal of the equitable claim." Romeo Inv. Ltd. v. Mich. Consol. Gas Co., No. 260320, 2007 WL 1264008, at *9 (Mich. Ct. App. May 1, 2007). "[A]n independent action for equitable relief will not lie where there is a full, complete, and adequate remedy at law, absent a showing that there is some feature of the case peculiarly within the province of the court of equity." Id. Here, the two claims cover the same subject matter. It would also appear that any remedy obtained through the PPPA would subsume the remedy available through the unjust enrichment claim, although the parties have not addressed whether a PPPA claim would in fact provide the same or an otherwise adequate remedy. See Duffie v. Mich. Grp., Inc., No. 14-cv-14148, 2016 WL 28987, at *17-18 (E.D. Mich. Jan. 4, 2016) (to the extent FLSA claim would "provide a full, complete, and adequate remedy that would mirror and exceed the remedy plaintiff seeks under her unjust enrichment claim," plaintiff could not go forward with unjust enrichment claim). As this subject has yet to be developed in the briefing, we decline to dismiss the unjust enrichment claim on this ground.

**CONCLUSION**

For the aforementioned reasons, Condé Nast's motion to dismiss is denied.  This Memorandum and Order resolves Docket No. 18.  Condé Nast is ordered to answer the Complaint within fourteen days of the entry of this Memorandum and Order.

**SO ORDERED.**

Dated:      New York, New York
            September 28, 2016

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE