UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ELIZABETH MOELLER, individually and on behalf of all others similarly situated,

Plaintiff,

v.

ADVANCE MAGAZINE PUBLISHERS INC., d/b/a CONDÉ NAST,

Defendant.

Case No.  15-CV-05671-NRB

ECF Case

Electronically filed

**ORAL ARGUMENT REQUESTED**

---

## MEMORANDUM OF LAW OF DEFENDANT
## ADVANCE MAGAZINE PUBLISHERS INC.
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Sandra D. Hauser
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Tel: (212) 768-6700
Fax: (212) 768-6800
sandra.hauser@dentons.com

Natalie J. Spears
Kristen C. Rodriguez
DENTONS US LLP
233 S. Wacker Drive, Suite 5900
Chicago, IL 60606-6404
Tel:  (312) 876-8000
Fax:  (312) 876-7934
natalie.spears@dentons.com
kristen.rodriguez@dentons.com

*Counsel for Defendant*
*Advance Magazine Publishers Inc.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................ 1

STATEMENT OF FACTS ................................................................... 5

    A.    Condé Nast and the Subscription Process.............................. 5
    B.    List Rental For Direct Marketing To Consumers ................... 6
    C.    Variations on Traditional List Rental for Direct Marketing to Consumers ........... 7
    D.    Condé Nast's Notice of its List Rental Practices and Ability to Opt Out ............. 7
    E.    Plaintiff Elizabeth Moeller........................................................ 8

        1.    Plaintiff's Condé Nast Subscriptions And Lack of Opt-Out ........... 8
        2.    Plaintiff's *Vanity Fair* PRI Not Disclosed To Third Party Marketers ............. 9
        3.    Plaintiff's Open Treatment of Her Own PRI And Other Information ........... 10

    F.    Condé Nast's Relationships With Service Providers to Conduct Business .......... 11

        1.    Condé Nast's Fulfillment Agent, CDS Global ............... 11
        2.    Condé Nast's IT "Back Office" And Database Manager, Acxiom ............... 11
        3.    Condé Nast's Relationship With Its List Rental Agent, SMS ............... 12
        4.    Condé Nast's Relationships With The Co-ops, Its Agents With Respect to Direct Marketing Data............... 13

ARGUMENT ................................................................................ 14

I.    Under The Summary Judgment Standard, Plaintiff's Claims Fail ............... 14

II.    There Is No Evidence Of Any Actionable Disclosures Of Plaintiff Moeller's Personal Reading Information Under The PPPA ................... 14

    A.    Transmissions To Condé Nast's Employees And Agents Are Not "Disclosures" Under The PPPA................... 15
    B.    The Marketing Exemption Permitted Any Disclosures For Direct Marketing To Consumers, Including Any To SMS And Co-ops ............... 21
    C.    As Plaintiff Concedes, No Claim Will Lie Based On The ▮▮▮▮ Subscription ............... 23
    D.    All Of Plaintiff's Claims Fail Because No Information Concerning A "Purchase" Of Magazine Titles Was Disclosed............... 24

III.    Plaintiff's Interpretation Of The PPPA Would Offend Due Process............... 25

IV.    Plaintiff's Application Of The PPPA Cannot Withstand First Amendment Scrutiny ...... 27

    A.    Michigan Has No Substantial Interest In Preventing The "Disclosures" Plaintiff Now Asserts............... 28
    B.    Applying The PPPA Here Will Not Advance A Valid Governmental Interest.... 29

i

  C.  Barring Publishers From Outsourcing Their Business Functions And Using Service Providers Is Not "Narrowly Tailored" .................................................... 31

V.  Plaintiff Lacks Standing To Bring Her Claims ................................................................. 32

VI.  Plaintiff's Unjust Enrichment Claim Is Baseless ............................................................ 34

CONCLUSION ...................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*44 Liquormart, Inc. v. Rhode Island*,
    517 U.S. 484 (1996)..................................................................................29

*A.B. Petro Mart v. Beydoun Ins. Ag. Inc.*,
    892 N.W.2d 460 (Mich. Ct. App. 2016) ................................................23

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................................14

*Austin-Spearman v. AMC Network Ent'mt LLC*,
    98 F.Supp.3d 662 (S.D.N.Y. 2015) ........................................................25

*Barua v. City of New York*,
    2016 WL 7494875 (S.D.N.Y. Dec. 29, 2016) ........................................14

*Bd. of Trs. of State Univ. of N.Y. v. Fox*,
    492 U.S. 469 (1989)..................................................................................31

*Boelter v. Advance Magazine Publ'rs Inc.*,
    210 F. Supp. 3d 579 (S.D.N.Y. 2016)............................................. *passim*

*Boelter v. Hearst Comm'cns, Inc.*,
    192 F. Supp. 3d 427, 438 (S.D.N.Y. 2016)............................................33

*In re Bradley Estate*,
    835 N.W.2d 545 (Mich. 2013)................................................................20

*Cain v. Redbox Automated Retail, LLC*,
    136 F. Supp. 3d 824 (E.D. Mich. 2015)................................................16

*Capital Title Ins. Agency Inc. v. Towne Mortg. Co.*,
    No. 278712, 2009 WL 609561 (Mich. Ct. App. Mar. 10, 2009)...........35

*Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of N.Y.*,
    447 U.S. 557 (1980).................................................................27, 28, 29, 31

*In re Certified Question (Deacon v. Pandora Media)*,
    885 N.W.2d 628 (Mich. 2016)..................................................16, 21, 24

*Rodriguez v. Sony Computer Entm't*,
    801 F.3d 1045 (9th Cir. 2015) ................................................................20

*Chatin v. Coombe,*
    186 F.3d 82 (2d Cir. 1999).................................................................................26

*City of Cincinnati v. Discovery Network, Inc.,*
    507 U.S. 410 (1993)...................................................................................31

*Compatible Laser Products, Inc. v. Main Street Financial Supplies,*
    No. 323122, 2016 WL 5121944 (Mich. Ct. App. Sept. 20, 2016)........................18

*Coulter-Owens v. Time, Inc.,*
    No. No. 16-1321, 2017 WL 2731309 (6th Cir. June 26, 2017) .....................3, 21, 22, 24, 25

*Diallo v. LaRochelle,*
    871 N.W.2d 724 (Mich. Ct. App. 2015) .............................................................23

*Doe v. Henry Ford Health Sys.,*
    865 N.W.2d 915 (Mich. Ct. App. 2014) .............................................................20

*Duffie v. The Mich. Grp., Inc.,*
    No. 14-cv-14148, 2016 WL 28987 (E.D. Mich. Jan. 4, 2016) ................................35

*Edenfield v. Fane,*
    507 U.S. 761 (1993).....................................................................................29

*Farrell v. Burke,*
    449 F.3d 470 (2d Cir. 2006)............................................................................26

*Frankenmuth Mut. Ins. Co. v. Marlette Homes, Inc.,*
    573 N.W.2d 611 (Mich. 1998)........................................................................16

*Matter of Gentry,*
    369 N.W.2d 889 (Mich. Ct. App. 1985) .............................................................26

*Halaburda v. Bauer Publ'g. Co., LP,*
    Nos. 12-cv-12831, 12–cv–14221, 12–cv–14390, 2013 WL 4012827
    (E.D. Mich. Aug. 6, 2013) ............................................................................22

*Hamilton Cty. Emergency Comm'cns Dist. v. BellSouth Telecomm'cns, LLC,*
    852 F.3d 521 (6th Cir. 2017) .........................................................................17

*Hayes v. Emerick,*
    416 N.W.2d 350 (Mich. Ct. App. 1987) .............................................................17

*Hayes v. N.Y. Att'y Grievance Comm.,*
    672 F.3d 158 (2d Cir. 2012)...........................................................................26

*In re Hulu Privacy Litig.,*
    No. No. C 11-03764 LB, 2012 WL 3282960 (N.D. Cal. Aug. 10, 2012)...................25

*John's Corvette Care, Inc. v. City of Dearborn*,
    516 N.W.2d 527 (Mich. Ct. App. 1994) ............................................................26

*Johnson v. City of Kalamazoo*,
    124 F. Supp. 2d 1099 (W.D. Mich. 2000) ........................................................25

*Lansing Ass'n of Sch. Adm'rs v. Lansing Sch. Dist. Bd. of Educ.*,
    549 N.W.2d 15 (Mich. Ct. App. 1996), *aff'd in part*, 565 N.W.2d 650 (Mich.
    1997) ................................................................................................................20

*Lincoln v. Fairfield-Nobel Co.*,
    257 N.W.2d 148 (Mich. Ct. App. 1977) ...........................................................17

*Lorillard Tobacco Co. v. Reilly*,
    533 U.S. 525 (2001) .........................................................................................31

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .........................................................................................32

*Matal v. Tam*,
    137 S.Ct. 1744 (2017) ......................................................................................30

*Midwest Healthplan v. Nat'l Med. Health Card Sys.*,
    413 F. Supp. 2d 823 (E.D. Mich. 2005) ...........................................................17

*People v. Jackson*,
    790 N.W.2d 340 (Mich. 2010) .........................................................................19

*Reed v. Town of Gilbert, Arizona*,
    135 S. Ct. 2218 (2015) .....................................................................................27

*Robins v. Spokeo, Inc.*,
    2017 WL 3480695 (9th Cir. Aug. 15, 2017) ....................................................33

*Ross v. AXA Equitable Life Ins. Co.*,
    680 F. App'x 41 (2d Cir. 2017) ........................................................................33

*Rubin v. Coors Brewing Co.*,
    514 U.S. 476 (1995) ...............................................................................28, 30, 31

*In re Schwein Estate*,
    885 N.W.2d 316 (Mich. Ct. App. 2016) ...........................................................21

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) .........................................................................................30

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) .....................................................................................33

*St. Clair School Dist. v. Intermediate Educ. Ass'n./Mich. Educ. Ass'n.*,
    581 N.W.2d 707 (Mich. 1998) ................................................................................. 17

*State v. Pacquin*,
    389 P.3d 897 (Haw. 2016) ........................................................................................ 26

*Stephenson v. Golden*,
    276 N.W. 849 (Mich. 1937) ...................................................................................... 17

*Sterk v. Redbox Automated Retail, LLC*,
    No. 11 C 1729, 2013 WL 4451223 (N.D. Ill. Aug. 16, 2013), *aff'd*, 770 F.3d
    618 (7th Cir. 2014) .................................................................................................... 23

*Strubel v. Comenity Bank*,
    842 F.3d 181 (2d Cir. 2016) ..................................................................................... 33

