**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELIZABETH MOELLER, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br>   v.<br><br>ADVANCE MAGAZINE PUBLISHERS INC., d/b/a CONDÉ NAST,<br><br>                    Defendant. | Civil Action No. 15-cv-05671-NRB |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR**
**PARTIAL SUMMARY JUDGMENT**

Dated:  September 28, 2017

**BURSOR & FISHER, P.A.**
Scott A. Bursor
Joseph I. Marchese
Philip L. Fraietta
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
Email:  scott@bursor.com
       jmarchese@bursor.com
       pfraietta@bursor.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION ................................................................. 1

II.   CONDÉ NAST DISCLOSED PLAINTIFF'S PRI TO 2 DATA
APPENDERS:  ACXIOM AND SMS................................................ 3

    A.   Acxiom ............................................................... 3

    B.   SMS.................................................................. 7

III.  CONDÉ NAST DISCLOSED PLAINTIFF'S PRI TO 3 DATA
COOPERATIVES:  ████████  ████████ , AND ████████ ................... 9

    A.   ████████ .......................................................... 10

    B.   ████████ ......................................................... 13

    C.   ████████ .......................................................... 16

IV.  OVERVIEW OF CONDÉ NAST'S DISCLOSURES OF PLAINTIFF'S
PRI ......................................................................... 17

V.   CONDÉ NAST DID NOT PROVIDE THE STATUTORY NOTICE, DID
NOT PROVIDE ANY ABILITY TO OPT-OUT OF THESE
DISCLOSURES, AND DID NOT TRANSMIT PLAINTIFF'S PRI FOR
THE EXCLUSIVE PURPOSE OF MARKETING GOODS AND
SERVICES TO HER ............................................................ 19

VI.  THE SUMMARY JUDGMENT STANDARD................................. 21

VII.  THERE IS NO GENUINE DISPUTE WITH RESPECT TO ANY FACT
MATERIAL TO ESTABLISHING THE FOUR ELEMENTS OF A
VIOLATION OF THE PPPA ................................................... 23

    A.   Condé Nast Is Engaged In The Business Of Selling Magazines At
Retail ................................................................. 23

    B.   Plaintiff Purchased Condé Nast Magazine Subscriptions At Retail ..... 23

    C.   Condé Nast Disclosed To Another Person, Other Than The
Plaintiff, A Record Or Information Concerning The Plaintiff's
Subscription .......................................................... 24

    D.   The Records Disclosed By Condé Nast Indicated The Plaintiff's
Identity ............................................................... 27

VIII. PLAINTIFF IS ENTITLED TO STATUTORY DAMAGES ................. 27

IX.   CONCLUSION................................................................ 28

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ........................................................................................ 21, 22

*Boelter v. Hearst Communications, Inc.*,
   2017 WL 3994934 (S.D.N.Y. Sept. 7, 2017) ................................................... *passim*

*Brown v. Eli Lilly & Co.*,
   654 F.3d 347 (2d Cir. 2011) ............................................................................... 22

*Business Trend Analysts, Inc. v. The Freedonia Grp., Inc.*,
   887 F.2d 399 (2d Cir. 1989) ............................................................................... 27

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ........................................................................................... 21

*Dawson v. County of Westchester*,
   373 F.3d 265 (2d Cir. 2004) ........................................................................... 22, 25

*Nagle v. Marron*,
   663 F.3d 100 (2d Cir. 2011) ........................................................................... 22, 26

*Psihoyos v. John Wiley & Sons, Inc.*,
   2012 WL 5506121 (S.D.N.Y. Nov. 7, 2012) .................................................. 27, 28

*Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*,
   391 F.3d 77 (2d Cir. 2004) ................................................................................. 22

*Sicom S.P.A. v. TRS Inc.*,
   168 F. Supp. 3d 698 (S.D.N.Y. Mar. 10, 2016) ............................................. 22, 23

*Wilson v. Nw. Mut. Ins. Co.*,
   625 F.3d 54 (2d Cir. 2010) ................................................................................. 22

*Yurman Design, Inc. v. PAJ, Inc.*,
   262 F.3d 101 (2d Cir. 2001) ............................................................................... 27

*Zalaski v. City of Bridgeport Police Dep't*,
   613 F.3d 336 (2d Cir. 2010) ............................................................................... 22

## STATUTES

Michigan Preservation of Personal Privacy Act
   M.C.L. § 445.1711 ........................................................................................... *passim*

**RULES**

Fed. R. Civ. P. 56 .......................................................................................................... 21, 22, 23, 28

**OTHER AUTHORITIES**

Michigan Non-Standard Jury Instr. Civil § 32:10 (Aug. 2016) ...................................................... 23

## I.      INTRODUCTION

This case is identical to *Boelter v. Hearst Communications, Inc.*, -- F. Supp. 3d --, 2017 WL 3994934 (S.D.N.Y. Sept. 7, 2017) (Torres, J.) [hereinafter *Hearst*] where Judge Torres granted the plaintiff's motion for partial summary judgment on a claim under the Michigan Preservation Of Personal Privacy Act, M.C.L. §§ 445.1711, *et seq.* (the "PPPA") arising from Hearst's disclosures of her Personal Reading Information to a data appender and a data cooperative.

Advance Magazine Publishers Inc. d/b/a Condé Nast ("Condé Nast") has been caught red-handed committing the exact same violations of the PPPA that Hearst committed.  Condé Nast disclosed Plaintiff's magazine subscription records, including her name, address, and the magazine titles she purchased (her Personal Reading Information, or "PRI") to at least 5 third parties, including data appenders and data cooperatives, each of whom acted as "middlemen" to sell or trade that information to additional third parties.  Given the very narrow limitations the Court imposed on Phase I discovery, these disclosures are likely just the tip of the iceberg.  The record amassed during Phase I discovery confirms that Condé Nast established a sophisticated network of third-party data-mining companies to store and transmit its subscribers' PRI to anyone that would pay for it.  Condé Nast did this on a routine, automated basis, for all subscribers, for years.  And Condé Nast did this without regard to its obligations under the PPPA.

Plaintiff Elizabeth Moeller ("Plaintiff" or "Ms. Moeller") subscribed directly to *Vanity Fair* and ▇▇▇ magazines, both published by Condé Nast.  Plaintiff testified that she "personally paid money" for her subscriptions to *Vanity Fair* and ▇▇▇ magazines.  Moeller Decl. ¶¶ 4-5. The records Condé Nast disclosed to third parties confirm that Plaintiff was a "subscriber" of these magazines, and include transaction details for her "purchase," including the order date and

paid status.  *See, e.g.*, Ex. 39[1] (customer record disclosed to █████████████████

identifying Plaintiff as a subscriber to ████ magazine, and including the original order date and

paid status); Ex. 44 (customer record disclosed to ███████████████████████████████

(███████ identifying Plaintiff as a subscriber to ████ magazine, and including the original

order date and paid status); *see also infra* Parts II & III.

