**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ELIZABETH MOELLER, individually and on behalf
of all others similarly situated,

                      Plaintiff,

    v.

ADVANCE MAGAZINE PUBLISHERS, INC. d/b/a
CONDÉ NAST,

                 Defendant.

Civil Action No. 15-cv-05671-NRB

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
ATTORNEYS' FEES, COSTS, EXPENSES, AND INCENTIVE AWARD**

Dated: December 20, 2018

**BURSOR & FISHER, P.A.**

Scott A. Bursor
Joseph I. Marchese
Philip L. Fraietta
888 Seventh Avenue
New York, NY  10019
Telephone:  (646) 837-7150
Facsimile:  (212) 989-9163
Email:  scott@bursor.com
        jmarchese@bursor.com
        pfraietta@bursor.com

*Class Counsel*

# TABLE OF CONTENTS

**PAGE(S)**

INTRODUCTION ............................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ....................................... 2

    A.    Michigan's Preservation Of Personal Privacy Act ........................ 2

    B.    Plaintiff's Allegations ..................................................................... 3

    C.    The Litigation And Work Performed To Benefit The Class ........... 3

SUMMARY OF THE SETTLEMENT ........................................................... 7

ARGUMENT ................................................................................................... 7

I.      THE REQUESTED ATTORNEYS' FEES ARE REASONABLE AND
       SHOULD BE APPROVED .................................................................... 7

    A.    The Percentage Method Should Be Used To Calculate Fees ................ 10

    B.    The Reasonableness Of The Requested Fees Is Supported By This
        Circuit's Six-Factor *Goldberger* Test ..................................... 11

        1.    Time And Labor Expended By Counsel ..................................... 11

        2.    Magnitude And Complexity Of The Litigation ........................ 13

        3.    The Risk Of Litigation ................................................................. 15

        4.    The Quality Of Representation .................................................. 16

        5.    The Requested Fee In Relation To The Settlement ................... 18

        6.    Public Policy Considerations ...................................................... 18

    C.    The Requested Attorneys' Fees Are Also Reasonable Under A
        Lodestar Cross-Check ............................................................... 19

II.    CLASS COUNSEL'S LITIGATION COSTS AND EXPENSES ARE
      REASONABLE AND WERE NECESSARILY INCURRED TO
      ACHIEVE THE BENEFIT OBTAINED ON BEHALF OF THE CLASS ...................... 23

III.   THE REQUESTED INCENTIVE AWARD REFLECTS MS.
      MOELLER'S ACTIVE INVOLVEMENT IN THIS ACTION AND
      SHOULD BE APPROVED ................................................................... 24

CONCLUSION .............................................................................................. 25

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*,
  522 F.3d 182 (2d Cir. 2008)................................................................................. 9, 10

*Asare v. Change Grp. of N.Y., Inc.*,
  2013 WL 6144764 (S.D.N.Y. Nov. 18, 2013) ......................................................... 21

*Baffa v. Donaldson Lufkin & Jenrette Secs. Corp.*,
  2002 WL 1315603 (S.D.N.Y. June 17, 2002) ........................................................... 8

*Beacon Assocs. Litig.*,
  2013 WL 2450960 (S.D.N.Y. May 9, 2013) ........................................................ 8, 10

*Beckman v. KeyBank, N.A.*,
  293 F.R.D. 467 (S.D.N.Y. 2013) ...................................................................... 21, 22

*Blum v. Stenson*,
  465 U.S. 886 (1984)................................................................................................. 20

*Cain v. Redbox Automated Retail, LLC*,
  136 F. Supp. 3d 824 (E.D. Mich. 2015)............................................................. 16, 17

*Cassese v. Williams*,
  503 F. App'x 55 (2d Cir. 2012) .............................................................................. 19

*City of Providence v. Aeropostale, Inc.*,
  2014 WL 1883494 (S.D.N.Y. May 9, 2014) ............................................................. 9

*Clark v. Ecolab, Inc.*,
  2010 WL 1948198 (S.D.N.Y. May 11, 2010) ........................................................... 9

*Coulter-Owens v. Time Inc.*,
  695 F. App'x 117 (6th Cir. 2017) .......................................................................... 14

*Dornberger v. Metro. Life Ins. Co.*,
  203 F.R.D. 118 (S.D.N.Y. 2001) ............................................................................ 25

*Ebin v. Kangadis Food Inc.*,
  297 F.R.D. 561 (S.D.N.Y. Feb. 25, 2014) .............................................................. 17

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974)................................................................................................ 19

*GB ex rel NB v. Tuxedo Union Free School Dist.*,
  894 F. Supp. 2d 415 (S.D.N.Y. 2012)....................................................................... 9

*Goldberger v. Integrated Resources, Inc.*,
  209 F.3d 43 (2d Cir. 2000)............................................................................... passim

*Hayes v. Harmony Gold Min. Co.*,
   2011 WL 6019219 (S.D.N.Y. Dec. 2, 2011) .................................................................... 9

*In re Citigroup Inc. Sec. Litig.*,
   965 F. Supp. 2d 369 (S.D.N.Y. 2013)......................................................................... 8

*In re Credit Default Swaps Antitrust Litig.*,
   2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016)............................................................. 21

*In re Currency Conversion Fee Antitrust Litig.*,
   263 F.R.D. 110 (S.D.N.Y. Oct. 22, 2009) ................................................................. 25

*In re EVCI Career Colleges Holding Corp. Sec. Litig.*,
   2007 WL 2230177 (S.D.N.Y. July 27, 2007) ...................................................... 10, 23

*In re IMAX Secs. Litig.*,
   2012 WL 3133476 (S.D.N.Y. Aug. 1, 2012) ............................................................. 24

*In re Initial Public Offering Secs. Litig.*,
   671 F. Supp. 2d 467 (S.D.N.Y.2009)......................................................................... 9

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   2018 WL 3863445 (S.D.N.Y. Aug. 14, 2018)........................................................... 25

*In re Marsh ERISA Litig.*,
   265 F.R.D. 128 (S.D.N.Y. 2010) ........................................................................ 15, 17

*In re MetLife Demutalization Litig.*,
   689 F. Supp. 2d 297 (E.D.N.Y. 2010) ....................................................................... 17

*In re Nasdaq Market-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) ........................................................................ 13, 14

*In re Telik, Inc. Sec. Litig.*,
   576 F. Supp. 2d 570 (S.D.N.Y. 2008)........................................................................ 15

*In re Visa Check/Mastermoney Antitrust Litig.*,
   297 F. Supp. 2d 503 (E.D.N.Y. 2003) ....................................................................... 23

*Khait v. Whirlpool Corp.*,
   2010 WL 2025106 (E.D.N.Y. Jan. 20, 2010) ............................................................. 9

*LeBlanc-Sternberg v. Fletcher*,
   143 F. 3d 748 (2d Cir. 1998) ............................................................................... 20, 21

*Luciano v. Olsten Corp.*,
   109 F.3d 111 (2d Cir. 1997) ..................................................................................... 20

*Massiah v. MetroPlus Health Plan, Inc.*,
   2012 WL 5874655 (E.D.N.Y. Nov. 20, 2012)..................................................... 18, 24

*McDaniel v. County of Schenectady*,
   595 F.3d 411 (2d Cir. 2010)...................................................................................... 8

*McMahon v. Olivier Cheng Catering & Events, LLC,*
  2010 WL 2399328 (S.D.N.Y. Mar. 3, 2010) ........................................................ 23

*Missouri v. Jenkins,*
  491 U.S. 274 (1989) ............................................................................................. 20