*Thibodeau v. Portuondo*,
    486 F.3d 61 (2d Cir. 2007) ....................................................................................... 26

*U.S. v. Dix Fork Coal*,
    692 F.2d 436 (6th Cir. 1982) .................................................................................... 19

*U.S. West, Inc. v. F.C.C.*,
    182 F.3d 1224 (10th Cir. 1999) ................................................................................ 31

*United States v. Lanier*,
    520 U.S. 259 (1997) .................................................................................................. 26

*Windsor Charter Twp. v. Remsing*,
    No. 249688, 2004 WL 2413791 (Mich. Ct. App. Oct. 28, 2004) ............................. 16

*Yachcik v. Yachcik*,
    319 Mich. App. 24 (2017) ......................................................................................... 16

**Statutes**

18 U.S.C.
    § 2710(a)(1) ............................................................................................................... 25

M.C.L. (effective prior to 7/31/16)
    § 445.1711(a) ............................................................................................................ 24
    § 445.1711(b) ............................................................................................................ 16
    § 445.1712 ......................................................................................................1, 2, 15, 24
    § 445.1713(d) ...................................................................................................... *passim*
    §§ 445.1714-15 ......................................................................................................1, 26
    § 445.2503 ................................................................................................................ 22
    § 600.5805(10) ...................................................................................................5, 6, 7

**Other Authorities**

45 C.F.R. §§ 164.308(b) ....................................................................................................32

67 FR 53182-01, 53248 (Aug. 14, 2002)............................................................................20, 32

*Agent*, Webster's Ninth New Collegiate Dictionary (1986) .........................................................17

*Disclose*, Webster's Ninth New Collegiate Dictionary (1986).....................................................19

Mich. Const. art. 1, § 17................................................................................................25

## <u>PRELIMINARY STATEMENT</u>

Plaintiff Elizabeth Moeller brought this action based on Defendant Condé Nast's purported vast disclosures of information relating to her *Vanity Fair* magazine subscription.  Her Complaint speculated that Condé Nast "sold" Plaintiff's "Personal Reading Information" ("PRI")—her name, address and title of magazine—to "data miners" and direct mail marketers leading to a deluge of junk mail, telephone solicitations and fraudulent "scams" attributable to Condé Nast.  (*See, e.g.,* First Amended Complaint ("FAC"),  ¶¶ 2, 3, 8, 24-27.)  The undisputed facts revealed in discovery show those assertions are wholly without basis.  Undeterred by the facts and in pursuit of massive statutory damages through the vehicle of a class action, Plaintiff's claim that Condé Nast violated Michigan's Preservation of Personal Privacy Act ("PPPA") now has devolved into theories that ignore the PPPA's plain language and rest on absurd, unintended and ultimately unconstitutional interpretations of that statute.

Michigan's PPPA prohibits and makes criminal the "disclosure" by certain persons of information "concerning the purchase, lease, rental, or borrowing" of videos as well as "books or other written materials" when (subject to important exceptions) such disclosure "indicates the identity of the customer."  M.C.L. § 445.1712.  Violation is punishable as a misdemeanor and carries a $5,000 civil penalty. §§ 445.1714-15.  However, the PPPA is not a generalized privacy statute.  Its genesis was the public disclosure of Judge Bork's video rentals in a newspaper, and it focuses on a narrow set of transactions involving disclosure of *both* the written materials (title) *and* the identity of the "customer" who "purchased" them.  Here, it is undisputed Condé Nast has never publicly disclosed what Plaintiff refers to as her PRI, and never sold that information to "data miners."  Undisputed too is that there is no evidence of any disclosures of Plaintiff's *Vanity Fair* subscription information to a direct marketer for any mailings to her in the relevant time period, and that Condé Nast has no record of, much less disclosed, her telephone number.

In light of that uncomfortable reality, and contrary to the FAC's grandiose allegations, Plaintiff's claim has morphed.  She now attacks Condé Nast's private transmissions of subscriber data to its own agents, who act on Condé Nast's behalf and under Condé Nast's control subject to confidentiality agreements.  Plaintiff contends, for example, that confidentially transmitting data to a third party service provider for purposes of hosting and maintaining Condé Nast's main subscriber marketing database—essentially as an extension of Condé Nast's IT department— constitutes a PPPA violation.  That attempted application of the PPPA has nothing to do with giving publicity to PRI in the way the Michigan legislature contemplated.  Instead, it would have the perverse effect of criminalizing and creating massive damages for confidential communications made in a closed-loop environment between Condé Nast and its agents.

That is not what the statute intended, and it is not what the statute says.  The PPPA does not prohibit a company from transmitting subscription data *to* its own employees or agents; it restricts only "disclosures" by a company *or* its "employees or agents" *to other* "persons" (unless the disclosure falls within one of the permitted exceptions).  M.C.L. § 445.1712.  Plaintiff's reading, in defiance of the statute's plain meaning and purpose, would forbid publishers and others from outsourcing any function that involved access to basic subscriber information (*e.g.*, database hosting, subscription fulfillment, customer service)—or face ruinous civil liability and criminal punishment.  That is not the law based on the PPPA's plain language.

Not only were there no actionable transmissions of Plaintiff's PRI, but discovery has shown that any so-called "disclosures" to Condé Nast's own agents (or even to direct marketers) for list rental were precisely the kind of communications for direct marketing to consumers that the Michigan legislature exempted.  Like other publishers, Condé Nast engages in a decades-old practice of list rental of names and addresses of subscribers for the exclusive purpose of marketing goods and services to consumers.  The PPPA expressly permits these marketing

practices as acceptable—not criminal or subject to crippling liability—as long as simple written notice to opt out exists.  M.C.L. § 445.1713(d).  Once that basic notice is provided, the default is that disclosure is allowed for direct marketing to consumers.

And once again, the record is undisputed:  Plaintiff admitted that she *never opted out* of Condé Nast's marketing practices despite notices in the magazines sent to her, which she concedes were placed on magazine pages she read, and in type that she likewise "could read."  Moreover, in all events, as noted above, the evidence established that during the relevant time period, not one direct marketer ever rented Plaintiff's name and address in connection with *Vanity Fair*.  In fact, it is undisputed that only *three* direct marketers ever rented Plaintiff's name and address, and those rentals were with regard to the ███ subscription in Plaintiff's name—which she concedes is not (and could not be) the subject of her claims.[1]  So much for the notion that Plaintiff was inundated with an "influx" of "harassing junk mail offerings and phone call solicitations . . . attributable to Condé Nast's unauthorized sale and disclosure of her Personal Reading Information." (FAC ¶¶ 8, 73.)  That simply didn't happen.

Further still, and yet another basis for summary judgment on Plaintiff's claims, her reading and application of the PPPA must be rejected because it would render the statute unconstitutionally vague and violate the First Amendment's speech protections.  A free press and free speech means publishers are not singled out for irrational government restraint on their basic business operations and threatened with ruinous liability for the "crime" of outsourcing IT or subscription fulfillment functions, or doing public market research on its subscribers or using agents for marketing-related functions, like almost every other business in America does.

---

[1]  The ███ subscription was neither purchased by Plaintiff nor purchased from Condé Nast "at retail" as the PPPA requires (*Coulter-Owens v. Time, Inc.*, 2017 WL 2731309, *6 (6th Cir. June 26, 2017) (affirming summary judgment)), and was never subject to an opt-out request by Plaintiff in all events.

But that is what Plaintiff and her class action counsel seek here—ruinous liability. *Billions*. From a statute never intended to prevent a publisher like Condé Nast from using agents in its business or from transmitting subscriber information in confidential communications with third parties assisting in its business. Let there be no mistake: what Plaintiff asks of this federal court in New York is extraordinary, and far beyond what the language or purpose of the PPPA can bear or was ever intended by the Michigan legislature. It would make the Michigan PPPA perhaps the most restrictive privacy statute in the nation, notwithstanding the relatively modest, if any, privacy interest in one's name, address and the fact of a subscription to *Vanity Fair* magazine. As but just one illustration of the absurdity of what Plaintiff proposes, her application of the statute would make this law even more restrictive than the Health Insurance Portability and Accountability Act ("HIPAA"), the federal statute that strictly regulates personal medical information. HIPAA permits highly sensitive information to be shared with service providers to whom various functions are outsourced, so long as they are subject to confidentiality agreements. The Michigan PPPA does not and could not possibly require more.

Finally, Plaintiff's "unjust enrichment" claim is void of substance. There is no evidence that Condé Nast allocated a portion of any subscription price to the PPPA, and Plaintiff herself admits that even after she learned about the PPPA, she continued to subscribe to Condé Nast publications, and that she would in fact pay even more for her subscriptions. Just as notably, Plaintiff has subscribed to dozens of magazines from various publishers over many years and admits that she never treated the fact that she read any magazine, including *Vanity Fair*, as private information, or considered it embarrassing in any way. Nor did she ever ask any magazine publisher or other company to opt her out of third party promotions. To the contrary, Plaintiff shared her name, address and other personal information freely with companies without regard to their information sharing practices. Plaintiff's own testimony makes clear there is no

genuine privacy interest at issue here.  Indeed, the record is so bereft of any concrete harm contemplated by the statute, let alone traceable to Condé Nast, that Plaintiff cannot meet her summary judgment burden of the necessary injury-in-fact for standing.

Plaintiff's individual claims simply fail as a matter of law for numerous reasons and this Court should grant summary judgment in Condé Nast's favor.

## STATEMENT OF FACTS

As set forth in detail below, following Phase I discovery on Plaintiff Elizabeth Moeller's individual claims, it is undisputed that there were no public disclosures by Condé Nast of Plaintiff's *Vanity Fair* subscription, nor evidence that such information was rented to any third party marketer during the relevant time period. [2]  Instead, the only evidence of transmissions of her "PRI" for *Vanity Fair*—her name, address and the fact that she subscribed to *Vanity Fair*—were transmissions made in strict confidence to Condé Nast's back-office and other service providers.  The following undisputed facts provide the relevant context and background for Condé Nast's business and marketing practices, opt-out notices in its magazines, contractual relationships with service providers, and Plaintiff's subscription history and admissions.

### A.     Condé Nast and the Subscription Process

Condé Nast is one of the oldest magazine publishers in the country.  Its publications encompass a wide variety of topics, reporting on matters of popular interest and public importance; they include *Vogue*, *Vanity Fair*, *The New Yorker, Bon Appétit*, *Glamour*, *GQ*, *Condé Nast Traveler*, *Allure*, *Architectural Digest*, *Wired*, and *W* among others.  (Statement of Undisputed Material Facts ("SUF") ¶ 1.)  Consumers can purchase a subscription directly from

---

[2]  Plaintiff has proceeded in accordance with the applicable three-year statute of limitations under Michigan law. *E.g.*, M.C.L. § 600.5805(10).  Without waiving any objection to relation back of Ms. Moeller's claims, the three year limitations period would start three years before the July 20, 2015 filing of the initial complaint.  Therefore, the "relevant period" for purposes of this motion begins July 20, 2012.