At her deposition, Plaintiff explained that if she had known that Condé Nast was going to

disclose her PRI, she would not have subscribed to these magazines:

> Q:     Do you feel harmed by [the release of your personal
>         reading information]?
>
> A:     Yes.
>
> Q:     How?
>
> A:     I wouldn't subscribe to the magazine if I knew that they
>         were going to release my personal reading information.

Deposition of Elizabeth Moeller ("Moeller Dep.") at 259:3-8; Ex. 6.[2]

Plaintiff moves for partial summary judgment on Count I of her complaint, for violation

of the PPPA.  This statute prohibits persons "engaged in the business of selling at retail, renting,

or lending books or other written materials, sound recordings, or video recordings" from

"disclos[ing] to any person, other than the customer," information about the customer that

"indicates [her] identity."  M.C.L.  § 445.1712.  Customers who are "identified in … information

that is disclosed in violation of [the] act" may bring a civil action to recover "actual damages,

including damages for emotional distress, or $5,000, whichever is greater," as well as costs and

attorneys' fees.  *Id.* § 445.1715.

---

[1] Unless otherwise noted, all Exhibits are attached to the Declaration of Joseph I. Marchese In
Support Of Plaintiff's Motion For Partial Summary Judgment.

[2] Objections are omitted from all deposition excerpts quoted throughout this brief.

## II.   CONDÉ NAST DISCLOSED PLAINTIFF'S PRI TO 2 DATA APPENDERS: ACXIOM AND SMS

Condé Nast disclosed Plaintiff's PRI to two firms – Acxiom and SMS – to append demographic and other data to enhance the rental value of those records.  These are exactly the same types of disclosures that led Judge Torres to find that Hearst violated the PPPA and grant the plaintiff's motion for summary judgment against Hearst.  *See Hearst*, 2017 WL 3994934, at *21 ("Defendant [Hearst] hired Experian to append demographic and other data onto records in its customer marketing database.  …  Defendant violated the [PPPA].  Plaintiff's motion for summary judgment as to these disclosures to Experian is GRANTED and Defendant's motion is DENIED.").

### A.   Acxiom

Effective January 1, 2005, and again on March 31, 2013, Condé Nast entered into a contract with Acxiom Corporation ("Acxiom") to design, build, and maintain a database at the request of Condé Nast.  *See* Plaintiff's Statement Of Material Facts Pursuant To Local Rule 56.1 ("PSOF") ¶¶ 12, 16; Ex. 15 & 19 (contracts with Acxiom).  To do so, Acxiom received source feeds from Condé Nast of magazine subscription order information on a daily basis, through an automated process pursuant to a scripted-scheduled computer program.  PSOF ¶ 15.

Acxiom's Rule 30(b)(6) designee, James Vanthournout, testified that Condé Nast would send Acxiom "magazine subscription orders" on a daily basis, and Acxiom would then update the database with those data, on a weekly basis:

> Q:    Just so I have this straight:  Does Condé Nast provide Acxiom with data about its magazine subscribers on a daily basis?
>
> A:    Yes.
>
> Q:    Pursuant to an automated process?

3

> A:     Yes.
>
> Q:     And then does Acxiom use that daily data provided by
>        Condé Nast to make weekly updates to the data in the
>        Condé Nast database of magazine subscribers?
>
> A:     Yes.

Deposition of James Vanthournout ("Vanthournout Dep.") at 74:4-18, Ex. 3; PSOF ¶ 15.

An Excel spreadsheet produced by Condé Nast confirms that Condé Nast transmitted

Plaintiff's PRI to Acxiom.  *See* Ex. 21.  Condé Nast's Rule 30(b)(6) designee, Mr. Matthew

Hoffmeyer, admitted that the information transmitted from Condé Nast to Acxiom included Ms.

Moeller's name, address, status as a ▮▮▮ and *Vanity Fair* subscriber, and the transaction details

for her subscription orders:

> Q:     Mr. Hoffmeyer, the data in Exhibit 21, the spreadsheets
>        we're looking at on the screen were extracted from the
>        database housed at Acxiom, right?
>
> A:     Yeah, Condé Nast database at Acxiom, right.
>
> Q:     And it includes Ms. Moeller's name, right?
>
> A:     Yes, it does.
>
> Q:     And it includes her address, right?
>
> A:     Yes, it does.
>
> Q:     And it includes the titles of the magazines she subscribed
>        to, right?
>
> A:     It includes the titles of the magazines for which we have a
>        subscription related to Ms. Moeller's name and address,
>        yes.
>
> Q:     And it includes the details of each transmission for those
>        subscriptions to her in the order detail?
>
> A:     The order detail shows the order, that tab shows the order
>        codes associated with those orders for those subscriptions
>        that roll up to the magazine level data.

4

Q:    And whether and how the subscription was paid for?

…

A:    Yes, and how it was payable was the method of payment, right, so was it paid by credit card or cash or open credit, yes.

Deposition of Matthew Hoffmeyer ("Hoffmeyer Dep.") at 122:6-123:16; Ex. 2; *see also*

Vanthournout Dep. at 69:5-12 ("Q:  Did Acxiom receive the name, address and magazine

subscription titles of Elizabeth Moeller from Condé Nast?  A:  Yes.  Q:  Did Acxiom also receive

Ms. Moeller's magazine subscription purchase transaction information?  A:  Yes."); PSOF ¶ 23.

Once the PRI is transmitted to Acxiom, Acxiom does two things with it.

First, pursuant to a Data Products License Agreement, and an Amended and Restated

Combined Product Schedule, *see* Exs. 17 & 18, Acxiom appends demographic and geographic

data from its own databases to the customer's record:

Q:    What you just said, 'When we do the data append,' what did you mean by that?

A:    As part of the data product license, the data attributes are appended to the subscriber file, the Condé Nast subscriber file.

Q:    By Acxiom?

A:    By Acxiom.

Vanthournout Dep. at 86:1-9; Ex. 3; PSOF ¶ 27.

Pursuant to the Amended and Restated Combined Product Schedule, Condé Nast was

permitted to use Acxiom's InfoBase Enhancement for its enhanced list rental business.  PSOF

¶ 36.  "Enhanced list rental" means that the customer records have data appended for the purpose

of list rental.  PSOF ¶ 42.  Condé Nast charges an additional $15/M ($15 per thousand) to rent

names with "Life Style Interest Enhancements."  PSOF ¶ 43.  Condé Nast is also able to make its

5

enhanced rental lists available to a larger universe of direct mail recipients than if its rental list

had not been appended with demographic and geographic information.  PSOF ¶ 44.