*Parker v. Jekyll & Hyde Entm't Holdings, LLC,*
  2010 WL 532960 (S.D.N.Y. Feb. 9, 2010) .......................................................... 23

*Parker v. Time Warner Entertainment Co., L.P.,*
  631 F. Supp. 2d 242 (E.D.N.Y. 2009) ................................................................. 20

*Pennsylvania v. Del. Valley Citizens' Council for Clean Air,*
  478 U.S. 546 (1986) ............................................................................................. 19

*Perdue v. Kenny A. ex rel. Winn,*
  559 U.S. 542 (2010) ............................................................................................. 10

*Reyes v. Altamarea Grp.,*
  2011 WL 4599822 (S.D.N.Y. Aug. 16, 2011) ............................................... 10, 24

*Shapiro v. JPMorgan Chase 7 Co.,*
  2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ......................................... 15, 18, 20

*Varljen v. H.J. Meyers & Co., Inc.,*
  2000 WL 1683656 (S.D.N.Y. Nov. 8, 2000) ....................................................... 10

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,*
  396 F.3d 96 (2d Cir. 2005) ....................................................................... 8, 11, 19, 24

*Willix v. Healthfirst, Inc.,*
  2011 WL 754862 (E.D.N.Y. Feb. 18, 2011) .......................................................... 9

*Yuzary v. HSBC Bank USA, N.A.,*
  2013 WL 5492998 (S.D.N.Y. 2013) .................................................................... 23

**STATUTES**

Michigan Preservation of Personal Privacy Act,
  M.C.L. §§ 445.1711-1715 ............................................................................. passim

**RULES**

Fed. R. Civ. P. 16 ......................................................................................................... 5

Fed. R. Civ. P. 23(h) ................................................................................................. 1, 7

Fed. R. Civ. P. 26 ..................................................................................................... 5, 12

Fed. R. Civ. P. 26(a)(1) ................................................................................................ 5

Fed. R. Civ. P. 41(a)(1)(A)(ii) ..................................................................................... 5

## INTRODUCTION

The class action settlement between Plaintiff Elizabeth Moeller and Defendant Advance Magazine Publishers, Inc. d/b/a Condé Nast ("Condé Nast"), if finally approved, resolves Plaintiff's and the Class' claims against Condé Nast under Michigan's Preservation of Personal Privacy Act ("PPPA"), M.C.L. §§ 445.1711-1715. The settlement – preliminarily approved by this Court on October 24, 2018 – creates a $13.75 million non-reversionary common fund from which class members will receive *pro rata* cash payments estimated to be approximately $75.

Obtaining this exceptional relief did not come easily. Plaintiff shouldered significant risk and battled through three years of hard-fought litigation, involving complex factual investigation into Condé Nast's disclosure practices, case-dispositive motion practice on novel legal issues, and complete Phase I discovery, including substantial document review and depositions of the Defendant and third parties. Indeed, the settlement was not reached until the Parties had filed and fully briefed competing motions for summary judgment.

Moreover, the settlement was not reached until the Parties participated in two in-person settlement meetings, followed by a full-day mediation session with Jill Sperber, Esq., who is a well-respected neutral affiliated with Judicate West. And, while the Parties ultimately achieved a settlement, it was only after continued negotiations with Ms. Sperber after the mediation.

In light of this exceptional result, Plaintiff respectfully requests pursuant to Federal Rule of Civil Procedure 23(h) that the Court approve attorneys' fees of one-third of the settlement fund, or $4,583,333.33, plus reimbursement of $33,084.46 in costs and expenses associated with this action, as well as an incentive award of $10,000 for Plaintiff for her service as class representative. The requested fee is an equal percentage to that approved by other courts in this District in PPPA class action settlements. *See Taylor v. Trusted Media Brands, Inc.*, No. 16-cv-01812-KMK, Dkt. 87 (S.D.N.Y. Feb. 1, 2018) (awarding one-third of $8.225 million settlement

1

fund resolving plaintiff's PPPA claim); *Ruppel v. Consumers Union of United States, Inc.*, No.

16-cv-02444-KMK, Dkt. 111 (S.D.N.Y. Dec. 4, 2018) (awarding one-third of $16.375 million

settlement fund resolving plaintiff's PPPA claim).  And it is a <u>lesser</u> percentage than courts have

approved in the Eastern District of Michigan.  *See Perlin v. Time Inc.*, No. 16-cv-10635-GCS,

Dkt. 55 (E.D. Mich. Oct. 15, 2018) (awarding 40% of $7.4 million settlement fund resolving

plaintiff's PPPA claim); *Kinder v. Meredith Corp.*, No. 14-cv-11284-TLL, Dkt. 81 (E.D. Mich.

May 18, 2016) (awarding 35% of $7.5 million settlement fund resolving plaintiff's PPPA claim);

*Moeller v. American Media, Inc.*, No. 16-cv-11367-JEL, Dkt. 42 (E.D. Mich. Sept. 28, 2017)

(awarding 35% of $7.6 million settlement fund resolving plaintiff's PPPA claim).

For these reasons, and as explained further below, this Court should approve the

requested fees, costs, expenses, and incentive award.

## FACTUAL AND PROCEDURAL BACKGROUND

A brief summary of the PPPA, the litigation performed by Class Counsel for the

Settlement Class' benefit, and the beneficial terms of the Settlement provide necessary context to

the reasonableness of the requested fee and incentive award.

### A.    Michigan's Preservation Of Personal Privacy Act

The Michigan legislature passed the PPPA "to preserve personal privacy with respect to

the purchase, rental, or borrowing of written materials, sound recordings, and video recordings."

First Amended Class Action Complaint, Dkt. 74 ["FAC."], Ex. A.  As such, the PPPA provides

that:

> a person, or an employee or agent of the person, engaged in the
> business of selling at retail . . . books or other written materials . . .
> shall not disclose to any person, other than the customer, a record
> or information concerning the purchase . . . of those materials by a
> customer that indicates the identity of the customer.

M.C.L. § 445.1712.

To enforce the statute, the PPPA authorizes civil actions and provides for the recovery of statutory damages in the amount of $5,000, plus costs and reasonable attorneys' fees. *See id.* § 445.1715.

### B.   Plaintiff's Allegations

Condé Nast an international media company that publishes widely-circulated magazines throughout the United States, such as *GQ*, *The New Yorker*, *Vanity Fair*, and *Vogue*. *See* FAC ¶ 1.  Plaintiff alleges that Condé Nast sells information related to its customers' magazine subscription histories and personal reading habits. *Id.* ¶¶ 1-4, 8, 40-46.  To increase the value of such information, Plaintiff alleges that Condé Nast trades its customers' protected reading information with certain third parties – including data mining companies – in exchange for other demographic and lifestyle data that such companies have already gathered (or "mined") on each subscriber. *Id.* ¶¶ 8, 40-42.  Plaintiff further alleges that Condé Nast thereafter "enhances" its own customer profiles with this additional data (*e.g.*, income levels, religion, age, race, political affiliation, travel habits, medical conditions, etc.), and then allegedly sells the enhanced information to other unrelated third parties for a profit. *Id.* ¶¶ 8, 40-42.