Condé Nast by using subscription cards in the magazines, by telephone, or on Condé Nast websites.  (*Id.* ¶ 15.)  They also can purchase a Condé Nast magazine subscription from third parties.  (*Id.* ¶ 17.)  Condé Nast fulfills all subscriptions orders by arranging for placement of the magazine in U.S. mail for delivery.  Magazines typically are delivered in a clear plastic envelope, with the magazine title and subscriber's name and address visible.  (*Id.* ¶ 25.)

**B.**     **List Rental For Direct Marketing To Consumers**

Like most publishers, Condé Nast's business model relies upon revenue from advertising and direct marketing, which helps support its journalism and lower the cost of its magazines to consumers.  (*Id.* ¶ 8.)  In addition to placing an ad in Condé Nast's magazines, approved advertisers also can "rent" a list of names and addresses of subscribers from Condé Nast, for a limited time and for the sole purpose of sending direct marketing for goods and services to those consumers, a process known as "list rental."  (*Id.* ¶ 9.)  The "list rental" practice has existed in the publishing industry for at least four decades.  (*Id.*)  Condé Nast has used list rental for many years as part of its business with advertisers.  (*Id.* ¶ 119.)[3]

To be included on any list rented by Condé Nast for direct marketing, a subscriber must be eligible for rental (*i.e.,* he or she must not be "opted out").  (*Id.* ¶ 121.)  Even then, not all eligible names and addresses are included in lists that are rented, as selection varies based on the third party marketers' criteria for each list rental.  (*Id.* ¶ 122.)  To enable more efficient and effective direct marketing to consumers, Condé Nast also offers list rentals that include additional selection criteria based on demographic or interest information associated with the names on a given list, tailoring the list to reach people most likely to have an interest in the marketing piece.  (*Id.* ¶ 133.)

---

[3]  Condé Nast stopped making names of Michigan subscribers available for list rental in April 2014, after class actions threatened other publishers in the industry with devastating damages under the PPPA.  (SUF ¶ 139.)

All third party marketers and each new marketing piece are subject to approval by Condé Nast.  (*Id.* ¶ 123.)  List rental orders are typically fulfilled by sending a list of names and addresses only (without any magazine title information) to the third party marketer's designated mailing house to address and stamp the mail piece.  (*Id.* ¶ 124.)

### C.  <u>Variations on Traditional List Rental for Direct Marketing to Consumers</u>

Condé Nast, like many publishers, also has been a member of certain co-operative databases, or "co-ops," which is another form of list rental.  Members of the co-op contribute names, addresses and, for example, magazine title information, on a confidential basis, to the co-op's database so that reputable businesses/members approved by the co-op, can rent lists of names and addresses generated from the aggregated names and addresses in the co-op database in order to send direct marketing for goods and services to those consumers.  (*Id.* ¶ 155.)  By agreement, lists of consumers' names and addresses generated from the aggregated contributions of all members to each co-op are "blind" (or anonymized), which means the lists contain only names and addresses of consumers without identification of magazine title or source—i.e., *without* "PRI".  (*Id.* ¶ 162.)

Like traditional list rental, the co-ops' purpose is direct marketing of goods and services to consumers by the co-op member companies.  (*Id.* ¶ 157.)  During the relevant time period, Condé Nast worked from time to time with three co-ops pursuant to contractual relationships: ████████, ████████ and ████████ (collectively, "the Co-ops").  (*Id.* ¶ 156.)[4]

### D.  <u>Condé Nast's Notice of its List Rental Practices and Ability to Opt Out</u>

Condé Nast notified Plaintiff Moeller, and all of its readers, in every issue of its magazines that it shares subscriber lists with third parties for direct marketing, and that subscribers can opt out of those practices.  For at least the past fifteen years, Condé Nast's

---

[4]  In December 2015, Condé Nast stopped transmitting Michigan subscribers to each of the Co-ops.  (SUF ¶ 167.)

magazines have contained the following notice:

> Occasionally, we make our subscriber list available to carefully screened companies that offer products and services that we believe would interest our readers.  If you do not want to receive these offers and/or information, please advise us at P.O. Box [number], Boone, IA [zip code], or call [phone number].  (SUF ¶ 27.)

This notice appears in the same place in each Condé Nast magazine as the "Identification Statement" required by the U.S. Postal Service for magazine publications; in the same place as the magazine's own trademark and copyright notices; and in the same place as the magazine's general customer service phone number and e-mail address.  (*Id.* ¶ 28.)  Millions of Condé Nast subscribers have exercised the ability to opt out, representing over 20% of its subscription records.  (*Id.* ¶ 36.)

Condé Nast also maintains a Privacy Policy on its website and all of its individual magazine websites, informing consumers that their "personally identifiable information" may be shared with "carefully selected companies who we think may offer services and/or products that may be of interest to you," and that they may "opt-out of having your personally identifiable information shared with third parties for their marketing purposes."  (*Id.* ¶¶ 29-31.)

When Condé Nast receives an opt-out request from an individual in connection with one of its magazine subscriptions, that individual's records are marked in Condé Nast's subscriber database with a suppression code indicating that the record is not eligible for list rental, or for transmission to the Co-ops for direct marketing.  (*Id.* ¶¶ 33-34.)  Unlike many other subscribers, Plaintiff admits that she never made an opt-out request to Condé Nast.  (*Id.* ¶ 43.)

### E.  **Plaintiff Elizabeth Moeller**

### 1.  **Plaintiff's Condé Nast Subscriptions And Lack of Opt-Out**

Plaintiff has had subscriptions in her name to several different Condé Nast magazines over the past two decades (SUF ¶ 42), but only three during the relevant time frame after July

2012: *Vanity Fair,* ███████ *and* ██████████████. (*Id.*) Plaintiff admits she is not bringing

any part of this lawsuit based on the ████████ or ████████████ subscriptions. (*Id.* ¶¶ 63,

74.) Plaintiff testified she did not purchase the ████████ subscription; her daughter did. (*Id.*

¶ 64.) Plaintiff further admits the ████████ subscription was purchased from a third-party seller,

discountmags.com, not directly from Condé Nast. (*Id.* ¶ 65.)[5]

Plaintiff has ordered subscriptions to *Vanity Fair* for "at least" 20 years (sometimes

directly from Condé Nast and other times from third parties). Plaintiff admits she reads *Vanity*

*Fair* "cover to cover" —including the page on which Condé Nast's opt-out notice appears. (*Id.*

¶¶ 45, 58.) Plaintiff admits she could read the type size and font of that notice. (*Id.* ¶ 59.)[6]

### 2. Plaintiff's *Vanity Fair* PRI Not Disclosed To Third Party Marketers

Plaintiff's complaint alleged disclosure of her *Vanity Fair* subscription. There is no

evidence of any transmissions of Plaintiff's *Vanity Fair* subscription for direct marketing to a

third party marketer or to the Co-ops. (*Id.* ¶¶ 140, 168.)[7] The *only* evidence of any rentals of

Plaintiff's name and address to direct mail marketers of goods and services during the relevant

time frame were three rentals (to JC Penney, the Leukemia Society, and AARP)—all of which

related to the ████████ subscription. (*Id.* ¶ 140.) Similarly, the only confidential transmissions by

Condé Nast to any Co-op that included Plaintiff's subscription information related to the ████████

subscription and an isolated (erroneous and inadvertent) transmission involving a long-ago expired

---

[5] Plaintiff's subscription to ██████████████ began after Condé Nast ceased making Michigan subscribers' names available for list rental or for transmission to the Co-ops. (SUF ¶¶ 73, 139.)

[6] While Plaintiff admittedly did not request that Condé Nast remove her from third party promotions in connection with *Vanity Fair,* and Condé Nast has no record of Plaintiff making such a request as it would had she done so, Condé Nast's records reflect a suppression code was placed on the records associated with her *Vanity Fair* subscription on or about February 5, 2015. (SUF ¶ 61.) That suppression code was likely related to the order of that subscription from a third party a few days earlier on January 30, 2015, and in any event was inconsequential because Condé Nast had already stopped including Michigan subscribers in list rentals in 2014, and there is no evidence of any transmission of Plaintiff's *Vanity Fair* subscription information to any Co-op in the relevant time frame. (*Id.*)

[7] Condé Nast has no record of Plaintiff's telephone number or any records of ever disclosing it. (SUF ¶ 41.)

███ subscription (which was corrected the next day and never uploaded or used by anyone).  (*Id.* ¶¶ 168, 175, 178.)  Again, Plaintiff admits she never asked Condé Nast to remove her from any third party promotions, including ███, ███ or any other subscription, and Condé Nast has no record of Plaintiff doing so for ███ or ███ at any time.  (*Id.* ¶¶ 43, 60, 72, 82.)

### 3. <u>Plaintiff's Open Treatment of Her Own PRI And Other Information</u>

Plaintiff is a prolific magazine subscriber.  She admits that over time, she or someone in her household has subscribed to over 60 different magazines from various publishers, all of which were addressed to her address in Bloomfield Hills, Michigan, including many non-Condé Nast magazines (such as ████████████████████ ████████████████).  (*Id.* ¶ 84.)  She is not embarrassed by her *Vanity Fair* subscription or any subscriptions that come to her house; she does not avoid letting other people see what magazines she reads, nor does it bother her that her postal delivery person might see them.  (*Id.* ¶ 89-93.)  Plaintiff admits she never has asked any magazine publisher or any other company to opt her out of third party promotions.  (*Id.* ¶ 44.)