Acxiom appended demographic and geographic data to Plaintiff's customer record at

Condé Nast's request:

> Q:   Do you know if Acxiom appended any demographic or
>       geographic consumer data to the customer record for
>       Elizabeth Moeller, the plaintiff in this case?
>
> A:   Yes.  I know they do.  Today, I know that, yes.
>
> Q:   And Acxiom did that at the request of Condé Nast, right?
>
> A:   Yes.

Vanthournout Dep. at 103:18-104:2; Ex. 3; PSOF ¶ 45.

The data appended to Plaintiff's customer record by Acxiom included, but was not

limited to, an "ethnic code," "household income," "voter party," "religion," and "community

charities."  PSOF ¶ 46.  In total, Acxiom appended more than 600 unique data variables to

Plaintiff's customer record at Condé Nast's request.  PSOF ¶ 47.  Condé Nast transmitted its

magazine subscriber PRI to Acxiom so that Acxiom would append that data with demographic

and geographic information:

> Q:   … .  Did Condé Nast disclose its magazine subscriber
>       personal reading information to Acxiom in part, so that
>       Acxiom would append that data with demographic and
>       geographic consumer data?
>
> A:   Yes.

Vanthournout Dep. at 102:12-19; Ex. 3; PSOF ¶ 48.

Second, after appending the data, Acxiom then would transmit the PRI to SMS and

███████ at Condé Nast's instruction:

> Q:     So is it fair to say that Condé Nast instructs Acxiom to
>        transmit the personal reading information of its magazine
>        subscribers by creating certain extracts?
>
> A:     Yes.
>
> Q:     Can you remember the names of any third-parties that
>        received extracts of Condé Nast subscriber information?
>
> …
>
> A:     Yes.
>
> Q:     What are those names?
>
> A:     I know two off the top of my head.  One is called SMS.
>        And one is ████████

*Id.* at 30:12-32:2; PSOF ¶ 49.  At Condé Nast's request, Acxiom also sent Plaintiff's information

to another company, Experian.  PSOF ¶ 52.

Acxiom plays no role in the fulfilment of subscriptions.  Nor does Acxiom market any

goods or services directly to consumers.  It facilitates Condé Nast's data practices.  Nothing else.

Condé Nast's only purposes for contracting with Acxiom were to have geographic and

demographic data appended to customer records to make those records more valuable for rental

to third parties, and to facilitate the transmission of customer data to other third parties such as

SMS, ████████ and Experian.

**B.     SMS**

Effective January 1, 2011, Condé Nast entered into a contract with Specialists Marketing

Services Inc. ("SMS").  PSOF ¶ 54; Ex. 23 (contract with SMS).

Since 2013, SMS has appended demographic and geographic data to Condé Nast's

subscriber file for enhanced list rental.  PSOF ¶ 57.  Like with the appended data from Acxiom,

Condé Nast charges an additional $15/M to rent names with "Lifestyle Interest Enhancements."

PSOF ¶ 43.  Condé Nast is also able to make an enhanced rental list available to a larger universe

of direct mail recipients than if its rental list had not been appended with demographic or geographic information.  PSOF ¶ 44.  The data fields appended by SMS include "African_American_Confidence," "Net_Worth," "Political_ Party," "Donor_Charities," and "Weight."  PSOF ¶ 58.

Condé Nast's Rule 30(b)(6) designee admitted that Condé Nast transmitted Plaintiff's PRI to SMS:

> Q:    Did you provide Ms. Moeller's subscription records to SMS?
>
> A:    We transmitted her name, address and the name of the magazine to SMS, we transmitted those.

Hoffmeyer Dep. at 128:5-9, Ex. 2; PSOF ¶ 61.

Condé Nast's Rule 30(b)(6) designee also admitted that the disclosures included other magazine subscription order data fields, such as "mag_original_order_date," "mag_order_date," and "mag_paid_status:"

> Q:    And the transmission [to SMS] would have included these [fields] –
>
> A:    Yes.
>
> Q:    – in Exhibit 24?
>
> A:    Yes

*Id.* at 133:20-134:4; *see also* PSOF ¶¶ 60, 62; Ex. 24 at CN001622-23 (transmission format to SMS).

Condé Nast's Rule 30(b)(6) designee also admitted that SMS appended demographic and geographic information to Plaintiff's record in the Condé Nast customer database:

> Q:    Is it for enhanced list rental?
>
> A:    … [W]e use SMS appended data on our subscriber file at SMS for Ms. Moeller.

8

*Id.* at 320:16-23; PSOF ¶ 63.

SMS plays no role in the fulfilment of subscriptions.  PSOF ¶¶ 67-68.  Nor does SMS market any goods or services directly to consumers.  It appends demographic and geographic data to Condé Nast's subscriber database.  Condé Nast's purpose for contracting with SMS was to have SMS append its customer records to make Condé Nast's mailing lists more attractive to other entities for rental:

> Q:   Can you charge a higher price for the list rental if you have
> the appended data and the ability to select data?
>
> A:   Yes … .

Hoffmeyer Dep. at 340:10-17, Ex. 2; PSOF ¶ 43.

> Q:   Are list renters able to make an enhanced rental list
> available to a larger universe of direct mail recipients than
> if their rental list had not been appended with demographic
> or geographic information?
>
> A:   Yes.

Vanthournout Dep. at 103:6-17, Ex. 3; PSOF ¶ 44.

## III.   CONDÉ NAST DISCLOSED PLAINTIFF'S PRI TO 3 DATA COOPERATIVES: ███████ ███████████, AND ████████

Conde Nast disclosed Plaintiff's PRI to at least 3 data cooperatives – ████████████ and ███████  "A data cooperative allows a company to receive personal information of potential new customers in exchange for submitting information about their current or past customers." *Hearst*, 2017 WL 3994934, at *4.  Judge Torres found that Hearst's disclosures to a data cooperative violated the PPPA and granted the plaintiff's motion for summary judgment against Hearst.  *See id.* at *26 ("Plaintiff's motion for summary judgment as to the disclosures to Company 3 … is GRANTED and Defendant's motion is DENIED.").

**A.**   ████████

Effective September 21, 2010, and amended March 1, 2015, Condé Nast entered into a

contract with ██████████████████████████ "████████ to "provide to ████████

each month a file containing the previous month Company Data."  PSOF ¶ 83; Ex. 41 at

CN000416 ¶ (B)(1); Ex. 43 at CN000423 ¶ (B)(1).  "Company Data" was defined as "the names

and street address and other similar information of certain U.S. subscribers … and the

transactional data associated with such subscribers."  PSOF ¶ 82.  ████████ is a data cooperative.