Plaintiff further alleges that no matter how consumers subscribe (*i.e.*, via postcard, over the phone, on Condé Nast's website, or through a subscription agent's website), Condé Nast's customers never provide consent to disclose information related to their magazine subscriptions to third parties. *Id.* ¶¶ 8, 43-44.  This is because – during the subscription process – Plaintiff claims that customers are not required to consent to any terms or policies informing them of Condé Nast's alleged disclosure practices. *Id.*

### C.   The Litigation And Work Performed To Benefit The Class

In May 2015, Class Counsel began what would be a 3-month pre-suit investigation into Condé Nast's alleged data-sharing practices. *See* Declaration of Joseph I. Marchese ("Marchese

Decl.") ¶ 3.  While that investigation was ongoing, *Spokeo v. Robins* – a case regarding Article III standing in statutory cases – was then pending before the Supreme Court.  *Id.* ¶ 4.  Knowing *Spokeo* would impact the litigation, Suzanne Boelter, through Class Counsel, filed a class action lawsuit on July 20, 2015, and Condé Nast has vigorously defended itself from the outset. *Id.* ¶¶ 6, 8.  On October 2, 2015 – after the Court granted permission – Condé Nast filed a motion to dismiss under Rules 12(b)(1) and 12(b)(6), arguing that:  (1) Plaintiff lacked Article III standing because she failed to allege an injury-in-fact; (2) the case could not proceed as a class action in federal court; (3) Defendant's alleged disclosures are permitted by the PPPA's direct marketing defense; and (4) the PPPA is overbroad and void under the First Amendment.  *Id.* ¶ 8. These legal arguments were novel and had previously been addressed in *Boelter v. Hearst Communications, Inc.*, No. 15-cv-03934-AT (S.D.N.Y.), a similar case under the PPPA in which Class Counsel served as plaintiff's counsel.  Ms. Boelter opposed Condé Nast's motion on November 3, 2015 and Class Counsel was able to incorporate some of its work product from *Hearst* in doing so.  *Id.* ¶ 9.

On December 15, 2015, the Michigan State Senate passed the bill to amend the PPPA, and on May 3, 2016, Michigan Governor Rick Synder signed that bill into law.  *Id.* ¶¶ 11-12. Immediately thereafter, the Parties submitted supplemental letter briefing to the Court addressing the impact of the amendments to the PPPA on this case.  *Id.* ¶¶ 12-15.

On May 16, 2016, the Supreme Court issued its opinion in *Spokeo*.  *Id.* ¶ 16. Immediately thereafter, the Parties submitted supplemental letter briefing to the Court addressing the impact of *Spokeo* on this case.  *Id.* ¶¶ 16-17.

On June 17, 2016, Judge Analisa Torres issued a Memorandum and Order denying defendant's motion to dismiss in *Hearst*, in its entirety.  *Id.* ¶ 18.  Immediately thereafter, the Parties submitted supplemental letter briefing to the Court addressing the impact of the *Hearst*

decision on this case. *Id.* ¶¶ 19-20.

On July 12, 2016, the Court held oral argument on Condé Nast's motion to dismiss. *Id.* ¶ 21. Then, on September 28, 2016, the Court issued a Memorandum and Order denying Condé Nast's motion to dismiss in its entirety. *Id.* ¶ 22.

On November 1, 2016, with consent of Condé Nast, Ms. Boelter and Plaintiff filed a First Amended Complaint adding Ms. Moeller as a named Plaintiff to this action. *Id.* ¶ 23.

On December 21, 2016, the Court held an initial scheduling conference pursuant to Fed. R. Civ. P. 16 and thereafter entered a Scheduling Order. *Id.* ¶ 25. The Parties then exchanged their initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1), conducted substantial written and document discovery on the merits of the case, produced and reviewed thousands of pages of documents, and engaged in several meet and confer conferences. *Id.* ¶¶ 24, 26-33.

Thereafter, Plaintiff served subpoenas on multiple third parties who she believed were recipients of Condé Nast's subscriber data disclosures and served requests for admissions on Condé Nast. *Id.* ¶¶ 34-35.[1] After that, the Parties engaged in deposition discovery, which included depositions of the Parties, as well as two third party witnesses. *Id.* ¶ 37. Plaintiff also obtained a declaration from another third party in lieu of a deposition. *Id.*

From the outset of the case, the Parties engaged in direct communication, and as part of their obligation under Fed. R. Civ. P. 26, discussed the prospect of resolution. To that end, on July 7, 2017, the Parties met in-person for approximately 1 hour to discuss potential resolution. While the Parties engaged in good faith negotiations, which at all times were at arms'-length, they failed to reach agreement. *Id.* ¶ 38.

On September 1, 2017, Condé Nast filed a motion for summary judgment arguing, *inter*

---

[1] On May 3, 2017, the Parties entered into a stipulation of dismissal pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) voluntarily dismissing Ms. Boelter's individual claims with prejudice. *Id.* ¶ 36.

*alia*, that:  (1) the PPPA does not prohibit the disclosure of the magazine subscription information at issue (because the third party recipients of the disclosures are Defendant's agents); (2) that Defendant provided appropriate notice of its practices; (3) that Plaintiff's interpretation of the PPPA would offend due process; (4) that Plaintiff's application of the PPPA could not withstand First Amendment scrutiny; (5) that Plaintiff lacked standing to bring her claims; and (6) that Plaintiff's unjust enrichment claim failed as a matter of law.  *Id.* ¶ 39.

On September 28, 2017, Plaintiff filed an opposition to Condé Nast's motion, arguing, *inter* alia, that:  (1) the recipients of Defendant's disclosures were not its agents under Michigan law; (2) Defendant did not provide adequate notice under the PPPA; (3) Plaintiff's application of the PPPA satisfied due process; (4) the PPPA withstood First Amendment scrutiny; and (5) Plaintiff could maintain a claim for unjust enrichment.  *Id.* ¶ 41.  Moreover, Plaintiff also filed her own motion for partial summary judgment, arguing that Defendant's disclosures of her personal information to data appenders and data cooperatives violated the PPPA.  *Id.* ¶ 42.

On October 26, 2017, Condé Nast filed an opposition to Plaintiff's motion for partial summary judgment, and a reply brief in support of its motion for summary judgment.  *Id.* ¶ 43. And on November 7, 2017, Plaintiff field a reply brief in support of her motion for partial summary judgment.  *Id.* ¶ 44.

On April 12, 2018, the Parties met in-person again for approximately 1 hour to discuss potential resolution.  *Id.* ¶ 45.  Those discussions eventually led to an agreement between the Parties to engage in mediation, which the Parties agreed would take place on July 17, 2018 before Jill Sperber, Esq., who is a neutral affiliated with Judicate West.  *Id.*  On June 18, 2018, in advance of the mediation, the Court so-ordered the Parties' stipulated withdrawal of their cross motions for summary judgment without prejudice.  *Id.* ¶ 46.

On July 17, 2018, the Parties participated in a mediation with Ms. Sperber at the New York office of Dentons US LLP. *Id.* ¶ 48. The mediation lasted approximately 9.5 hours. *Id.* While the Parties engaged in good faith negotiations, which at all times were at arms'-length, they failed to reach an agreement that day. *Id.*

Following the mediation session, the Parties worked further with Ms. Sperber and, with her help, were able to reach an agreement on all material terms of a class action settlement, and thereafter executed a term sheet. *Id.* ¶ 49.

## SUMMARY OF THE SETTLEMENT

Class Counsel's efforts resulted in an outstanding settlement. *Id.* ¶ 50. The Settlement provides an exceptional result for the class by delivering immediate cash to approximately 1,158,089 persons with a Michigan street address who subscribed to a Condé Nast Publication to be delivered to a Michigan street address between July 20, 2009 and July 30, 2016. *Id.* The Settlement creates a non-reversionary $13,750,000 Settlement Fund, from which class members will receive a *pro rata* cash payment, which Class Counsel estimates will be approximately $75. *Id.* Ex. A, Class Action Settlement Agreement ("Agreement") ¶¶ 1.33, 2.1; *see also* Marchese Decl. ¶ 50.