Plaintiff's name and address are matters of public record.  (*Id.* ¶ 118.)  Plaintiff also freely made her name, address and other personal information available to third parties.  For example, she twice voluntarily participated in a Condé Nast consumer survey, providing her demographic information as well as brand preferences and general interests. (*Id.* ¶ 96.)  Plaintiff voluntarily (and regularly) provides her name and address to other companies and  rewards programs without regard to their information sharing practices.  (*Id.* ¶ 97-99.)  For example, as a member of the "E-Rewards" website, a "market research panel" in which individuals share their opinions about products and services in return for rewards like gift certificates, Plaintiff answers surveys about "financial situations," food and travel interests, etc.; she does not know what E-Rewards does with the information she provides. (*Id.* ¶ 101.)  There are many potential sources

of the unwanted mail she claims to have received (but for which she produced no evidence).  (*Id.*)

   **F.**  **Condé Nast's Relationships With Service Providers to Conduct Business**

   Condé Nast uses a variety of service providers to conduct its business.  In addition to the printers that put names and addresses on magazines, mailing houses that mail them to subscribers, and the U.S. Postal Service that delivers them, the following business associates perform key functions for Condé Nast at Condé Nast's direction and control:

   **1.**  **Condé Nast's Fulfillment Agent, CDS Global**

   CDS Global is Condé Nast's subscription order management and fulfillment provider; it handles subscriptions, recurring billing, and account processing services.  (SUF ¶ 184-85.)  CDS also provides Condé Nast's customer service function.  (*Id.*)  Prior to using a service provider, Condé Nast handled these functions in-house.  (*Id.* ¶ 187.)  At all times, CDS maintained Condé Nast's subscriber data, including Plaintiff's subscriptions, pursuant to confidentiality terms.  Condé Nast retains control and ownership over the data CDS manages on its behalf under the contract with Condé Nast.  (*Id.* ¶ 188-89.)  Condé Nast never has sold data to CDS.  (*Id.* ¶ 191.)

   **2.**  **Condé Nast's IT "Back Office" And Database Manager, Acxiom**

   Condé Nast uses Acxiom to host and maintain Condé Nast's main subscriber marketing database in a confidential, stand-alone environment on servers dedicated to Condé Nast. (SUF ¶¶ 192, 196.)  In doing so, Acxiom receives and inputs data from Condé Nast (or from CDS on Condé Nast's behalf), and generally functions (and views itself) as an extension of Condé Nast's information technology ("IT") department and workforce.  (*Id.* ¶¶ 194, 199.)  Prior to hiring Acxiom in this role, Condé Nast handled many of these functions in-house.  (*Id.* ¶ 198.)

   Regardless of the service Acxiom has performed on Condé Nast's behalf, several things remain consistent.  The data Acxiom hosts is Condé Nast's property, and Acxiom is required to treat that data as strictly confidential.  (*Id.* ¶ 204.)  Acxiom is required to use the data only as

required to perform services for Condé Nast and not for its own commercial or other purposes, and it has done so.  Acxiom never has publicly shared Condé Nast's subscriber data or used that data for Acxiom's own purposes.  (*Id.* ¶ 204-05.) Acxiom provides all services with respect to Condé Nast's data on Condé Nast's behalf and under its direction and control.  (*Id.* ¶ 197.)

Condé Nast's subscriber marketing database is updated by routine, automated transmissions sent from Condé Nast and CDS to the database hosted by Acxiom; in essence, Condé Nast is sending information to itself.  Names, addresses, and subscription information are securely maintained in strict confidence in this database, including Plaintiff's.  (*Id.* ¶ ¶ 199, 204.)

As another part of its services, Acxiom provides Condé Nast with demographic and other types of public and licensed data associated with the names and addresses of people already in Condé Nast's database.  (*Id.* ¶ 206.)  This "appending" process allows Condé Nast to learn more about its subscribers in order to help make the editorial content of its magazines more relevant to its readers, to understand the aggregate profile of the readership (demographics, age) for general in-magazine advertising purposes and to support its own direct marketing to consumers.  (*Id.* ¶ 209.)  The appending process *does not use or disclose subscriber's PRI*; only name and addresses are used; magazine title is not needed, and is never transmitted in this process.  (*Id.* ¶ 207.)

Condé Nast pays Acxiom for the services and data outlined in its Agreements.  (*Id.* ¶ 212.)  Acxiom never has paid Condé Nast for Condé Nast's data, and Condé Nast never has sold subscriber data of any kind to Acxiom or to data aggregators or data miners.  (*Id.* at ¶ 213.)

### 3.    Condé Nast's Relationship With Its List Rental Agent, SMS

SMS is Condé Nast's list rental manager.  (SUF ¶ 125.)  For the sole purpose of renting lists of names and addresses of subscribers for the marketing of goods or services directly to those individuals, Condé Nast confidentially transmits subscription data to SMS with respect to individuals who are not "opted out" of third party offers.  (*Id.* ¶ 128.)  SMS acts on Condé Nast's

behalf, at Condé Nast's direction and only with Condé Nast's prior approval and authority to market, negotiate and fulfill list rentals.  (*Id.* ¶ 126.)  Condé Nast controls the rental of lists of its subscribers, and retains ownership of its subscriber data.  (*Id.* ¶¶ 127, 132.)

Under its Agreement with Condé Nast and as a matter of actual practice, SMS has kept the subscriber lists and magazine title information it receives from Condé Nast strictly confidential and has used it only with Condé Nast's authorization in connection with list rentals.  (*Id.* ¶ 129.)  For purposes of fulfilling list rentals with additional selection criteria to tailor list rentals to the audience most likely to be interested, SMS "appends" publicly available and licensed information associated with names and addresses only on Condé Nast's lists.  (*Id.* ¶ 134.)  This "appending" process also does not involve PRI; *only names and addresses* are transmitted and used; no magazine title is transmitted to acquire the demographic and other information.  (*Id*. ¶ 135.)

SMS receives compensation for its services to Condé Nast in the form of a commission on the revenue generated by each list rental that SMS negotiates on Condé Nast's behalf.  (*Id.* ¶ 138.)  Condé Nast never has sold any information to SMS.  (*Id.* ¶ 137.)

### 4.   Condé Nast's Relationships With The Co-ops, Its Agents With Respect to Direct Marketing Data

The Co-ops (████████ and █████) each act on Condé Nast's behalf and under its control and direction with respect to the information Condé Nast confidentially transmits to them as a member of the Co-op for direct marketing to consumers.  (SUF ¶ 163.)  Pursuant to Co-op agreements, Condé Nast remains the owner of the data it transmits to each of these Co-ops, and the Co-ops act under Condé Nast's authority with regard to the data confidentially transmitted by Condé Nast.  (*Id.* ¶ 163-64.) The data is not used by the Co-op—or anyone else—for any purpose other than for marketing goods and services directly to consumers.  (*Id.* ¶ 165.)

As noted above, under the Co-op agreements, the Co-ops keep Condé Nast's subscribers'

magazine title information confidential, and are prohibited from identifying Condé Nast (or any magazine title) as a source of information generally, or as associated with any individual record in their databases.  (*Id.* ¶ 160.)  There is no evidence that during the relevant time frame Condé Nast transmitted Plaintiff's *Vanity Fair* PRI to the Co-ops, let alone that any Co-op shared publicly or with any third party that Plaintiff subscribed to *Vanity Fair* or any other Condé Nast publication.  None of the Co-ops has compensated Condé Nast for its participation.  (*Id.* ¶ 166.)

## ARGUMENT

### I.    Under The Summary Judgment Standard, Plaintiff's Claims Fail

Summary judgment should be granted here because, drawing all reasonable inferences in favor of Plaintiff, the evidence demonstrates that "there is no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  "To show a genuine issue of fact for trial, the non-moving party must 'cit[e] to particular parts of materials in the record' to show that 'a fact . . . is genuinely disputed.'" *Barua v. City of New York*, 2016 WL 7494875, *4 (S.D.N.Y. Dec. 29, 2016) (Buchwald, J.)).  Plaintiff "may not rely on conclusory allegations or unsubstantiated speculation" as she did in her Complaint, but instead "must produce specific facts indicating that a genuine factual issue exists"; if Plaintiff's evidence "is merely colorable, or is not significantly probative," summary judgment is in order.  *Id.* (citations omitted).  That is the case here.

### II.   There Is No Evidence Of Any Actionable Disclosures Of Plaintiff Moeller's Personal Reading Information Under The PPPA

Discovery has made clear that Condé Nast is entitled to summary judgment on the merits of Plaintiff Moeller's claims as a matter of law under the plain language of the PPPA.

*First*, there was no unlawful "disclosure" of Plaintiff's "PRI" under the statute.  Instead, the transmissions of subscriber data of which Plaintiff now complains were made, in confidence,

to service providers acting as Condé Nast's agents with respect to that data.  No other transmissions—much less the kind of publicity the statute contemplates—are at issue.

*Second*, aside from there being no actionable disclosure of Plaintiff's PRI, any such transmissions would have been permissible in all events under the PPPA's express exemption for disclosures for purposes of direct marketing to consumers because Condé Nast provided notice and Plaintiff admits she did not opt out from such third party promotions as the statute provides.

*Third*, the only actual use of Plaintiff's name and address for direct marketing related to her ███████ subscription, which Plaintiff admits she did not purchase (and was not purchased "at retail" from Condé Nast), so she has no claim based on that subscription.

*Fourth*, unlike the federal VPPA, the PPPA bars only disclosure of information identifying a "purchaser" (as opposed to "subscriber") of written materials, and there is no evidence Condé Nast ever disclosed "a record or information" identifying Plaintiff as the *purchaser* of any magazine—because Condé Nast does not maintain that information.

### A.   Transmissions To Condé Nast's Employees And Agents Are Not "Disclosures" Under The PPPA

Condé Nast's use of and communication to CDS, Acxiom, and its list rental-related agents are not actionable "disclosures" under the PPPA.  The PPPA does not prohibit a company from transmitting subscriber data to its own employees or agents; it restricts only "disclosures" by the company *or* its "employees or agents" *to other* "persons."  M.C.L. § 445.1712.  The fact that section 445.1712 prohibits employees and agents from disclosing certain information presupposes that they would possess that information in the first place.  Thus, sharing information with employees and agents in a confidential closed-loop environment to conduct the company's business cannot itself be a "disclosure" barred by the statute.  Specifically, in this case, using third party business associates to perform "back office" business functions for Condé Nast (*i.e.*, CDS's

fulfillment services; Acxiom's database hosting and market research services; other agents' list rental-related services) is not such a disclosure. Holding otherwise would be an absurd, not to mention unconstitutional, reading of the statute.

The PPPA's primary purpose was to regulate disclosures of protected information to third-parties for an "*external purpose* . . . . unrelated to [defendant's] own business." *Cain v. Redbox Automated Retail, LLC,* 136 F. Supp. 3d 824, 837 and n.14 (E.D. Mich. 2015) (emphasis in original) (noting limitations of Act and granting summary judgment on other grounds). This limitation makes sense: a company can act only through its own employees and agents, who would need access to customer information to perform their functions. *See Yachcik v. Yachcik*, 319 Mich. App. 24, *3 (2017) ("Statutory language should be construed reasonably, keeping in mind the purpose of the act").