PSOF ¶ 76.  "A data cooperative is a cooperative in which mailers can submit customer

information from their housefile for prospecting by other members in exchange for the right to

rent other consumer names from that cooperative for their own prospecting efforts."  PSOF ¶ 78.

"Members of ████████ include charities and political organizations."  PSOF ¶ 79.

"During Condé Nast's membership in ████████ Condé Nast transmitted some of its

subscribers' first names, middle initials, last names, addresses, and subscription magazine titles

to ████████ including, but not limited to, such information for *Vanity Fair*, ████████ and ████████

magazine subscribers."  PSOF ¶ 86.

On October 8, 2015, Condé Nast sent a raw data transmission to ████████ that identified

Plaintiff's name, address, and status as a ████████ magazine subscriber.  PSOF ¶ 87.  The

transmission also included "a field 'MAG_ORIGINAL_ORDER_DATE' which [wa]s marked

'20031201.'"  PSOF ¶ 89.  A copy of that record, Exhibit 44, is reproduced here:

10

File name: tra18297.00001.20151008.12:55:32.update.name.RAW

```
------------------------------------------------------------------------  rec: 000001
SALUTATION            FIRST_NAME           MIDDLE_INITIAL              LAST_NAME
STREET_ADDRESS        THIRDLINE                                 BUSINESS_NAME
                      CITY                      STATE           POSTAL_CODE
KEYCODE     PROMOTION_CODE              INDIVIDUAL_ID           IND_URN
MAG_MAGAZINE_CODE     MAG_RECORD_STATUS      MAG_TIMES_RENEWED       MAG_DOCUMENT_KEY
MAG_PREVIOUS_DOCUMENT_KEY       MAG_OVERALL_EXPIRATION_DATE      MAG_ORIGINAL_ORDER_DATE
MAG_ORDER_DATE        MAG_PAID_STATUS           GENDER          MAG_CDS_SOURCE
------------------------------------------------------------------------  rec: 000002
             ELIZABETH                                          MOELLER
       2190 LANCASTER RD
             BLOOMFIELD HILLS            MI          483020635
EXP        -EXP            10000110026259690        2361320

D3MZJ102              20070131          20031201
20041208              2                 F           BB
```

CONFIDENTIAL                                                   01

The record includes Plaintiff's name and address. Ex. 44. It also includes the code ▮ which

"is the code for ▮ magazine." *Id.*; PSOF ¶ 88.

According to Condé Nast, the transmission of Plaintiff's PRI as a ▮ subscriber to

▮ was sent in error:

> Q:   So you didn't mean to send her name to ▮ as a
>      subscriber either?

11

> A:   It was the same mistake, yes.
>
> Q:   The same as the mistaken transmission to ██████?
>
> A:   Yes, they're related files.  The selection occurred
>       erroneously, and so when the transmissions went to those
>       two cooperatives, they received ████ information in error.

Hoffmeyer Dep. at 220:6-16; Ex. 2; PSOF ¶ 90.  Condé Nast never asked █████ to delete or

destroy the file that was erroneously sent, which included Plaintiff's PRI, and █████ did not

delete or destroy that file.  PSOF ¶¶ 91-92.  Condé Nast's Rule 30(b)(6) designee admitted that

the information in that file, which included Plaintiff's PRI, was not used for the purpose of

marketing any goods or services that might be of interest to Condé Nast subscribers:

> Q:   And ██████ didn't use this information for the purpose of
>       marketing any goods or services that might be of interest to
>       Condé Nast subscribers, did it?
>
> A:   No, they were instructed to use the files with the correct
>       information instead of this file.

Hoffmeyer Dep. at 224:25-225:7; Ex. 2; PSOF ¶ 93.

The contracts between Condé Nast and █████ state that Condé Nast was required to

"grant to █████ a non-exclusive, royalty-free license to use Company Data solely for the

purpose of creating the █████ Cooperative file and to use and to grant to Members the right to

use the Company Data for identifying recipients of marketing promotions and research and

analysis related to consumer behavior."  PSOF ¶ 84; Ex. 41 at CN000417 ¶ (B)(4); Ex. 43 at

CN000423 ¶ (B)(4).  In exchange, Condé Nast received "the right to rent other consumer names

from th[e █████ cooperative for [its] own prospecting efforts."  PSOF ¶ 78.

█████ plays no role in the fulfilment of subscriptions.  Nor does █████ market any

goods or services directly to consumers.  PSOF ¶ 104.  It is a data cooperative wherein "mailers

can submit customer information from their housefile for prospecting by other members in

exchange for the right to rent other consumer names from that cooperative for their own

prospecting efforts."  PSOF ¶ 78.

      **B.**     ████████

Effective January 17, 2013, Condé Nast entered into a contract with ███████████. (█

███████).  PSOF ¶ 105; Ex. 35 (contract with ████████. █████████ is a data cooperative.

PSOF ¶ 106.  ████████ corporate representative testified that "[a] data co-operative is a

consortium of various business entities that contribute data into the co-operative and then

purchase modeled data for the purposes of prospecting additional or new clients."  PSOF ¶ 108.

The ████████ data cooperative has approximately 3,000 members, including charities and

political organizations.  PSOF ¶ 109.

Pursuant to the contract, Condé Nast was required to update its Data – defined as "the

names and street addresses of certain U.S.-based subscribers to certain of its magazines, together

with item level transaction information and unique ID's" – in the ████████ data cooperative "at

least quarterly."  PSOF ¶¶ 112-113.  Over the duration of their contractual relationship, Condé

Nast sent ████████approximately 400 files containing the names and addresses of tens of

thousands of its customers, on an average monthly basis.  PSOF ¶¶ 114, 116.

Condé Nast's Rule 30(b)(6) designee admitted that Condé Nast transmitted Plaintiff's

PRI to ████████

        Q:     Didn't you also transmit to the ████████ cooperative
              database the names of the titles of the magazines that Ms.
              Moeller subscriber to?

        A:     We submitted – we transmitted to ████████ the name,
              address and magazine title to the ████████ to the
              database.

Hoffmeyer Dep. at 169:15-23; Ex. 2; PSOF ¶ 129.