## ARGUMENT

### I.   THE REQUESTED ATTORNEYS' FEES ARE REASONABLE AND SHOULD BE APPROVED

The requested fee award of $4,583,333.33, representing one-third of the cash common fund, is reasonable and merits approval. Under Federal Rule of Civil Procedure 23(h), courts may award "reasonable attorney's fees and nontaxable costs that are authorized by law or the parties' agreement." Fed. R. Civ. P. 23(h). Here, the Settlement Agreement between the Parties provides that Class Counsel may petition the Court for an award of attorneys' fees up to one-third of the Settlement Fund. Agreement ¶ 8.1.

In common-fund cases such as this one, courts in the Second Circuit apply one of two fee calculation methods – the "percentage of the fund" method or the "lodestar" method. *See Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000). The Court has discretion in choosing which method to employ. *See McDaniel v. County of Schenectady*, 595 F.3d 411, 419 (2d Cir. 2010) (holding that "the decision as to the appropriate method [is left] to 'the district court, which is intimately familiar with the nuances of the case'") (quoting *Goldberger*, 209 F.3d at 48). "[T]he trend in this Circuit has been toward the use of a percentage of recovery as the preferred method of calculating the award for class counsel in common fund cases." *In re Beacon Assocs. Litig.*, 2013 WL 2450960, at *5 (S.D.N.Y. May 9, 2013); *see also* Marchese Decl. Ex. L, 1/31/18 *Trusted Media Brands* Final Approval Hearing Transcript ("*TMBI* Hearing Tr.") at 16-18 (applying percentage of the fund method in a PPPA case). In fact, the "trend" of using the percentage of the fund method to compensate class counsel is now "firmly entrenched in the jurisprudence of this Circuit." *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 388 (S.D.N.Y. 2013). As the Second Circuit has stated, the percentage method "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005). "In contrast, the 'lodestar create[s] an unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in gimlet-eyed review of line-item fee audits.'" *Id.* (quoting *Baffa v. Donaldson Lufkin & Jenrette Secs. Corp.*, 2002 WL 1315603, at *1 (S.D.N.Y. June 17, 2002)). Indeed, over a decade ago, the Second Circuit described difficulties with the lodestar method:

> As so often happens with simple nostrums, experience with the lodestar method proved vexing. Our district courts found it created a temptation for lawyers to run up the number of hours for which they could be paid. For the same reason, the lodestar created an unanticipated disincentive to early settlements. But the primary source of dissatisfaction was that it resurrected the ghost of

> Ebenezer Scrooge, compelling district courts to engage in a gimlet-
> eyed review of line-item fee audits.  There was an inevitable waste
> of judicial resources.

*Goldberger*, 209 F.3d at 48-49.  And as Judge Karas has noted, "courts in the Second Circuit no longer use the 'lodestar' method for computing attorneys' fees" in fee-shifting cases.  *GB ex rel NB v. Tuxedo Union Free School Dist.*, 894 F. Supp. 2d 415, 427 (S.D.N.Y. 2012) (citing *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182 (2d Cir. 2008)); *see also TMBI* Hearing Tr. at 16:18-19 ("Now, the lodestar method is not supposed to be used for computing attorneys' fees.").

Moreover, Courts in this Circuit routinely approve fee requests for one-third of a common fund.  *See TMBI* Hearing Tr. at 17:21-22 ("As I said, it's one-third.  That's typically approved by other courts."); *see also Hayes v. Harmony Gold Min. Co.*, 2011 WL 6019219, at *1 (S.D.N.Y. Dec. 2, 2011) (awarding "attorneys' fees in the amount of one third" of a $9 million settlement fund), *aff'd* 509 F. App'x 21, 23-24 (2d Cir. 2013) (affirming fee award, and noting that "the prospect of a percentage fee award from a common fund settlement, as here, aligns the interests of class counsel with those of the class"); *In re Initial Public Offering Secs. Litig.*, 671 F. Supp. 2d 467, 516 (S.D.N.Y.2009) (awarding one-third of the $510 million net settlement fund); *City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at *20 (S.D.N.Y. May 9, 2014) (awarding 33% of $15 million settlement fund); *Khait v. Whirlpool Corp.*, 2010 WL 2025106, at *8 (E.D.N.Y. Jan. 20, 2010) (awarding 33% of $9.25 million settlement fund); *Willix v. Healthfirst, Inc.*, 2011 WL 754862, at *6–7 (E.D.N.Y. Feb. 18, 2011) (awarding one-third of $7.675 million settlement fund); *Clark v. Ecolab, Inc.*, 2010 WL 1948198, at *8–9 (S.D.N.Y. May 11, 2010) (awarding one-third of $6 million settlement fund).  Indeed, as courts in this Circuit have noted, fee requests for one-third of common funds represent what "reasonable, paying client[s] … typically pay … of their recoveries under private retainer

agreements." *Reyes v. Altamarea Grp.*, 2011 WL 4599822, at *8 (S.D.N.Y. Aug. 16, 2011)

(citing *Arbor Hill*, 522 F.3d 182).

### A.   The Percentage Method Should Be Used To Calculate Fees

As aforementioned, the "trend in this Circuit has been toward the use of a percentage of

recovery as the preferred method of calculating the award for class counsel in common fund

cases." *In re Beacon Assocs. Litig.*, 2013 WL 2450960, at *5 (S.D.N.Y. May 9, 2013).  Indeed,

the percentage method has been used to calculate fees for the seven other major PPPA class

action settlements, including by courts in this District.  *See TMBI* Hearing Tr. at 16-18 (applying

percentage method); *Ruppel v. Consumers Union of United States, Inc.*, No. 16-cv-02444-KMK,

Dkt. 111 (S.D.N.Y. Dec. 4, 2018) (same); *Halaburda v. Bauer Publ'g Co., L.P.*, No. 12-cv-

12831-GCS, Dkt. 68 (E.D. Mich. Jan. 6, 2015) (same); *Kinder v. Meredith Corp.*, No. 14-cv-

11284-TLL, Dkt. 81 (E.D. Mich. May 18, 2016) (same); *Coulter-Owens v. Rodale, Inc.*, No. 14-

cv-12688-RHC, Dkt. 54 (E.D. Mich. Sept. 29, 2016) (same); *Moeller v. American Media, Inc.*,

No. 16-cv-11367-JEL, Dkt. 42 (E.D. Mich. Sept. 28, 2017) (same); *Perlin v. Time Inc.*, No. 16-

cv-10635-GCS, Dkt. 55 (E.D. Mich. Oct. 15, 2018) (same).  In contrast, the lodestar approach is

more often applied in federal fee-shifting cases, particularly civil rights actions.  *See, e.g.*,

*Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010).  As Judge Cote has stated, the

percentage method is preferred for several reasons:

> First, it relieves the court of the cumbersome, enervating, and often
> surrealistic process of evaluating fee petitions.  Second, it
> decreases plaintiff lawyers' incentive to run up the number of
> billable hours for which they would be compensated by the
> lodestar method.  And finally, it decreases the incentive to delay
> settlement because the fee for the plaintiffs' attorneys does not
> increase with delay.