"Employees" and "agents" are treated the same under the PPPA. The service providers to whom Condé Nast entrusted its subscription information were unquestionably its "agents" with respect to that information.[8] The undefined term "agent" "must be given its ordinary meaning" and "the reasonable construction that best accomplishes the purpose of the statute." *Frankenmuth Mut. Ins. Co. v. Marlette Homes, Inc.*, 573 N.W.2d 611, 613 (Mich. 1998). "When considering the meaning of a nonlegal word or phrase that is not defined in a statute, resort to a lay dictionary is appropriate." *In re Certified Question (Deacon v. Pandora Media)*, 885 N.W.2d 628, 631 (Mich. 2016). All the entities that received Plaintiff's subscription information were Condé Nast's agents with respect to that data under the common meaning of the term "agent": they operate on Condé

---

[8]  Each service provider also meets the statute's broad definition of "employees". Although "agent" is not defined in the statute, "employee" is defined as "a person who works for an employer in exchange for wages *or other remuneration*." M.C.L. § 445.1711(b) (emphasis added). All Condé Nast third-party business associates here were remunerated for their services. (SUF ¶¶ 138, 166, 191, 212.) As such, they are "employees" under the statute even if they would not necessarily be under common law. *Windsor Charter Twp. v. Remsing*, 2004 WL 2413791, at *2 (Mich. Ct. App. Oct. 28, 2004) (individual can be "employee" within the meaning of a statute even if that individual might not meet the common law definition and even if parties' contract disclaims such a relationship).

Nast's behalf; act pursuant to its direction and control with respect to its data; have no rights to use the data for their own purposes; and are bound to and have maintained the data's confidentiality.

The ordinary meaning of "agent" is "one who acts for or in the place of another by authority from him" (*Agent*, Webster's Ninth New Collegiate Dictionary (1986)); an agent can be "one who undertakes to transact some business or manage some affairs for another by authority and on account of the latter, and to render an account of it" (*Hayes v. Emerick*, 416 N.W.2d 350, 351 (Mich. Ct. App. 1987)), and "in its broadest sense includes every relation in which one person acts for or represents another by his authority.'" *Stephenson v. Golden*, 276 N.W. 849, 857-58 (Mich. 1937) (quoting 2 C.J.S. p. 419); *Hamilton Cty. Emergency Comm'cns Dist. v. BellSouth Telecomm'cns, LLC*, 852 F.3d 521, 532 (6th Cir. 2017) ("the concept of agency includes every relation in which one person acts for or represents another," such that statute could be interpreted as "implicitly making" phone company the "*de facto* agent" of county 911 districts "for the limited purpose of billing, collecting, and remitting" 911 charges).

Courts focus on parties' actual practices in their relationship, not formulaic recitations in a contract. "The manner in which the parties designate the relationship is not controlling. If an act done by a person on behalf of another is in its essential nature one of agency, then he is an agent regardless of the title bestowed upon him." *Lincoln v. Fairfield-Nobel Co.*, 257 N.W.2d 148, 151 (Mich. Ct. App. 1977).   Agency exists where "one person or entity has a duty to act for another on matters falling within the scope of the relationship," and "categorization [as independent contractor] does not preclude [a person or entity] from also being an agent and therefore subject to some degree of control by the principal and accountability to the principal within the parameters of" their agreement. *Midwest Healthplan v. Nat'l Med. Health Card Sys.*, 413 F. Supp. 2d 823, 833-34 (E.D. Mich. 2005).[9]

---

[9]   *See also St. Clair School Dist. v. Intermediate Educ. Ass'n./Mich. Educ. Ass'n.*, 581 N.W.2d 707, 716 & n.18 (Mich. 1998) (agency exists where principal has the "right to control the conduct of the agent . . . with respect to the

Here, Condé Nast clearly limited the scope of its service providers' agency and controlled the terms of its engagements, as well as their use of information entrusted to them. These service providers may use information only for purposes specified under agreement and are required to keep all information confidential, and their actions were at all times consistent with these obligations. For example, Condé Nast paid Acxiom to host and maintain its subscriber marketing database, and Plaintiff's subscription information was provided to Acxiom for the sole purpose of including that information in Condé Nast's database. (SUF ¶¶ 192-99.) For CDS, for example, Plaintiff's information was transmitted for magazine fulfillment and customer support services. (*Id.* ¶ 186.) And, while there is no evidence Plaintiff's *Vanity Fair* information was transmitted for list rental via SMS or the Co-ops, those providers receive subscriber information from Condé Nast in confidence for marketing goods and services to consumers. (*Id.* ¶¶ 128, 155-65.)

Under the general definition, these entities were Condé Nast's agents regarding the receipt and handling of Plaintiff's PRI. They do not have to be Condé Nast's agents for all purposes, or for purposes of tort liability, in order to be agents within the meaning and intent of the PPPA. Accordingly, any transmission of PRI to these "agents" is not an actionable "disclosure" under the plain language of the PPPA.

Furthermore, not only do these transmissions involve agents in confidence, but Plaintiff's speculative allegations about how certain transmissions work were simply wrong. For example, the Complaint's repeated assertion that Condé Nast sold subscribers' PRI to "data miners" is false. Condé Nast "sold" nothing to "big data" or anyone else. Instead, Condé Nast uses Acxiom, its agent, for market research on subscriber names and addresses in Condé Nast's database so that Condé Nast itself can use that information for its own editorial, advertising and direct marketing

---

matters entrusted to him"); *Compatible Laser Products, Inc. v. Main Street Financial Supplies*, No. 323122, 2016 WL 5121944, *11 (Mich. Ct. App. Sept. 20, 2016) (business that shipped toner cartridges on behalf of customers was their agent; business "acted on behalf of" and "followed the instructions of its customers").

purposes.  (SUF ¶ 209.)  Nothing in the PPPA prohibits Condé Nast from doing so.  In all events, contrary to Plaintiff's allegations, no PRI is disclosed in those research efforts whether for Condé Nast's own internal use or for list rental; as noted, in using either Acxiom's or SMS's "append" services, only name and address—not magazine title information—is used.  (*Id.* ¶¶ 135, 207.)  In either case, the PPPA is not implicated.

Again, now that the actual facts have been revealed in discovery, it cannot be emphasized enough that confidential business communications—which are all that are now at issue—were not what the Michigan legislature had in mind in enacting the PPPA.  There is no legislative history suggesting the Michigan legislature intended the PPPA to regulate a publisher's use of third party agents to outsource business services.  The legislature did not intend and could not have intended to make such activity a crime (and basis for ruinous liability).  "In defining particular words within a statute, we must consider both the plain meaning of the critical word or phrase" and its "purpose in the statutory scheme."  *People v. Jackson*, 790 N.W.2d 340, 345 (Mich. 2010).  Plaintiff's attempt to interpret "agent" restrictively not only defies its plain meaning, but is senseless and without basis in statutory purpose.  *See U.S. v. Dix Fork Coal*, 692 F.2d 436, 439-40 (6th Cir. 1982) ("an overly restrictive common-law definition of agent which would subvert the purpose of the statutory framework in which it is employed is to be avoided").

In addition, like "agent," the undefined terms "disclose" and "disclosure" carry their common meaning.  The dictionary definition of "disclose" is to "make known or public."  *Disclose*, Webster's Ninth New Collegiate Dictionary (1986).  That is also the term's settled meaning under privacy law.  The "kinds of unauthorized disclosures" the Michigan legislature found to "invade the privacy interests of consumers in the content they consume . . . have close ties to those recognized by the common law tort of invasion of privacy."  *Boelter v. Advance Magazine Publ'rs Inc.*, 210 F. Supp. 3d 579, 590 (S.D.N.Y. 2016).  Under the disclosure of

private facts tort—the closest common law privacy analogue to the PPPA—"disclosure" is synonymous with "giving publicity," which means "communicating that information 'to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.'" *Doe v. Henry Ford Health Sys.*, 865 N.W.2d 915, 919-20 (Mich. Ct. App. 2014).[10]  And that would have been the Michigan legislature's understanding in using the term "disclose" in the PPPA.  *See In re Bradley Estate,* 835 N.W.2d 545, 554-55 (Mich. 2013) ("the Legislature is presumed to be aware of the common law when enacting legislation").  Accordingly, under basic statutory construction principles, PPPA "disclosures" require *public* disclosure or publicity, and for this reason as well, the confidential, closed loop communications among Condé Nast and its business associates here are decidedly not that.

Plaintiff would prevent publishers from using  service provider agents for fulfillment, market research, customer service, and any number of other basic functions, or risk catastrophic liability.  *Cf. Rodriguez v. Sony Computer Entm't*, 801 F.3d 1045, 1054 (9th Cir. 2015) (on other grounds, noting federal VPPA reflects "the unremarkable fact that no business is an island and that video tape services providers, like many other businesses, 'may use third parties in their business operations'").  Not even HIPAA, which protects patients' *medical privacy*, forbids such communications; the government instead sensibly recognizes that covered entities do not "carry out all of their health care activities and functions by themselves, but rather use the services of, or receive assistance from, a variety of other persons or entities."  Standards for Privacy of Individually Identifiable Health Information, 67 FR 53182-01, 53248 (Aug. 14, 2002).

In sum, the PPPA's plain meaning forecloses Plaintiff's claim, which rests exclusively on confidential transmissions to Condé Nast's service provider "agents," not actionable

---

[10]  *See also Lansing Ass'n of Sch. Adm'rs v. Lansing Sch. Dist. Bd. of Educ.*, 549 N.W.2d 15, 21 (Mich. Ct. App. 1996) (communication "concerning the plaintiff's private life to a single person or even to a small group of persons" does not support privacy claim), *aff'd in part*, 565 N.W.2d 650 (Mich. 1997).

"disclosures."  There is no basis for the Court to rewrite the Act's terms to reach an absurd result, all in service of Plaintiff's trumped-up effort to somehow wring a class action out of this statute.[11]  "Statutes should be construed to avoid absurd results."  *In re Schwein Estate*, 885 N.W.2d 316, 322 (Mich. Ct. App. 2016) (declining interpretation that would require persons subject to statute to perform "nonsensical" tasks) (citations omitted).