On October 8, 2015, Condé Nast sent a raw data transmission to ███████ that identified Plaintiff's name and address as a ████ magazine subscriber.  PSOF ¶ 130; Ex. 39. The transmission also included a field "MAG_ORIGINAL_ORDER_DATE" which was marked "20031201."  PSOF ¶ 131.  An excerpt of that record, Exhibit 39, is reproduced here:

RECORD
filename: AL_AEC_20151009.CSV_648068.gz

| SALUTATION | FIRST_NAME | MIDDLE_INITIAL | LAST_NAME | STREET_ADDRESS | THIRDLINE | BUSINESS_NAME | CITY | STATE | POSTAL_CODE | KEYCODE | PROMOTION_CODE | INDIVIDUAL_ID | IND_URN |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | ELIZABETH |  | MOELLER | 2190 LANCASTER RD |  |  | BLOOMFIELD HILLS | MI | 483020635 | EXP | #NAME? | 1.00E+16 | 2361320 |

| MAG_MAGAZINE_CODE | MAG_RECORD_STATUS | MAG_TIMES_RENEWED | MAG_DOCUMENT_KEY | MAG_PREVIOUS_DOCUMENT_KEY | MAG_OVERALL_EXPIRATION_DATE | MAG_ORIGINAL_ORDER_DATE | MAG_ORDER_DATE | MAG_PAID_STATUS | GENDER | MAG_CDS_SOURCE |
|---|---|---|---|---|---|---|---|---|---|---|
|  |  | 8 | 2 | D3MZJ102 |  | 20080131 | 20031201 | 20041208 | 2 F | BB |

According to Condé Nast, the transmission of Plaintiff's PRI as a ████ subscriber to █ was sent in error, without explanation:

> Q:   And because, as you said, the file with Moeller's name was
>        transmitted by mistake?
>
> A:   Yes, the ████ subscription that was in Moeller's name was
>        somehow picked up in what was supposed to be an ████
>        selection and shipped in error, transmitted in error to █
>        ██████
>
> Q:   How did that error happen?
>
> A:   No explanation.

Hoffmeyer Dep. at 198:6-15; Ex. 2; PSOF ¶ 133.  Condé Nast never asked ████████ to delete or destroy the data erroneously transmitted in Exhibit 39, and ███████ did not delete or destroy that file.  PSOF ¶¶ 134-135.  The information in that file, which included Plaintiff's PRI, was not used for the purpose of marketing any goods or services that might be of interest to Condé Nast subscribers:

> Q:   So you maintained possession of a file that was never used
>        for marketing; is that correct?

A:      That's correct.

Deposition of ▮▮▮▮▮▮▮ ("▮▮▮▮ Dep.") at 104:18-20; Ex. 4; PSOF ¶¶ 135-136.

On June 25, 2014, Condé Nast transmitted a raw data file to ▮▮▮▮▮▮▮ that identified Plaintiff's name and address as a *Vanity Fair* magazine subscriber.  PSOF ¶ 137.  An excerpt of that record, Exhibit 36, is reproduced here:



▮▮▮▮▮▮▮ Rule 30(b)(6) designee testified that Exhibit 36 contains Plaintiff's name and address as a *Vanity Fair* magazine subscriber:

> Q:      Okay.  So in Exhibit 36, as you understand it, it has Ms. Moeller's first and last name, her street address, and the code VF, which stands for *Vanity Fair*, correct?
>
> A:      It has her name and address information and has the code VF, which I presume is *Vanity Fair*.

▮▮▮▮ Dep. at 91:3-11; Ex. 4; PSOF ¶ 137.

The contract between Condé Nast and ▮▮▮▮▮▮ required Condé Nast to "grant[] ▮ ▮▮▮▮▮▮ a non-exclusive, royalty-free license to use Data solely for the purpose of creating the Database and to use and to grant to Database members the right to use the Data for identifying recipients of marketing promotions and research and analysis related to consumer behavior." PSOF ¶ 123; Ex. 35 at CN000412 ¶ 4.  In exchange, Condé Nast was "granted access to the [▮ ▮▮▮▮▮▮ cooperative] Database for the purpose of customer prospecting and enhancement." PSOF ¶ 118; Ex. 35 at CN000412 ¶ 2.  Condé Nast was also given a discount to purchase data from i▮▮▮▮▮▮.  PSOF ¶ 120.  Pursuant to its contract with ▮▮▮▮▮▮, Condé Nast used ▮ ▮▮▮▮▮▮ data to prospect to new customers.  PSOF ¶ 121.

15

███████ plays no role in the fulfilment of subscriptions.  Nor does ███████ market

any goods or services directly to consumers.  PSOF ¶¶ 147, 149.  It is a data cooperative wherein

"a consortium of various businesses … contribute data into the co-operative and then purchase

modeled data for the purposes of prospecting additional or new clients."  PSOF ¶ 108.  Nothing

else.  Condé Nast's only purpose for contracting with ███████ was to receive modeled data

from ███████ for its own prospecting efforts.  PSOF ¶ 118; Ex. 35 at CN000412 ¶ 2

("Member will be granted access to the Database for the purpose of customer prospecting and

enhancement.").

> **C.** ███████

On September 18, 2008, Condé Nast entered into a contract with ███████

███████.  PSOF ¶ 150.  ███████ is a data cooperative to which Condé Nast is a member.

PSOF ¶ 151.  Pursuant to the contract, Condé Nast agreed to provide ███████ with "its subscriber

file and related transaction data" "quarterly or on a more frequent schedule as agreed by the

parties."  PSOF ¶ 153; Ex. 48 at CN000427 ¶¶ 1-2.

On April 6, 2015, June 15, 2015, and October 9, 2015, Condé Nast sent raw data files to

███████ that identified Plaintiff's name and address as a *Vanity Fair* magazine subscriber, for a

total of three disclosures.  PSOF ¶¶ 156-158.  Excerpts of those records, Exhibits 51, 52, and 53,

are reproduced here:



| SALUTATION | FIRST_NAME | MIDDLE_INITIAL | LAST_NAME | SUFFIX | STREET_ADDRESS | | THIRDLINE | BUSINESS_NAME | CITY | | STATE | POSTAL_CODE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | ELIZABETH | | MOELLER | | 2190 LANCASTER RD | | | | BLOOMFIELD HILLS | | MI | 483020635 |



| SALUTATION | FIRST_NAME | MIDDLE_INITIAL | LAST_NAME | SUFFIX | STREET_ADDRESS | | THIRDLINE | BUSINESS_NAME | CITY | | STATE | POSTAL_CODE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | ELIZABETH | | MOELLER | | 2190 LANCASTER RD | | | | BLOOMFIELD HILLS | | MI | 483020635 |

16



| SALUTATION | FIRST_NAME | MIDDLE_INITIAL | LAST_NAME | SUFFIX | STREET_ADDRESS | THIRDLINE | BUSINESS_NAME | CITY | STATE | POSTAL_CODE |
|---|---|---|---|---|---|---|---|---|---|---|
| | ELIZABETH | | MOELLER | | 2190 LANCASTER RD | | | BLOOMFIELD HILLS | MI | 483020635 |

The data provided to ██████ by Condé Nast was used "as a part of the ████████

Cooperative Database for the mutual benefit of Members."  PSOF ¶ 154; Ex. 48 at CN000427

¶ 1.  In exchange, Condé Nast was granted access to the names in the ████ Cooperative

Database.  PSOF ¶ 155 ("Only Member companies which contribute to the Cooperative Database

may use names from the Cooperative Database."); Ex. 48 at CN000427 ¶ 3.