*Varljen v. H.J. Meyers & Co., Inc.*, 2000 WL 1683656, at *5 (S.D.N.Y. Nov. 8, 2000) (internal

citations omitted); *see also In re EVCI Career Colleges Holding Corp. Sec. Litig.*, 2007 WL

2230177, at *16 (S.D.N.Y. July 27, 2007) ("From a public policy perspective, the percentage method is the most efficient means of compensating the work of class action attorneys.  It does not waste judicial resources analyzing thousands of hours of work, where counsel obtained a superior result.").

Under the circumstances of this case – wherein Class Counsel received an exceptional result for the Settlement Class – the Second Circuit prefers the percentage method.  *See Wal-Mart Stores, Inc.*, 396 F.3d at 121 (noting that the percentage method "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation").  In contrast, "the lodestar create[s] an unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in gimlet-eyed review of line-item fee audits."  *Id.* at 121.

### B.    The Reasonableness Of The Requested Fees Is Supported By This Circuit's Six-Factor *Goldberger* Test

The Second Circuit has articulated six factors that should be considered when determining the reasonableness of a requested percentage to award as attorneys' fees:  "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation…; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations."  *Goldberger*, 209 F.3d at 50.  A review of these factors support Class Counsel's fee request.

#### 1.    Time And Labor Expended By Counsel

Class Counsel has been working on this case since May 2015, when it began investigating magazine publishers' violations of the PPPA.  *See* Marchese Decl. ¶ 3.  The pre-suit investigation was extensive, spanning 3 months, and involving in-depth research into a number of data sharing practices, including data appending, subscriber list rental, and use of data cooperatives.  *Id.*  During that pre-suit investigation, Class Counsel also conducted extensive

11

research into the Supreme Court's Article III standing precedents, in light of the Supreme Court granting *certiorari* in *Spokeo v. Robins*. *Id.* ¶ 4. Class Counsel also drafted the complaints, engaged in dispositive motion practice on novel legal issues, including whether the amendment to the PPPA applied retroactively, served and responded to discovery requests, conducted meet-and-confer teleconferences with defense counsel, reviewed thousands of pages of documents, engaged in third party discovery, and conducted depositions of the Parties and two third party witnesses. *Id.* ¶¶ 6-37. Class Counsel also obtained a declaration from another third party in lieu of a deposition, in order to maximize efficiencies. *Id.* ¶ 37. Moreover, Class Counsel fully briefed competing motions for summary judgment. *Id.* ¶¶ 39-44.

Further, Class Counsel expended considerable time and labor on the settlement process as well. From the outset of the case, the Parties engaged in direct communication, and as part of their obligation under Fed. R. Civ. P. 26, discussed the prospect of resolution. *Id.* ¶ 38. To that end, on July 7, 2017, Class Counsel participated in a 1 hour in-person meeting with defense counsel to discuss potential resolution. *Id.* Then, on April 12, 2018, Class Counsel participated in a second 1 hour in-person meeting with defense counsel to discuss potential resolution. *Id.* ¶ 45. Next, on July 17, 2018, after Phase I discovery had been completed, Class Counsel participated in a full-day mediation session with Ms. Sperber. *Id.* ¶ 48. In preparation for that mediation, Class Counsel prepared a detailed mediation statement and presentation, outlining the strengths of Plaintiff's case and comparing her case with other PPPA cases against magazine publishers that had settled, in order to help evaluate any potential settlement. *Id.* ¶ 47. Finally, following the mediation session, Class Counsel continued to work with Ms. Sperber and, with her help, was able to reach an agreement on all material terms of a class action settlement, and thereafter executed a term sheet. *Id.* ¶¶ 49-50. And since that time, Class Counsel has: (1) worked extensively with defense counsel to finalize and memorialize the agreement into a

formal Class Action Settlement Agreement, including proposed class notice documents; (2) prepared Plaintiff's Motion For Preliminary Approval; (3) worked with the Settlement Administrator, JND Legal Administration ("JND"), to carry out the Court-ordered notice plan and monitor settlement claims and any other issues that may arise; and (4) fielded calls from Settlement Class Members and assisted them with filing claims. *Id.* ¶¶ 51-52; 58-59. Thus, the work performed by Class Counsel to date has been comprehensive, complex, and wide ranging. This factor supports the requested fee award.

### 2. Magnitude And Complexity Of The Litigation

"[C]lass actions have a well deserved reputation as being most complex." *In re Nasdaq Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 477 (S.D.N.Y. 1998) (internal citation and quotations omitted). This case was no exception, both factually and legally. This case involved multiple layers of factual complexity, much of which was obscured at the outset due to Condé Nast's alleged concealment of its data sharing practices from consumers. As a result, this required extensive preliminary investigation into Condé Nast's business practices, their methods of data collection, aggregation, and sharing, and the nature of their relationships with various third-party data companies. Marchese Decl. ¶¶ 3, 26, 30-32, 34.

The case involved complex legal issues as well. Condé Nast challenged the basis of the lawsuit on constitutional grounds, based on new case law that did not even exist at the time of filing. *Id.* ¶¶ 8, 16-17. Condé Nast also challenged the basis of the lawsuit on statutory grounds, as the PPPA was amended after the case was filed. *Id.* ¶¶ 11-15. And Condé Nast challenged the lawsuit by arguing that: (1) Condé Nast's alleged disclosures were permitted by the PPPA's direct marketing defense; (2) the case could not proceed as a class action in federal court; and (3) the PPPA is overbroad and void under the First Amendment. *Id.* ¶ 8. Even after that motion was denied, Condé Nast continued to challenge liability and the constitutionality of the PPPA, and it

asserted a number of other defenses in its motion for summary judgment, including that the disclosures of magazine subscription information at issue did not violate the PPPA, because the recipients were Condé Nast's agents. *Id.* ¶¶ 41-44. If its summary judgment motion would have been ultimately denied, Plaintiff was keenly aware that Condé Nast would continue to challenge liability and the constitutionality of the PPPA, as well as assert a number of defenses. Condé Nast indicated that it would continue to assert numerous defenses on the merits, including that PPPA does not prohibit the disclosure of the magazine subscriptions information at issue (because the third-party recipients of the disclosures are Condé Nast's agents), that Condé Nast also provided appropriate notice of its practices, and that the PPPA does not apply to subscriptions that were not sold by Condé Nast "at retail," as is required to come under the scope of the statute. Condé Nast would have also continued to challenge Plaintiff's standing, and the constitutionality of the PPPA, as well as its applicability to magazines in particular and the magazine publishing industry in general. *Id.* ¶ 56. Plaintiff and Class Counsel are also aware that Condé Nast would oppose class certification vigorously, and that Condé Nast would prepare a competent defense at trial. *Id.* Looking beyond trial, Plaintiff and Class Counsel are also keenly aware that Condé Nast could appeal the merits of any adverse decision, and that in light of the statutory damages in play it would argue – in both the trial and appellate courts – for a reduction of damages based on due process concerns. *Id.*

In the end, because this case involved complex factual and legal questions under the PPPA – its application to Condé Nast and its alleged disclosures, the constitutionality of the underlying statute, and defining the scope of what it means to sell a magazine "at retail," an issue which was ultimately decided unfavorably for Plaintiff by the Sixth Circuit in *Coulter-Owens v. Time Inc.*, 695 F. App'x 117, 124 (6th Cir. 2017) – the magnitude and complexity of the litigation further supports the requested fee award.