**B.      The Marketing Exemption Permitted Any Disclosures For Direct Marketing To Consumers, Including Any To SMS And Co-ops**

To begin, there is no evidence of any transmissions of Plaintiff's *Vanity Fair* PRI to a third-party marketer for list rental via SMS or to any Co-op.[12]  But even if there had been, any such "disclosures" of Plaintiff's PRI for direct marketing of goods and services to her, including to Condé Nast's list rental-related agents (SMS and the Co-ops), would be permissible under the PPPA's marketing exemption.  Likewise, even if the transmissions to SMS and the Co-ops relating to the ██████ subscription were actionable (which as discussed below they are not), those too are foreclosed by the marketing exemption.[13]

This important, "purpose"-based exemption expressly permits disclosures to others so long as it is "for the exclusive purpose of marketing goods and services directly to the consumer," if written notice is provided that the customer may remove his or her name from such disclosures.  M.C.L. § 445.1713(d).  The statute requires "written notice"—nothing more.  The

---

[11]  *See, e.g., Deacon*, 885 N.W.2d at 631-33 (affirming dismissal of putative PPPA class action alleging disclosure of consumers' music selections, where statute's plain language did not support claim); *Time*, 2017 WL 2731309, *6 (affirming summary judgment of PPPA claim against nonretail seller based on plain meaning of phrase "at retail").

[12]  Plaintiff's name and address was included only on *Vanity Fair* "pander" files transmitted to two of the Co-ops in the relevant time period.  "Pander" files are direct marketing suppression files that do not contain PRI and are not uploaded to the Co-op database for subsequent direct marketing by other members.  Instead, pander files consist of names and address only, and contain both subscribers and non-subscribers.  A "pander" file for a particular magazine informs the Co-ops of the individuals that the Co-op may not provide back to Condé Nast in prospect lists that Condé Nast *itself* orders from the Co-op for its own direct marketing for that particular magazine.  (SUF ¶ 171-74.)

[13]  As noted above, an isolated, inadvertent and erroneous transmission involving Plaintiff's long-ago expired ██████ subscription was sent to two of the Co-ops in error and corrected the next day.  (SUF ¶¶ 175, 178.)  That mistaken transmission to an agent could not be the basis for a PPPA claim.  And, in any event, it would be subject to the marketing exemption because, despite notice in every ██████ magazine, Plaintiff never opted out.

legislature chose not to require "conspicuous" or any other specific form of notice—even though other Michigan statutes do just that.[14]  Once notice is provided, the "default" is that disclosure is *permitted for direct marketing*, *i.e.,* there is no requirement to affirmatively consent or "opt in."

It is undisputed that Condé Nast provided precisely such written notice to Plaintiff, in every copy of every Condé Nast magazine before and after she subscribed, stating that Condé Nast shares its subscriber mailing lists for direct marketing and that consumers can opt-out. (SUF ¶¶ 27, 55, 68, 78.)  Millions of Condé Nast subscribers have done just that and exercised their right to opt out.  (*Id.* ¶ 36.)  *See Halaburda v. Bauer Publ'g. Co., LP*, Nos. 12-cv-12831, 12–cv–14221, 12–cv–14390, 2013 WL 4012827, *8 (E.D. Mich. Aug. 6, 2013) (publishers' in-magazine "notices certainly appear to comply with the terms of the statute" and would be the basis for a "compelling" summary judgment argument).[15]  Publishers have shared subscriber mailing lists for direct marketing for many decades; and indeed, this practice underlies the very reasons a marketing exemption was included when the statute was enacted in 1988.

Here, Plaintiff testified that she read *Vanity Fair* "cover to cover" for nearly twenty years and even recalled being on the same page on which the notice appeared for one of the issues she received.  (SUF ¶ 58.)  Notwithstanding being a sophisticated and experienced magazine consumer who concedes she was able to read the Condé Nast notice (*id*. ¶ 59), Plaintiff admitted that, unlike many others, she *never asked Condé Nast to opt out*. (*Id.* ¶ 43.)

Clearly also, the *purpose* of transmitting any PRI to each of Condé Nast's list rental-related agents—SMS and the Co-ops—was exclusively for marketing goods and services to

---

[14]  *See, e.g.,* M.C.L. § 445.2503 (unsolicited commercial e-mails must "conspicuously state . . . sender's legal name, correct street address, valid internet domain name, and valid return e-mail").

[15]  Judge Steeh later granted summary judgment in this same case in favor of defendant Time without reaching the notice issue, because in the first instance the plaintiffs there did not purchase their magazine subscription "at retail" from Time as the statute requires.  The Sixth Circuit affirmed.  *See Time*, 2017 WL 2731309.

consumers, squarely within the meaning of section 445.1713(d).  As the statutory text itself reflects, it is the marketing *purpose* of the disclosure that is key; if that purpose is the reason for the disclosure, then disclosure is permissible to *any* person.  *Cf. Sterk v. Redbox Automated Retail, LLC*, No. 11 C 1729, 2013 WL 4451223, *5 (N.D. Ill. Aug. 16, 2013) (analyzing federal VPPA exemption for disclosures to third parties in the ordinary course of business and finding it "focuses on the purpose of the disclosure to determine whether it is proper" and allows disclosure to "any person" so long as the "purpose" is met), *aff'd*, 770 F.3d 618 (7th Cir. 2014).

Contrary to what Plaintiff would *like* the statute to say, the PPPA does *not* allow only disclosure to companies that *themselves* do direct marketing, such that no agent intermediaries can be involved for the "exclusive purpose of marketing goods and services directly to the consumer."  M.C.L. § 445.1713(d).  "Courts should not abandon common sense when construing a statute," *Diallo v. LaRochelle*, 871 N.W.2d 724, 728 (Mich. Ct. App. 2015), and it is common sense "that corporations can only act through their agents."  *A.B. Petro Mart v. Beydoun Ins. Ag. Inc.*, 892 N.W.2d 460, 464 n. 2 (Mich. Ct. App. 2016).  Making application of the marketing exemption depend on whether an agent is involved has no basis in the statute's text or logic.

### C.   <u>As Plaintiff Concedes, No Claim Will Lie Based On The ▮▮▮▮▮ Subscription</u>

Discovery revealed that during the relevant period, only three instances of actual list rentals associated with Plaintiff's name and address were identified (to JC Penney, Leukemia Society and AARP[16]), all of which were related to the subscription to ▮▮▮▮ magazine. (SUF ¶ 140.)  Likewise, the only (arguable) transmissions of any of Plaintiff's PRI in the relevant time frame to Co-ops were in connection with the ▮▮▮▮ subscription.  (*Id.* ¶ 168.)  Again, notice

---

[16]  JC Penney, the Leukemia Society, and AARP all offer goods and/or services to consumers.  (SUF ¶¶ 142, 147, 153.)  The Leukemia mailer was about its "Team in Training" marathon program, which clearly falls under "services."  (*Id.* ¶ 149.)  Further, finding that Leukemia Society did not offer goods or services within the meaning of the marketing exemption would render the PPPA unconstitutional as applied under the First Amendment.  *See infra*, Section IV.

appeared in every copy of ███ and Plaintiff indisputably never opted out.  (*Id.* ¶ 68.)

Beyond being subject to the marketing exemption, Plaintiff admitted that she is not

bringing any claims based on the ███ subscription.  (*Id.*¶ 63.)  That waiver is not surprising:

there are two additional independent reasons why Plaintiff cannot bring such a claim.

First, as Plaintiff admitted, her daughter was the purchaser of the ███ subscription.

(*Id.* ¶ 64.)  As a result, Plaintiff is not a "customer" as defined under the Act.  M.C.L. §

445.1711(a) (defining "customer" as a "person who *purchases* . . . written material").  Only

"customers" under the Act can bring an action.  *Id.* § 445.1715; *Deacon*, 885 N.W.2d at 631-32.

Second, the ███ subscription was purchased from a third party seller, not directly

from Condé Nast.  (*Id.* ¶ 65.)  The PPPA's protections apply only to purchases "at retail"

(M.C.L. § 445.1712), which eliminates claims against Condé Nast by consumers like Plaintiff

where the subscription was purchased from a third-party.  *See Time*, 2017 WL 2731309, *6.  As

in *Time*, the third party seller at retail, not Condé Nast, has all purchasing interactions (*e.g.,*

payment, responsibility for taxes, customer service on billing and delivery, etc.) with the "end

consumer."  *Id.*; SUF ¶¶ 17-24, 66.  Accordingly, as in *Time*, the PPPA does not apply to any

Condé Nast "disclosures" relating to that ███ subscription.

**D.**     **All Of Plaintiff's Claims Fail Because No Information Concerning A**
     **"Purchase" Of Magazine Titles Was Disclosed**

Yet another independent reason Plaintiff's claims fundamentally fail is that the only

"disclosures" the PPPA prohibits are of information "*concerning the purchase*" of, in this case, a

magazine subscription, "*by a customer* that indicates the identity of *the customer.*" M.C.L. §

445.1712.  "Customer" is specifically defined as "a person who purchases." *Id*. § 445.1711; *see*

*Deacon*, 885 N.W.2d at 631 & n. 10 (no PPPA claim where plaintiff admittedly did not

"purchase" and "neither 'rent[ed]' nor 'borrow[ed]' a sound recording").

Nothing in any of the transmissions at issue identify Plaintiff as the *purchaser* of any of her subscriptions.  Condé Nast in fact does not record in its database who actually purchased a particular subscription—only the name of the person who receives the subscription, which is not necessarily the same person (as Plaintiff's ▮▮▮▮▮ subscription demonstrates).  (*See* SUF ¶ 64.)  Hence, any "disclosures" did not and cannot involve the "purchase" of a magazine subscription because Condé Nast does not have that information in the first place.  (*Id*. ¶ 203.)

Thus, put simply, under the plain language of this statute—identifying Plaintiff as a magazine *subscriber* does not identify her as the *purchaser* of that particular written material.  The PPPA's  restriction to "purchasers" contrasts with the federal VPPA, which encompasses "any renter, purchaser, *or subscriber* of goods or services."  18 U.S.C. § 2710(a)(1) (emphasis added).  "Purchaser" and "subscriber" are distinct concepts as this Court has recognized.  *See Austin-Spearman v. AMC Network Ent'mt LLC*, 98 F.Supp.3d 662, 668 (S.D.N.Y. 2015) (Buchwald, J.); *In re Hulu Privacy Litig.*, 2012 WL 3282960, at*8 (N.D. Cal. Aug. 10, 2012).  As the Sixth Circuit observed in *Time*, the PPPA is inartfully drafted, but its narrowing phraseology "has to mean something" and it is not up to courts to broaden the statute's scope (2017 WL 2731309, at *6)—particularly when the result would be crippling liability the legislature in no way intended.[17]

## III.   Plaintiff's Interpretation Of The PPPA Would Offend Due Process

If accepted, Plaintiff's overbroad reading of the PPPA to cover Condé Nast's use of and communications to its third-party agents would raise serious due process concerns under both the U.S. and Michigan Constitutions,[18] namely by rendering the PPPA incomprehensibly vague and subjecting Condé Nast and others to civil and criminal liability under an indeterminate standard.