██████ plays no role in the fulfilment of subscriptions.  Nor does ██████ market any

goods or services directly to consumers.  It is a data cooperative wherein direct-mail markets

exchange customer information for their own prospecting efforts.  Nothing else.

## IV.   OVERVIEW OF CONDÉ NAST'S DISCLOSURES OF PLAINTIFF'S PRI

This table illustrates graphically the many ways that Condé Nast disclosed Plaintiff's PRI

in violation of the PPPA:



V.  **CONDÉ NAST DID NOT PROVIDE THE STATUTORY NOTICE, DID NOT PROVIDE ANY ABILITY TO OPT-OUT OF THESE DISCLOSURES, AND DID NOT TRANSMIT PLAINTIFF'S PRI FOR THE EXCLUSIVE PURPOSE OF MARKETING GOODS AND SERVICES TO HER**

Section 445.1713(d) of the PPPA authorizes disclosure of customers' PRI "for the exclusive purpose of marketing good and services directly to the consumer" only if the customer has been provided with "written notice that the customer may remove his or her name at any time by written notice to the person disclosing the information."  But Condé Nast never provided such notice.

An issue of ████ magazine published during the timeframe that Plaintiff was a subscriber included fine print on page 210, under the heading "Postmaster," stating:

> Occasionally, we make our subscriber list available to carefully screened companies that offer products and services that we believe would interest out readers.  If you do not want to receive these offers and/or information, please advise us at P.O. Box 37650, Boone, Iowa 50037-0650 or call 800-777-4058.

Ex. 57 (December 2003 ████ page 210).  The June 2011 edition of *Vanity Fair* magazine included the same text at page 209 of the issue.  *See also* PSOF ¶¶ 183-184.

This statement does not comply with any of the requirements for the statutory notice referenced in section 445.1713(d).  None of the five entities to whom Condé Nast disclosed Plaintiff's PRI "offer products and services" to consumers.  The only thing they do is trade and manage data.  And they do not sell anything "directly to the consumer."   M.C.L. § 445.1713(d).  Remarkably, even if the subscriber wrote to Condé Nast to try to opt out, Condé Nast disclosed her PRI to Acxiom anyway.  Acxiom's Rule 30(b)(6) confirmed that:

> Q:   But even though those consumers have opted out of receiving solicitations, Acxiom will receive those magazine subscribers' information from Condé Nast, right?
>
> A:   Yes.

19

Vanthournout Dep. at 90:11-18; Ex. 3; PSOF ¶ 204.

Moreover, Condé Nast did not "carefully screen" the other members of the ███████

████████████ data cooperatives.  As Condé Nast's Rule 30(b)(6) designee admitted,

Condé Nast does not even know the identity of a single other member of those data cooperatives:

Q:    Who are the other members of the ██████ cooperative?

A:    Again, I don't have any idea who's a member of ██████

Q:    You can't tell me the name of a single other member of the
        ██████ cooperative; isn't that true?

A:    I cannot tell you a single name of any member other than
        Condé Nast of the ██████ cooperative.

Hoffmeyer Dep. at 210:10-19; Ex. 2; PSOF ¶ 80.

Q:    Can you tell me the name of any other member of the █
        ██████ cooperative other that Condé Nast?

A:    I can't, it's confidential.

Q:    So you didn't carefully screen the companies that would
        have access to Condé Nast data through the ████████
        cooperative, did you?

A:    Condé Nast did not.

*Id.* at 165:9-17; PSOF ¶ 111.

Q:    Who are the other members of the ████████
        cooperative?

A:    I do not know.  That's part of the reason we are with them
        because we don't know the members of the cooperative.

*Id.* at 237:15-19; PSOF ¶ 152.

Finally, it is undisputed that the October 8, 2015 disclosures of Plaintiff's PRI to ████████

and ████████ were <u>not</u> used for marketing purposes:

Q:    And ██████ didn't use this information for the purpose of
        marketing any goods or services that might be of interest to
        Condé Nast subscribers, did it?

> A:      No, they were instructed to use the files with the correct
>          information instead of this file.

Hoffmeyer Dep. at 224:25-225:7; Ex. 2; PSOF ¶ 93.

> Q:      So you maintained possession of a file that was never used
>          for marketing; is that correct?
>
> A:      That's correct.

████████ at 104:18-20; Ex. 4; PSOF ¶¶ 135-136.

And while Condé Nast states that those disclosures were made in error,[3] it is also undisputed that Condé Nast never asked ██████ or ██████ to delete or destroy the files, and that ████ and ████████ did not delete or destroy the files.  PSOF ¶¶ 90-93; 132-135.  At minimum, these particular disclosures were not "for the exclusive purpose of marketing good and services directly to the consumer."  M.C.L. § 445.1713(d).

## VI.    THE SUMMARY JUDGMENT STANDARD

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine dispute as to any material fact and it is clear the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law ....  Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

A dispute regarding a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party.  *See id.*  The Court "is not to

---

[3] The PPPA does not have a "knowledge" requirement to make a disclosure actionable, and Condé Nast does not argue otherwise.  So whether transmission to ████ and ████████ were made "in error" is of no moment.

resolve disputed issues of fact but to assess whether there are any factual issues to be tried."
*Wilson v. Nw. Mut. Ins. Co.,* 625 F.3d 54, 60 (2d Cir. 2010) (citation omitted).  It is the moving party's burden to establish the absence of any genuine issue of material fact.  *Zalaski v. City of Bridgeport Police Dep't,* 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party submits evidence that is "merely colorable," summary judgment may be granted.  *Anderson*, 477 U.S. at 249-50.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."  *Brown v. Eli Lilly & Co.,* 654 F.3d 347, 358 (2d Cir. 2011) (citations and internal quotation marks omitted).  The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient to preclude summary judgment; there must be evidence on which the jury could reasonably find for it.  *Dawson v. County of Westchester,* 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court resolves all ambiguities and draws all permissible factual inferences in favor of the non-moving party.  *Nagle v. Marron,* 663 F.3d 100, 105 (2d Cir. 2011).  If there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper.  *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 83 (2d Cir. 2004).