### 3.     The Risk Of Litigation

This factor recognizes the risk of non-payment in cases prosecuted on a contingency basis where claims are not successful, which can justify higher fees.  *See, e.g., In re Marsh ERISA Litig.*, 265 F.R.D. 128, 148 (S.D.N.Y. 2010) ("There was significant risk of non-payment in this case, and Plaintiffs' Counsel should be rewarded for having borne and successfully overcome that risk."); *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 592 (S.D.N.Y. 2008) (noting risk of non-payment in cases brought on contingency basis).  "It is well settled that class actions are notoriously complex and difficult to litigate."  *Shapiro v. JPMorgan Chase 7 Co.*, 2014 WL 1224666, at *21 (S.D.N.Y. Mar. 24, 2014) (internal citation omitted).  This case presented a substantial risk of non-payment for Class Counsel.

For over three years, Class Counsel invested significant time, effort, and resources to the litigation without any compensation.  Marchese Decl. ¶ 61.  Cognizant of the risk of nonpayment, Class Counsel nonetheless embarked on a fact-intensive investigation of Condé Nast's practices, engaged in dispositive motion practice, and completed Phase I discovery.  *Id.* ¶¶ 3-22, 24-35, 37, 39-44.  Class Counsel also filed this case with *Spokeo* pending, which could have been dispositive on the case.  *Id.* ¶ 4.  Additionally, Class Counsel also paid for and participated in a full-day mediation, as well as additional discussions with the mediator in order to try and resolve the action.  *Id.* ¶¶ 48-49.  Class Counsel fronted this investment of time and resources, despite the significant risk of nonpayment inherent in this case, and in doing so, had to forego other work, including hourly non-contingent matters, and other class action cases.  *Id.* ¶¶ 3-22, 24-35, 37, 39-44, 63.  And given the defenses mounted by Condé Nast, as well as the fairly limited history of PPPA litigation, the risk of establishing liability was substantial.  *Id.* ¶¶ 3-22, 39-44, 56.

Indeed, at the time of settlement, Condé Nast had filed a motion for summary judgment making fact-intensive arguments concerning whether the recipients of its disclosures were its agents, and whether it provided adequate notice of its disclosures under the PPPA, among other arguments. *Id.* ¶ 56. Defendant's summary judgment motion presented a substantial risk to establishing liability. Had that motion ultimately been granted, Plaintiff and the Settlement Class would have recovered nothing. If Plaintiff survived Defendant's motion for summary judgment, she would have faced additional risk after completing Phase II discovery seeking to certify and maintain a class through trial.

Moreover, Class Counsel faced highly qualified defense counsel, who themselves have represented leading magazine publishers in related PPPA litigation. *See, e.g.*, *Taylor*, No. 16-cv-01812-KMK (S.D.N.Y.). Defense counsel has also been successful in defeating other PPPA cases, further underscoring the risks Class Counsel faced in pursuing this litigation. *See Cain v. Redbox Automated Retail, LLC*, 136 F. Supp. 3d 824 (E.D. Mich. 2015) (granting summary judgment for defendant on a PPPA claim).

The fact that Class Counsel undertook this representation, despite the significant risk of nonpayment, supports the requested fee award.

### 4. The Quality Of Representation

Class action litigation presents unique challenges and – by achieving an exceptional settlement – Class Counsel proved that they have the ability and resources to litigate this case zealously and effectively. In addition, Class Counsel are well-respected attorneys with significant experience litigating consumer class actions of similar size, scope, and complexity. Marchese Decl. ¶ 71, Ex. M. Class Counsel also served as Class Counsel in *Ruppel v. Consumers Union of United States, Inc.*, No. 16-cv-02444-KMK (S.D.N.Y.), a case brought under the PPPA wherein Judge Karas approved a class-wide settlement for $16.375 million, in

16

*Taylor v. Trusted Media Brands, Inc.*, No. 16-cv-01812-KMK (S.D.N.Y.), a case brought under the PPPA wherein Judge Karas approved a class-wide settlement for $8.225 million, and in *Moeller v. American Media, Inc.*, No. 16-cv-11368-JEL (E.D. Mich.), a case brought under the PPPA wherein Judge Levy approved a class-wide settlement for $7.6 million.  *Id.*  Class Counsel is also counsel for plaintiff in another PPPA putative class actions pending in this District, wherein it reached proposed class-wide settlement for $50 million, which is pending preliminary approval.  *See Hearst*, No. 15-cv-09279-AT (S.D.N.Y.) at Dkt. 289 (motion for preliminary approval of a $50 million class-wide settlement).  *Hearst* survived a motion to dismiss, *see* Marchese Decl. ¶ 18, and the plaintiff won a motion for partial summary judgment.  *Id.* ¶ 40.

Moreover, Class Counsel has been recognized by courts across the country for its expertise.  *See* Firm Resume, Marchese Decl. Ex. M; *see also Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 566 (S.D.N.Y. Feb. 25, 2014) (Rakoff, J.) ("Bursor & Fisher, P.A., are class action lawyers who have experience litigating consumer claims. … The firm has been appointed class counsel in dozens of cases in both federal and state courts, and has won multi-million dollar verdicts or recoveries in five class action jury trials since 2008.").

Furthermore, "[t]he quality of the opposition should be taken into consideration in assessing the quality of the plaintiffs' counsel's performance."  *In re MetLife Demutalization Litig.*, 689 F. Supp. 2d 297, 362 (E.D.N.Y. 2010).  Class Counsel achieved an exceptional result in this case while facing well-resourced and experienced defense counsel.  *See Marsh ERISA Litig.*, 265 F.R.D. at 148 ("The high quality of defense counsel opposing Plaintiffs' efforts further proves the caliber of representation that was necessary to achieve the Settlement.").

Class Counsel litigated this case efficiently, effectively, and civilly.  The excellent result is a function of the high quality of that work, which supports the requested fee award.

### 5.    The Requested Fee In Relation To The Settlement

Class Counsel seeks attorneys' fees of one-third of the $13.75 million cash settlement fund.  As aforementioned, courts in this Circuit routinely approve fee requests for one-third of a common fund.  *See supra* cases cited in Argument § I.  Moreover, the requested fees of one-third of the settlement fund is an equal percentage to that approved by other courts in this District.  *See Taylor v. Trusted Media Brands, Inc.*, No. 16-cv-01812-KMK, Dkt. 87 (S.D.N.Y. Feb. 1, 2018) (awarding one-third of $8.225 million settlement fund resolving plaintiff's PPPA claim); *Ruppel v. Consumers Union of United States, Inc.*, No. 16-cv-02444-KMK, Dkt. 111 (S.D.N.Y. Dec. 4, 2018) (awarding one-third of $16.375 million settlement fund resolving plaintiff's PPPA claim).  And it is a lesser percentage than courts have approved in the Eastern District of Michigan.  *See Perlin v. Time Inc.*, No. 16-cv-10635-GCS, Dkt. 55 (E.D. Mich. Oct. 15, 2018) (awarding 40% of $7.4 million settlement fund resolving plaintiff's PPPA claim); *Kinder v. Meredith Corp.*, No. 14-cv-11284-TLL, Dkt. 81 (E.D. Mich. May 18, 2016) (awarding 35% of $7.5 million settlement fund resolving plaintiff's PPPA claim); *Moeller v. American Media, Inc.*, No. 16-cv-11367-JEL, Dkt. 42 (E.D. Mich. Sept. 28, 2017) (awarding 35% of $7.6 million settlement fund resolving plaintiff's PPPA claim).  This factor thus supports the requested fee award.