---

[17] Plaintiff's suit also subverts Michigan legislative intent in that she *could not have brought this putative class action in Michigan*, and it is only in federal court by dint of an anomaly under CAFA.  *See Boelter,* 210 F.Supp.3d at 591.

[18]  "[D]ue process protections afforded by the Michigan Constitution are coextensive with the U.S. Constitution." *Johnson v. City of Kalamazoo*, 124 F. Supp. 2d 1099, 1106 (W.D. Mich. 2000); *see* Mich. Const. art. 1, § 17.

"[T]he vagueness doctrine bars enforcement of 'a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.'" *United States v. Lanier*, 520 U.S. 259, 266 (1997) (citation omitted); *Thibodeau v. Portuondo,* 486 F.3d 61, 65 (2d Cir. 2007); *Matter of Gentry*, 369 N.W.2d 889, 893 (Mich. Ct. App. 1985). Since the PPPA not only imposes significant civil penalties but also criminal penalties (*see* M.C.L. § 445.1714), it is subject to stricter constitutional scrutiny than statutes with only civil penalties. *Chatin v. Coombe*, 186 F.3d 82, 86 (2d Cir. 1999). And "when First Amendment rights are involved" the vagueness doctrine also "demands a greater degree of specificity than in other contexts." *Farrell v. Burke*, 449 F.3d 470, 485 (2d Cir. 2006).

If read as Plaintiff does, the PPPA lacks the requisite clarity to impose the statute's extraordinary penalties and criminal liability.[19] Plaintiff's constructions of "disclosure" and "agent" are at odds not only with the ordinary meaning of those terms but with the legislature's narrow purpose. Plaintiff's overbroad, purposeless interpretation would strait-jacket publishers from using and confidentially communicating with third party agents. It would cast an untenable pall of uncertainty over publishers' ability to engage in outsourcing, lest they be subject to criminal and crippling civil penalties. Likewise, to the extent Plaintiff suggests that the marketing exemption's use of the word "exclusive" to modify "purpose" somehow means that service providers cannot help carry out the list rental process for direct marketing to consumers, that too would sow uncertainty and defeat the provision's purpose-based intent.

---

[19] *See, e.g., Hayes v. N.Y. Att'y Grievance Comm.*, 672 F.3d 158, 168-70 (2d Cir. 2012) (disciplinary rule requiring disclaimer in attorney advertising to be "prominently made" was unconstitutionally vague where it was "not clear" to "a lawyer of ordinary skill and intelligence attempting to comply with it"); *John's Corvette Care, Inc. v. City of Dearborn*, 516 N.W.2d 527, 529 (Mich. Ct. App. 1994) (ordinance defining false alarm as police response that is "not needed" was "seriously deficient. That vague language does not give its readers fair notice of what types of conduct are prohibited" and was "void for vagueness"); *State v. Pacquin*, 389 P.3d 897, 910-11 (Haw. 2016) (portions of state statute criminalizing the "unauthorized possession of confidential personal information" were unconstitutionally vague; definition of "confidential personal information" compelled one "to guess as to the actual scope and meaning of [the statute]" and "does not 'inform[] the actor as to how to avoid violating'" statute).

**IV.**   **Plaintiff's Application Of The PPPA Cannot Withstand First Amendment Scrutiny**

Applying the PPPA here also would violate the First Amendment.  On Condé Nast's

motion to dismiss, the Court did not have the opportunity to consider the constitutionality of the

PPPA as applied to the actual facts.  *Boelter*, 210 F. Supp. 3d at 599 n. 16 ("no factual record has

yet been developed" as to First Amendment challenge).  Discovery has sussed out what exactly

Plaintiff is and is not claiming, and she may no longer rely on her Complaint's disproven factual

allegations to fend off summary judgment.  Instead, Plaintiff now has the burden of justifying her

application of the statute under the Supreme Court's heightened First Amendment scrutiny.

Attempts to regulate commercial speech  have traditionally been governed by the rigorous

four-part test set forth in *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of N.Y.*,

447 U.S. 557, 566, 591 (1980): assuming that the speech in question is (1) not misleading and

concerns lawful activity, one seeking to punish that speech must show, (2) that the government's

asserted interest is substantial, (3) that the regulation at issue directly advances that interest, and

(4) that the restriction is "not more extensive than necessary."[20]

Plaintiff cannot meet her burden.  Condé Nast's communications concern a lawful

activity (magazine subscriptions) and are not misleading.  There is no evidence that application

of the PPPA here would directly and materially advance any substantial privacy interest.  The

opposite is true:  Plaintiff herself did not treat the fact that she subscribed to any Condé Nast

magazine as private, and Condé Nast never publicly shared that information.  If the PPPA were

read to prohibit the transmissions in this case, which never publicized the fact that Plaintiff

purchased *Vanity Fair*, the law would not be a narrowly tailored means of accomplishing

---

[20]  *Reed v. Town of Gilbert, Arizona*, 135 S. Ct. 2218 (2015) affirmed that laws like the PPPA, that define regulated speech by subject matter, are content-based and subject to strict scrutiny; Plaintiff does not argue that the PPPA can survive strict scrutiny.  Condé Nast assumes, as law of the case, that the speech at issue is commercial speech and that intermediate scrutiny applies, but reserves all rights with respect to the application of *Reed* and strict scrutiny to this case.

Michigan's stated goal; it would criminalize and authorize massive damages for making secure communications with trusted business associates to whom publishers outsource important back office functions, and would not be in proportion to any substantial interest served by the PPPA.

**A.  Michigan Has No Substantial Interest In Preventing The "Disclosures" Plaintiff Now Asserts**

In enacting the PPPA, Michigan's interest and sole justification was to prevent *public disclosure* of one's purchase of specific reading material in "gossipy publications" and through other means of publicity that might result in such information being known at one's place of employment, clubs one may wish to join or already belong to, etc.  *See Boelter*, 210 F. Supp. 3d at 601 (citations omitted); FAC ¶ 19 & Ex. A.  Accordingly, Michigan's professed interest in regulating speech, rooted in concern over the Bork disclosure and the real or perceived harm it may have caused, can be considered "substantial" only to the extent it is limited to preventing *public disclosure* of genuinely *private* information.  *See Boelter*, 210 F. Supp. 3d at 590 (harms addressed by PPPA "have close ties to those recognized by the common law tort of invasion of privacy").  Michigan has no substantial interest in preventing non-public transmissions, or disclosures of information not considered or maintained as private.  Yet it is undisputed that (a) *any* information about Plaintiff (*i.e.*, her PRI) was transmitted only to service providers who were subject to and abided by confidentiality and other limitations on using such data (*E.g.* SUF ¶¶ 129, 163, 189, 204); (b) Plaintiff did not treat her subscriptions as "secret" or embarrassing (*id.* ¶¶ 89-93); and (c) Plaintiff never sought to opt out of having Condé Nast share her information, though she admittedly received notice of how to do so (*id.* ¶¶ 43, 58).

Under *Central Hudson*, a speech regulation must be supported by empirical evidence of actual harm stemming from the speech at issue.  *See Rubin v. Coors Brewing Co.*, 514 U.S. 476, 486-87 (1995).  As this Court has noted, no empirical evidence of actual harm was considered by

the Michigan Legislature at all—only anecdotal speculation related to Judge Bork.  *See Boelter*, 210 F. Supp. 3d at 599 n. 16.  If there is no empirical proof to support the privacy interests the Michigan legislature explicitly referenced, there is certainly none to support Plaintiff's improper *expansion* of the legislature's purpose to encompass the closed-loop, confidential transmissions at issue here.  Nothing in the statute's legislative history, text, or criminal enforcement history—of which there has been none in the nearly 30 years the statute has been on the books—supports such reading; there is no evidence that the Michigan legislature had any concern about these types of transmissions, and *Central Hudson* "does not permit [a court] to supplant the precise interests put forward by the State with other suppositions." *Edenfield v. Fane*, 507 U.S. 761, 768 (1993).

### B.     Applying The PPPA Here Will Not Advance A Valid Governmental Interest

*Central Hudson's* third prong requires Plaintiff to affirmatively demonstrate that applying the PPPA to this case will in fact advance the government's stated interest "in a direct and material way." *Edenfield*, 507 U.S. at 767.  There must be an "immediate connection" between the prohibition on truthful speech and its asserted end.  *Central Hudson*, 447 U.S. at 569.  Plaintiff's application of the PPPA to punish confidential communications between Condé Nast and its agents has no "immediate connection" with the State's professed goal of preventing PRI from becoming *public knowledge*.  Even if it could be shown that prohibiting Condé Nast from confidentially transmitting Plaintiff's PRI to its agents would somehow directly advance the Legislature's interest in preventing public disclosures, Plaintiff cannot prove, as she must, that it will do so "to a material degree," by *significantly* reducing harm to her privacy interest.  *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996) (ban on liquor price advertising might keep prices higher and demand lower, but no evidence it would  "significantly" advance State's interest in temperance).

Plaintiff's construction also fails prong three because it would draw irrational distinctions among speakers and users of information; such a reading is presumptively unconstitutional and

would not directly and materially advance the asserted privacy interests. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 573-74 (statute barring disclosure of prescriber-identifying information for marketing, but permitting "insurers, researchers, journalists, the State itself, and others to use the information," did "not advance the State's asserted interest in physician confidentiality"); *Rubin*, 514 U.S. at 487-89 (statute prohibiting brewers from disclosing alcohol content on labels, but exempting wines and distilled spirits, did not "directly and materially advance its aim).

In particular, Plaintiff's reading of the PPPA would prohibit publishers, *per se*, from talking about their customers in a way other businesses are not. Imposing a burden based on the content of the speech and speaker, Plaintiff would make it illegal under the PPPA for publishers—but not other businesses—to use agents to conduct basic market research about their customers. "An individual's right to speak is implicated when information he or she possesses is subjected to 'restraints on the way in which the information might be used' or disseminated." *Sorrell*, 564 U.S. at 568 (citation omitted). Categorically restraining the use of such information in publishers' possession chills their right to speak in a stark and irrationally discriminatory way. Imposing liability under these circumstances would mean that Condé Nast and other publishers would be singled out for civil and criminal sanctions for using outside vendors to perform necessary functions such as hosting its subscriber marketing database, analyzing information in that database, conducting public record research and adding information to entries in that database.[21]

---

[21]  Plaintiff would also read the PPPA "marketing exemption" (M.C.L. § 445.1713(d)) to cover only marketing (*i.e.,* speech for) "goods and services" by "for-profit" companies but exclude similar speech by "non-profits" when the services are for others (*e.g.,* the poor, cancer patients) or for political organizations, and are supported through donations and fundraising. The marketing exemption is broad enough to include solicitations by charitable and political organizations in support of their services; Plaintiff's restrictive reading of the statute would not only impermissibly discriminate based on the speaker, as in *Sorrell*, but also based on the message being conveyed (political/social as opposed to for-profit). *See Matal v. Tam*, 137 S.Ct. 1744, 1768 (2017) (Kennedy, J., concurring) ("[n]onprofit organizations—ranging from medical research charities and other humanitarian causes to political advocacy groups. . . compete in a real economic sense for funding and other resources. . . . To permit viewpoint discrimination in this context is to permit Government censorship").