On a motion for <u>partial</u> summary judgment, such as this one, the court may "enter an order stating any material fact that is not genuinely in dispute and treating that fact as established in the case."  *Sicom S.P.A. v. TRS Inc.*, 168 F. Supp. 3d 698, 705 (S.D.N.Y. Mar. 10, 2016), *citing* Fed. R. Civ. P. 56(g).  "Partial summary judgment thus functions as "a pretrial adjudication that certain issues shall be deemed established for the trial of the case," which

"serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact." *Sicom S.P.A.*, 168 F. Supp. 3d at 705 (quoting Fed. R. Civ. P. 56, advisory committee's note to 1946 amendment).

## VII.  THERE IS NO GENUINE DISPUTE WITH RESPECT TO ANY FACT MATERIAL TO ESTABLISHING THE FOUR ELEMENTS OF A VIOLATION OF THE PPPA

To establish her claim under the PPPA, Plaintiff must prove **four elements**:

(1)   Condé Nast is engaged in the business of selling magazines at retail;

(2)   Plaintiff purchased the magazines from Condé Nast;

(3)   Condé Nast disclosed a record or information concerning Plaintiff's purchase of the magazines; and

(4)   The disclosed record or information indicated Plaintiff's identity.

*Hearst*, 2017 WL 3994934, at *20 (citing Michigan Non-Standard Jury Instr. Civil § 32:10 (Aug. 2016)); *see also* M.C.L. § 445.1712.

Plaintiff's proof of each of these four elements is uncontroverted.

### A.   Condé Nast Is Engaged In The Business Of Selling Magazines At Retail

The first of the four elements Plaintiff must prove is that Condé Nast is "engaged in the business of selling magazines at retail." *Hearst*, 2017 WL 3994934, at *20.  It is undisputed that Condé Nast is engaged in the business of selling magazine subscriptions at retail.  PSOF ¶ 1. And it is undisputed that Condé Nast sells magazine subscriptions directly to its subscribers, and sold magazine subscriptions directly to the Plaintiff.  PSOF ¶ 2.

### B.   Plaintiff Purchased Condé Nast Magazine Subscriptions At Retail

The second of the four elements Plaintiff must prove is that she "purchased the magazine[s] from Defendant." *Hearst*, 2017 WL 3994934, at *20.  It is undisputed that Plaintiff

purchased two subscriptions to ▮▮▮ magazine, and one subscription to *Vanity Fair* magazine,

directly from Condé Nast.  PSOF ¶¶ 171-176.

C.     **Condé Nast Disclosed To Another Person, Other Than The Plaintiff, A Record Or Information Concerning The Plaintiff's Subscription**

The third of the four elements Plaintiff must prove is that Condé Nast "disclosed a record

or information concerning Plaintiff's purchase of the magazine[s]."  *Hearst*, 2017 WL 3994934,

at *20.  Undisputed evidence confirms that Condé Nast disclosed to Acxiom, SMS, ▮▮▮▮▮▮

▮▮▮▮▮▮ and ▮▮▮▮▮ records or information concerning Plaintiff's purchases of magazine

subscriptions.  *See supra* Parts II & III.

**<u>Condé Nast's disclosure of Plaintiff's PRI to Acxiom is undisputed</u>**.  Condé Nast

contracted to disclose Plaintiff's PRI to Acxiom.  *See* Exs. 14, 15, 17, 18, 19; PSOF ¶¶ 8-9, 11-

15, 16-22, 25, 33.  Condé Nast's Rule 30(b)(6) designee admitted that it transmitted Plaintiff's

name, address, status as a *Vanity Fair* and ▮▮▮▮ subscriber, and subscription purchase

transaction information to Acxiom.  PSOF ¶ 23.  Condé Nast also produced records showing

Plaintiff's PRI that included individual contact information (i.e., name, address), and

subscription purchase transaction information, Exhibit 21, and Acxiom's Rule 30(b)(6) designee

confirmed at his deposition that Condé Nast had transmitted Plaintiff's PRI to Acxiom.

Vanthournout Dep. at 69:5-12, 129:14-19, 133:13-24, 135:5-20, Ex. 3.  Condé Nast's September

1, 2017 summary judgment brief also admits, at page 12, that Condé Nast transmits "[n]ames,

addresses, and subscription information" to Acxiom.  *See also supra* Part II.A.  On similar facts

concerning disclosures to a data appender – Experian – Judge Torres granted the plaintiff's

motion for summary judgment in *Hearst*.  *See Hearst*, 2017 WL 3994934, at *21-22 (granting

plaintiff's motion for summary judgment for disclosures to company that "appen[ed]

demographic and other data onto records in [Hearst's] customer marketing database").

24

**<u>Condé Nast's disclosure of Plaintiff's PRI to SMS is undisputed</u>**.  Condé Nast's Rule 30(b)(6) designee admitted at his deposition that Condé Nast transmitted Plaintiff's PRI to SMS. Hoffmeyer Dep. at 128:5-9, 133:20-134:4, Ex. 2.  Mr. Hoffmeyer also admitted that SMS appended demographic and geographic information to Plaintiff's record in the Condé Nast database.  *Id.* at 302:16-23.  Condé Nast's September 1, 2017 summary judgment brief also admits, at page 12, that Condé Nast transmitted PRI to SMS.  *See also supra* Part II.B.  On similar facts concerning disclosures to a data appender – Experian – Judge Torres granted the plaintiff's motion for summary judgment in *Hearst*.  *See Hearst*, 2017 WL 3994934, at \*21-22 (granting plaintiff's motion for summary judgment for disclosures to company that "appen[ed] demographic and other data onto records in [Hearst's] customer marketing database").

**<u>Condé Nast's disclosure of Plaintiff's PRI to ███ is undisputed</u>**.  Condé Nast's Rule 30(b)(6) designee admitted that Condé Nast transmitted Plaintiff's PRI to ███ on October 8, 2015.  Hoffmeyer Dep. at 219:20-220:1; Ex. 2.  ████████████████████ ████████████████ confirmed in a sworn declaration that ███ in fact received Plaintiff's PRI from Condé Nast.  ███████ Decl. ¶¶ 9-11, Ex. 5.  The transmission of Plaintiff's PRI to ███ is confirmed by Exhibit 44, a copy of the raw data file sent to ███ which Condé Nast produced.  *See* Ex. 44.  Condé Nast's September 1, 2017 summary judgment brief also admits, at page 21 footnote 13, that Condé Nast transmitted Plaintiff's PRI to ███ *See also supra* Part III.A.  On similar facts concerning disclosures to a data cooperative Judge Torres granted the plaintiff's motion for summary judgment in *Hearst*.  *See Hearst*, 2017 WL 3994934, at \*25-26 (granting plaintiff's motion for summary judgment for disclosures to data cooperative).