### 6.    Public Policy Considerations

The final *Goldberger* factor is public policy.  "Skilled counsel must be incentivized to pursue complex and risky claims [that protect the public on a contingency basis]."  *Shapiro*, 2014 WL 1224666, at *24.  As such, reasonable fee awards must be provided in order to ensure that attorneys are incentivized to litigate class actions, which serve as private enforcement tools to police defendants who engage in misconduct.  *See id.*  "Attorneys who fill the private attorney general role must be adequately compensated for their efforts," otherwise the public risks an absence of a "remedy because attorneys would be unwilling to take on the risk."  *Massiah v.*

*MetroPlus Health Plan, Inc.*, 2012 WL 5874655, at *7 (E.D.N.Y. Nov. 20, 2012) (citing

*Goldberger*, 209 F.3d at 51).  Further, when individual class members seek a relatively small

amount of statutory damages, "economic reality dictates that [their] suit proceed as a class action

or not at all."  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 161 (1974).

Society undoubtedly has a strong interest in incentivizing lawyers to bring complex

litigation that is necessary to protect the privacy of consumers' personal reading choices.  In fact,

class action litigation in this area is the most realistic means of safeguarding the privacy of

readers under the PPPA, especially because consumers are generally unaware that their privacy

rights are being violated by these data sharing practices (here, Plaintiff alleged that Condé Nast

secretly disclosed its customers' personal reading information).  *See also TMBI* Hearing Tr. at

17:23-25 ("Here the private Attorney General role is something that does merit compensation

and this case is another example of that.").  Thus, the alternative to a class action in this case

would have been no enforcement at all, and Condé Nast's allegedly unlawful conduct would

have continued unabated.  This factor thus supports the requested fee award.

### C.    The Requested Attorneys' Fees Are Also Reasonable Under A Lodestar Cross-Check

A lodestar cross-check further supports the requested fee.  Courts applying the lodestar

method generally apply a multiplier to take into account the contingent nature of the fee, the

risks of non-payment, the quality of representation, and the results achieved.  *See Wal–Mart

Stores, Inc.*, 396 F.3d at 121.  Where the lodestar is "used as a mere cross-check, the hours

documented by counsel need not be exhaustively scrutinized by the district court."  *Goldberger*,

209 F.3d at 50; *see also Cassese v. Williams*, 503 F. App'x 55, 59 (2d Cir. 2012) (noting the

"need for exact [billing] records [is] not imperative" where the lodestar is used as a "mere cross-

check").

To calculate lodestar, counsel's reasonable hours expended on the litigation are

multiplied by counsel's reasonable rates.  *See Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986); *Blum v. Stenson*, 465 U.S. 886, 897 (1984); *Parker v. Time Warner Entertainment Co., L.P.*, 631 F. Supp. 2d 242, 264 (E.D.N.Y. 2009).  The resulting figure may be adjusted at the court's discretion by a multiplier, taking into account various equitable factors.  *See Parker*, 631 F. Supp. 2d at 264; *Shapiro*, 2014 WL 1224666, at *24 ("Additionally, under the lodestar method, a positive multiplier is typically applied to the lodestar in recognition of the risk of litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors.") (internal quotations and citations omitted).

The hourly billing rate to be applied is the hourly rate that is normally charged in the community where the counsel practices, *i.e.*, the "market rate."  *See Blum*, 465 U.S. at 895; *see also Luciano v. Olsten Corp.*, 109 F.3d 111, 115-116 (2d Cir. 1997) ("The 'lodestar' figure should be 'in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation'") (alteration in original and citation omitted).  Here, the hourly rates used by Class Counsel are comparable to rates charged by attorneys with similar experience, skill, and reputation, for similar services in the New York legal market.  *See* Marchese Decl. ¶¶ 65-69.[2]

The hours worked, lodestar fee, and expenses for Class Counsel are set forth in the declaration of Mr. Marchese, submitted herewith.  These records confirm Class Counsel's efficient billing.  For example, Class Counsel strives to assign as much work as possible to less

---

[2]  The Supreme Court and other courts have held that the use of current rates is proper since such rates compensate for inflation and the loss of use of funds. *See Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989) (recognizing "an appropriate adjustment for delay in payment—whether by the application of current rather than historic hourly rates or otherwise"); *LeBlanc-Sternberg v. Fletcher,* 143 F. 3d 748, 764 (2d Cir. 1998) ("The lodestar should be based on 'prevailing market rates' … and current rates, rather than historical rates, should be applied in order to compensate for the delay in payment.") (citation omitted).

senior lawyers or paralegals who bill at lower hourly rates in order to minimize fees for the

Class.  Approximately 60.3% of Class Counsel's hours (787.1 hours) were billed by attorneys

who were associates at the time, or by paralegals.  *Id.* ¶ 60.  However, this was a complex case

that involved a lot of novel legal issues, which required some involvement by more experienced

lawyers.  Thus, attorneys who were partners billed approximately 39.7% of the total hours (518.3

hours), primarily on the pre-suit investigation, developing the litigation strategy, deposing

witnesses and defending depositions, drafting briefs on dispositive motions, making court

appearances, attending mediation, and negotiating the settlement.  *See id.*

Thus, even under the optional lodestar cross check, Class Counsel's requested fees are

reasonable given the unique circumstances of this case.  Specifically:

- Class Counsel obtained an exceptional settlement, which will result in class members receiving a substantial amount of money quickly.

- The litigation was conducted and the settlement was obtained in an efficient manner, by experienced and qualified counsel.

- The case involved complex and novel legal issues and factual theories, which involved significant litigation risks.

- Class Counsel devised a litigation and settlement strategy that factored in the complex and uncertain nature of the case, including Defendant's recent financial and business positioning.

In total, through November 30, 2018, Class Counsel billed 1,305.4 hours, which at their

hourly rates amounts to a lodestar of $818,557.50.  *See id.* ¶ 61.  Therefore, the requested fee

award reflects a 5.59 times multiplier on Class Counsel's regular hourly rates.  This multiplier is

well within the accepted range in this Circuit.  *See Asare v. Change Grp. of N.Y., Inc.*, 2013 WL

6144764, at *19 (S.D.N.Y. Nov. 18, 2013) ("Typically, courts use multipliers of 2 to 6 times the

lodestar."); *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 482 (S.D.N.Y. 2013) (approving

attorneys' fees of 33% of a $4.9 million common fund, representing a 6.3 times multiplier on

Class Counsel's regular hourly rates); *In re Credit Default Swaps Antitrust Litig.*, 2016 WL 2731524, at *17 (S.D.N.Y. Apr. 26, 2016) (approving attorneys' fees of $253,758,000, which reflected a "lodestar multiplier of just over 6").  And it is lower than the multipliers approved in PPPA cases by other courts in this District.  *See TMBI* Hearing Tr. at 18:4-12 (approving attorneys' fees of one-third of an $8.225 million common fund, representing an 11.7 times multiplier on Class Counsel's regular hourly rates); *Ruppel*, No. 16-cv-02444-KMK, Dkts. 104, 111 (S.D.N.Y. 2018) (approving attorneys' fees of one-third of a $16.375 million common fund, representing an 8.18 times multiplier on Class Counsel's regular hourly rates).

| Southern District of New York PPPA Class Action Settlements | | | |
|---|---|---|---|
| Case | Cash Settlement Fund | Awarded Attorneys' Fees Percentage | Lodestar Multiplier |
| *Taylor v. Trusted Media Brands, Inc.*, No. 16-cv-01812 | $8,225,000 | One-Third | 11.7 |
| *Ruppel v. Consumers Union of United States, Inc.*, No. 16-cv-02444 | $16,375,000 | One-Third | 8.18 |
| *Moeller v. Advance Magazine Publishers, Inc. d/b/a Condé Nast*, No. 15-cv-05671 | $13,750,000 | One-Third (sought) | 5.59 |

Moreover, as courts in this District have noted, a higher multiplier "should not result in penalizing plaintiffs' counsel for achieving an early settlement, particularly where, as here, the settlement amount was substantial."  *Beckman*, 293 F.R.D. at 482.  Further, due to Condé Nast's summary judgment motion, Class Counsel recognized that a settlement was the best result for the class members, as continued litigation would have resulted in Plaintiff and the Settlement Class recovering nothing, had the motion been granted.