### C.   Barring Publishers From Outsourcing Their Business Functions And Using Service Providers Is Not "Narrowly Tailored"

To satisfy *Central Hudson*'s fourth prong, restrictions on commercial speech must be "narrowly tailored" and their costs "carefully calculated" to accomplish their asserted purpose. *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989).  That necessitates affirmative proof by Plaintiff that there is a "reasonable fit" between the regulatory means and their asserted ends.  *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 561-63, 566 (2001); *see also Rubin*, 514 U.S. at 489-93; *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n. 13 (1993).

If applied as urged by Plaintiff, the PPPA would sweep so broadly that it would effectively ban—and criminalize—all outsourcing by publishers of any functions that involve access to basic subscriber information, such as database hosting, analytics, marketing research, and even printing labels. Such a blanket ban on *any* communications in the hope of averting the possibility of a public disclosure is precisely the sort of sweepingly overbroad prophylactic rule that cannot possibly be justified as providing a "reasonable fit".  Consistent with this Court's recognition that "consumers' privacy interests in PRI are 'not absolute'" (*Boelter*, 210 F.Supp.3d at 601), the court in *U.S. West, Inc. v. F.C.C.*, 182 F.3d 1224 (10th Cir. 1999) aptly observed that "privacy is not an absolute good because it imposes real costs on society" and "may lead to reduced productivity and higher prices for those products or services." *Id.* at 1235 and n. 7.

There is nothing in the legislative history to suggest that the Michigan legislature considered the PPPA's impact on publishers' right to engage in non-public, confidential speech related to its subscribers—much less that it considered less restrictive alternatives to protect privacy interests.  Because the PPPA, if held to apply to the communications Plaintiff assails, would be far more extensive than necessary to advance any substantial privacy interest, it would violate the First Amendment.  *See Lorillard*, 533 U.S. at 562 (notwithstanding "compelling

interest" in preventing underage tobacco use, the "breadth and scope of the regulations" did not "demonstrate a careful calculation of the speech interests involved").

The most obvious way to avoid this constitutional infirmity is to refuse Plaintiff's overbroad reading and maintain the PPPA's proper scope—as a prohibition on *public* disclosures and in all events not a prohibition on use of agents.  That addresses Michigan's goal directly without burdening non-public, confidential business communications.  That is what HIPAA does in enforcing the privacy of personal medical information:  it expressly permits such information to be shared by a covered entity with its workforce and service providers subject to confidentiality safeguards.  *See, e.g.*, 45 C.F.R. §§ 164.308(b); 164.502(e)(1).[22]

In sum, because the PPPA cannot be applied as Plaintiff advocates without violating the First Amendment, the Court should decline Plaintiff's invitation, and instead confine the statute to its intended scope as a prohibition on public disclosures, not confidential ones with agents.

## V.       Plaintiff Lacks Standing To Bring Her Claims

While "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, . . . [i]n response to a summary judgment motion, . . . the plaintiff can no longer rest on such 'mere allegations.'"  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  Thus, the allegations of injury-in-fact the Court was obliged to accept at the motion to dismiss stage can no longer be assumed true.  And discovery has revealed that, notwithstanding what was represented in the Complaint, Plaintiff did *not* suffer injury-in-fact.  Plaintiff's allegations—that she received a deluge of junk mail and telemarketing attributable to Condé Nast, that her PRI was rented to marketers without notice, that she was exposed to risk of

---

[22] Even in that sensitive context, sharing information with service providers is not deemed to jeopardize patients' privacy interests.  *See* Standards for Privacy of Individually Identifiable Health Information, 67 FR 53182-01, 53248 (Aug. 14, 2002).  HIPAA's privacy regime reflects the kind of narrow tailoring that adequately protects private information from public disclosure while also sensibly permits confidential business communications.

identity theft, and that she failed to receive the full value of her magazine subscription (*e.g.,* FAC ¶¶ 8, 29-31, 42, 65, 70-73, 81-83)—have all been disproven as discussed above.  Without benefit of the favorable inferences previously accorded her baseless allegations, Plaintiff cannot meet her burden of establishing standing to sue in federal court.

Under *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), a "violation of a statute by itself is insufficient to confer standing to sue . . . ." *Boelter v. Hearst Comm'cns, Inc.*, 192 F. Supp. 3d 427, 438 n. 4 (S.D.N.Y. 2016).  As the Second Circuit has held in applying *Spokeo*, "even where . . . Congress has statutorily conferred legal interests on consumers, a plaintiff has standing to sue only if she can allege concrete and particularized injury to *that interest*." *Strubel v. Comenity Bank*, 842 F.3d 181, 188 (2d Cir. 2016) (emphasis added); *Ross v. AXA Equitable Life Ins. Co*., 680 F. App'x 41, 44-45 (2d Cir. 2017); *accord Robins v. Spokeo, Inc.*, 2017 WL 3480695, at \*4 (9th Cir. Aug. 15, 2017).

Thus, under this controlling law there must be some nexus between the harm addressed in the statute and the injury claimed by plaintiff.  The PPPA's goal was to prevent public disclosure of certain information relating to the purchase of video or written materials to "gossipy" publications and others.  *See Boelter*, 210 F. Supp. 3d at 601; FAC ¶ 19.  There have been no disclosures of that nature.  *See supra*, Section IV, Subsection A.[23]

Not only is there no evidence of harm to the legal interest conferred by the PPPA, as *Strubel* requires, there is *no* evidence that Plaintiff suffered *any* harm, economic or otherwise, as a result of any purported transmission of her subscription information by Condé Nast.  None of the injuries that Plaintiff alleged in her Complaint have materialized in discovery, such as a

---

[23] *Cf. Robins v. Spokeo*, 2017 WL 3480695, at \*6 & n. 3 (since defendant "published" an inaccurate consumer report about plaintiff "on the Internet," FCRA claim implicated plaintiff's "concrete interests in truthful credit reporting"; declining to consider whether allegations "that a materially inaccurate report about him was *prepared* but never *published*" would allege concrete harm) (italics in original).

deluge of junk mail, telemarketing calls, or identity theft.  (*E.g.,* FAC ¶¶ 7-8, 29-31.)  Nor has discovery revealed any causal link to Condé Nast for such non-existent harms, particularly given Plaintiff's prolific magazine subscription history and the lack of *any* request by her to opt out of marketing promotions from *any* publisher.  (SUF ¶¶ 43-44.)  Plaintiff even abandoned her allegation that she could or would choose to pay less money for a magazine subscription if the publisher shared the identities of its subscribers (FAC ¶¶ 70-72), admitting that she would pay even *more* for her subscriptions.  (SUF ¶¶ 52-53.)  At this stage, following discovery, Plaintiff's failure to substantiate her allegation of injury is fatal to her claim.

## VI.   <u>Plaintiff's Unjust Enrichment Claim Is Baseless</u>

Plaintiff's claim for unjust enrichment is premised entirely on a purported violation of the PPPA, and as such Condé Nast is entitled to summary judgment on that claim as well.  The claim depends on the notion that the price Plaintiff paid for her subscriptions included a "premium" for non-disclosure of her PRI (*e.g.,* FAC ¶ 83), such that she was "denied the full benefit of her subscription fees".  *Boelter*, 210 F. Supp. 3d at 584, 603.  In denying Condé Nast's motion to dismiss, the Court found Plaintiff's "scant allegations on this subject" left it "skeptical as to the effect that any disclosure had on the independent value of magazines" Plaintiff subscribed to.  *Id.* at n. 17.  Discovery revealed the Court's skepticism to be well-founded:  there is *no evidence* (a) that any portion of the subscription price was for PPPA compliance; (b) that Plaintiff relied on the PPPA's purported privacy protections before subscribing; or (c) that Plaintiff could have paid less for a subscription without those protections.  To the contrary, Plaintiff admitted she was a subscriber before she knew of the PPPA, and continued to subscribe after she learned of it and Condé Nast's practices, and still plans to renew.  (SUF ¶¶ 48-49, 94.)  Her admission that she would pay *more* for her subscription than she is currently paying now (*id.* ¶ 53) belies any notion

34

that she somehow "overpaid" for her subscription, and dooms her unjust enrichment claim.[24]

Furthermore, as the Court observed, the PPPA and unjust enrichment claims "cover the same subject matter" and "any remedy obtained through the PPPA would subsume the remedy available through the unjust enrichment claim." *Boelter*, 210 F. Supp. 3d at 604.  The PPPA would provide Plaintiff with a complete and adequate remedy for any alleged disclosure of her PRI, and she has offered no evidence of why the PPPA's remedy—including $5,000 in statutory damages—would not fully compensate her for any purported violation.  And, as shown above, there is no evidence she suffered any injury at all.  As such, no equitable claim for unjust enrichment will lie.  *See Duffie v. The Mich. Grp., Inc.*, No. 14-cv-14148, 2016 WL 28987, at *17 (E.D. Mich. Jan. 4, 2016) ("additional recovery under the theory of unjust enrichment is precluded by" the existence of "a legal remedy," and a "plaintiff does not have to actually recover under the legal theory for the equitable claim to be barred").

## **CONCLUSION**

For the foregoing reasons, summary judgment should be granted for Condé Nast.

Dated:   September 1, 2017

Respectfully Submitted,
DENTONS US LLP

By:   /s/ Sandra D. Hauser
       Sandra D. Hauser

---

[24]  So too, as a matter of law, any purported benefit must be *unjustly* received—not one the defendant would otherwise be entitled to, such as a fee for a magazine subscription. *See Capital Title Ins. Agency Inc. v. Towne Mortg. Co.*, No. 278712, 2009 WL 609561, at *2 (Mich. Ct. App. Mar. 10, 2009) ("[T]he allegedly unjust benefit is the same benefit that MFM expected and not an independent benefit unjustly received").