**Condé Nast's disclosure of Plaintiff's PRI to ████████ is undisputed**.  Condé Nast's Rule 30(b)(6) designee admitted that Condé Nast transmitted Plaintiff's PRI to ████████, including on October 8, 2015.  *See* Hoffmeyer Dep. at 169:15-23; *id.* at 196:3-8; Ex. 2.  ██ ████████ Rule 30(b)(6) designee confirmed at his deposition that Condé Nast made that transmission.  *See* ████████ Dep. at 98:1-12; Ex. 4.  The transmission of Plaintiff's PRI to ██ ████████ is confirmed by Exhibit 39, a copy of the raw data file sent to ████████, which Condé Nast produced.  *See* Ex. 39.  Condé Nast also produced a raw data file, Exhibit 36, which confirms a transmission of Plaintiff's PRI to ████████ on June 25, 2014.  *See* Ex. 36.  Condé Nast's September 1, 2017 summary judgment brief also admits, at page 21 footnote 13, that Condé Nast transmitted Plaintiff's PRI to ████████.  *See also supra* Part III.B.  On similar facts concerning disclosures to a data cooperative Judge Torres granted the plaintiff's motion for summary judgment in *Hearst*.  *See Hearst*, 2017 WL 3994934, at *25-26 (granting plaintiff's motion for summary judgment for disclosures to data cooperative).

**Condé Nast's disclosure of Plaintiff's PRI to ████████ is undisputed.**  Condé Nast contracted to disclose Plaintiff's PRI to ████████  *See* Ex. 48.  Condé Nast produced three raw data files, Exhibits 51, 52, and 53, which confirm transmissions of Plaintiff's PRI to ████████ on April 6, 2015, June 15, 2015, and October 9, 2015.  *See* Exs. 51-53.  Condé Nast's September 1, 2017 summary judgment brief also admits, at page 13, that Condé transmitted subscribers' PRI to ████████  *See also supra* Part III.C.  On similar facts concerning disclosures to a data cooperative Judge Torres granted the plaintiff's motion for summary judgment in *Hearst*.  *See Hearst*, 2017 WL 3994934, at *25-26 (granting plaintiff's motion for summary judgment for disclosures to data cooperative).

26

### D.    The Records Disclosed By Condé Nast Indicated The Plaintiff's Identity

The fourth and final element Plaintiff must prove is that "the disclosed record or information indicated Plaintiff's identity." *Hearst*, 2017 WL 3994934, at *20. Plaintiff's name and address were contained in all of the PRI disclosures to Acxiom, SMS, ███████ ███████ and ███████ *See supra* Parts II-IV, VII.C. This too is undisputed.

## VIII.   PLAINTIFF IS ENTITLED TO STATUTORY DAMAGES

Section 445.1715 of the PPPA states a plaintiff "may recover … (a) Actual damages, including damages for emotional distress, or $5,000.00, whichever is greater." M.C.L. § 445.1715(a). Plaintiff is therefore entitled to $5,000.

Statutory damages are especially appropriate in a case like this. The Second Circuit describes statutory damages as "an automatic measure of recovery to plaintiffs regardless of injury or profits." *Business Trend Analysts, Inc. v. The Freedonia Grp., Inc.*, 887 F.2d 399, 406 (2d Cir. 1989). Statutory damages are designed precisely for the situations in which "proof of damages … is difficult or impossible." *Id.* As Judge Oetken stated:

> The Second Circuit has explained that "statutory damages are not meant to be merely compensatory or restitutionary," meaning that … a verdict should not be reversed solely because it "bears little relationship" to the plaintiff's actual damages. *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 113 (2d Cir. 2001). … [S]tatutory damages are by definition a substitute for unproven and unprovable damages. It therefore makes no sense to consider the disparity between actual harm and an award of statutory damages when statutory damages are designed precisely for instances where actual harm is difficult or impossible to calculate.

*Psihoyos v. John Wiley & Sons, Inc.*, 2012 WL 5506121, at *3 (S.D.N.Y. Nov. 7, 2012) (internal quotations and citations omitted).

The award of statutory damages is well deserved here. The record amassed during Phase I discovery confirms that Condé Nast established a sophisticated network of third-party

27

data-mining companies to transmit its subscribers' PRI. *See* graphical table providing an overview of Condé Nast's disclosures of PRI, at p. 18, *supra*. Condé Nast did this through sophisticated business contracts to exploit the value of subscribers' PRI so that Condé Nast could sell, rent, trade, or license it to generate revenues for Condé Nast. *See supra* Parts II-IV. This was not a mistake. Condé Nast did this intentionally. For the purpose of making money.

Condé Nast also concealed these practices from its subscribers, and made no effort to notify them, or to seek their consent. *See supra* Part V. And most egregiously, even if a subscriber wrote to Condé Nast asking that Condé Nast not disclose her PRI to third-parties, Condé Nast disclosed it anyway. *See id.* These disclosures were not necessary for Condé Nast to operate its publishing business. They were not even remotely related. Indeed, Condé Nast stopped disclosing its Michigan subscribers' PRI to SMS in April 2014. PSOF ¶ 165. And Condé Nast stopped disclosing its Michigan subscribers' PRI to ███████ █████████, and █████ in December 2015. *See* PSOF ¶ 166. Yet Condé Nast continues to sell magazines to Michiganders every day.

This was an elaborate scheme to enrich Condé Nast at the expense of the privacy rights of every single Michigan subscriber.

## IX.   CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court grant her motion for partial summary judgment on Count I, for violation of M.C.L. § 445.1712, by deeming Condé Nast's liability to Plaintiff on her individual claim established, and by deeming Plaintiff's entitlement to $5,000 statutory damages pursuant to M.C.L. §445.1715(a) to be established. *See* Fed. R. Civ. P. 56(g) (stating that on a motion for partial summary judgment the court "may enter an order stating any material fact – including an item of damages or other relief – that is not genuinely in dispute and treating the fact as established in the case").

Dated:  September 28, 2017

Respectfully submitted,


By:      /s/ Scott A. Bursor
         Scott A. Bursor

**BURSOR & FISHER, P.A.**
Scott A. Bursor
Joseph I. Marchese
Philip L. Fraietta
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
Email:  scott@bursor.com
        jmarchese@bursor.com
        pfraietta@bursor.com


*Attorneys for Plaintiff*

29