Class Counsel's lodestar multiplier is also reasonable because it will decrease over time.  *See* Marchese Decl. ¶ 62.  "[A]s class counsel is likely to expend significant effort in the future

implementing the complex procedure agreed upon for collecting and distributing the settlement funds, the multiplier will diminish over time." *Parker v. Jekyll & Hyde Entm't Holdings, LLC*, 2010 WL 532960, at *2 (S.D.N.Y. Feb. 9, 2010).  Here, "[t]he fact that Class Counsel's fee award will not only compensate them for time and effort already expended, but for time that they will be required to spend administering the settlement going forward, also supports their fee request." *Yuzary*, 2013 WL 5492998, at *11 (quoting *McMahon v. Olivier Cheng Catering & Events, LLC*, 2010 WL 2399328, at *8 (S.D.N.Y. Mar. 3, 2010)).

In sum, Class Counsel's efforts in this case resulted in an exceptional settlement of a complex and uncertain case.  Class Counsel should be rewarded for achieving this result.

## II.   CLASS COUNSEL'S LITIGATION COSTS AND EXPENSES ARE REASONABLE AND WERE NECESSARILY INCURRED TO ACHIEVE THE BENEFIT OBTAINED ON BEHALF OF THE CLASS

To date, Class Counsel incurred out-of-pocket costs and expenses of $33,084.46. *See* Marchese Decl. ¶ 64, Ex. C.  These expenses are categorized in the Marchese Declaration submitted to the Court herewith.  The incurred costs include court fees, mediation fees, legal research charges, travel costs, postage fees, court reporting fees, and other related costs.  *See id.*

"Courts typically allow counsel to recover their reasonable out-of-pocket expenses." *McMahon*, 2010 WL 2399328, at *8.  Indeed, "[c]ourts in the Second Circuit normally grant expense requests in common fund cases as a matter of course."  *In re EVCI Career Colleges Holding Corp. Sec. Litig.*, 2007 WL 2230177, at *18.  The expenses categorized in the attorney declaration submitted herewith reflect commonly reimbursed expenses.  *See Yuzary*, 2013 WL 5492998, at *11 ("Class Counsel's unreimbursed expenses, including court and process server fees, postage and courier fees, transportation, working meals, photocopies, electronic research, expert fees, and Plaintiffs' share of the mediator's fees, are reasonable and were incidental and necessary to the representation of the class."); *In re Visa Check/Mastermoney Antitrust Litig.*,

297 F. Supp. 2d 503, 525 (E.D.N.Y. 2003) ("I award Lead Counsel reimbursement from the

Fund for … costs and expenses.  …  [T]hese expenses reflect[] the costs of … litigation and trial

support services, document imaging and copying, deposition costs, online legal research, and

travel expenses.  …  I see no reason to depart from the common practice in this circuit of

granting expense requests."), *aff'd*, *Wal-Mart Stores, Inc.*, 396 F.3d 96 (2d Cir. 2005).

Each of these costs and expenses was necessarily and reasonably incurred to bring this

case to a successful conclusion.  Moreover, the costs and expenses only equate to approximately

0.2% of the settlement fund.  *See In re IMAX Secs. Litig.*, 2012 WL 3133476, at *6 (S.D.N.Y.

Aug. 1, 2012) (listing cases approving costs and expenses totaling approximately 2% of the

settlement funds).  The Court should therefore approve the reimbursement of costs and expenses

in the amount of $33,084.46.

## III.  THE REQUESTED INCENTIVE AWARD REFLECTS MS. MOELLER'S ACTIVE INVOLVEMENT IN THIS ACTION AND SHOULD BE APPROVED

Incentive awards are common in class action cases and serve to "compensate plaintiffs

for the time and effort expended in assisting the prosecution of the litigation, the risks incurred

by becoming and continuing as a litigant, and any other burdens sustained by the plaintiff[s]."

*Reyes*, 2011 WL 4599822, at *9.  Incentive awards fulfill the important purpose of compensating

plaintiffs for the time they spend and the risks they take.  *Massiah*, 2012 WL 5874655, at *8.

Here, the participation of Ms. Moeller was critical to the ultimate success of the case.

*See* Marchese Decl. ¶¶ 74-76.  Ms. Moeller spent approximately 70 hours protecting the interests

of the class through her involvement in this case.  *See* Declaration of Elizabeth Moeller

("Moeller Decl.") ¶ 11.  Ms. Moeller assisted Class Counsel in investigating her claims, by

detailing her magazine subscription histories and aiding in drafting the FAC.  *Id.* ¶¶ 3-4.  During

the course of this litigation, Ms. Moeller kept in regular contact with his lawyers to receive

updates on the progress of the case and to discuss strategy.  *Id.* ¶ 5.  Further, Ms. Moeller

preserved and produced documents in discovery. *Id.* ¶ 6. And Ms. Moeller prepared for and sat for her deposition in New York City. *Id.* ¶ 7. Finally, Ms. Moeller was actively consulted during the settlement process. *Id.* ¶ 8.

On these facts, the $10,000 incentive payment is fair and reasonable. Indeed, Judge Karas approved an incentive award of $5,000 for the Class Representative in *Taylor*, but she did not sit for a deposition, and she had spent approximately 30 hours protecting the interests of the class through her involvement in the case. *TMBI* Hearing Tr. at 15:10-19. Here, by contrast, Ms. Moeller sat for a deposition in New York City and spent approximately 70 hours protecting the interests of the class through her involvement in the case. Moeller Decl. ¶¶ 7, 11. Thus, a higher incentive award is warranted.

Moreover, the requested $10,000 is well within the range of incentive awards approved by this Court and others in this Circuit. *See, e.g.*, *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2018 WL 3863445, at *2 (S.D.N.Y. Aug. 14, 2018) (approving incentive awards of $25,000); *Dornberger v. Metro. Life Ins. Co.*, 203 F.R.D. 118, 125 (S.D.N.Y. 2001) (noting case law supports payments of between $2,500 and $85,000). Finally, the requested incentive award is approximately 0.07% of the Settlement Fund, which is similar to other cases. *See, e.g.*, *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 131 (S.D.N.Y. Oct. 22, 2009) (approving incentive award of approximately 0.1% of the settlement fund).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court (1) approve attorneys' fees in the amount of one-third of the settlement fund, or $4,583,333.33, (2) approve reimbursement of costs and expenses in the amount of $33,084.46; (3) grant Ms. Moeller an incentive award of $10,000 in recognition of her efforts on behalf of the class, and (4) award such other and further relief as the Court deems reasonable and just.

Dated:  December 20, 2018

Respectfully submitted,


By:    */s/ Joseph I. Marchese*
         Joseph I. Marchese

**BURSOR & FISHER, P.A.**
Scott A. Bursor
Joseph I. Marchese
Philip L. Fraietta
888 Seventh Avenue
New York, NY 10019
Telephone:  (646) 837-7150
Facsimile:  (212) 989-9163
Email:  scott@bursor.com
         jmarchese@bursor.com
         pfraietta@bursor.com

*Class Counsel*